DECLARATION OF DR. BRAD A. MYERS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GIRAFA.COM, Inc,

      Plaintiff,

    v.

Amazon Web Services LLC,
Amazon.com, Inc.,
Alexa Internet, Inc.,
IAc Search & Media, Inc.,
Snap Technologies, Inc.,
Yahoo! Inc.,
Smartdevil Inc.,
Exalead, Inc., and
Exalead S.A,

      Defendants.

C.A. No. 07-787

## DECLARATION OF DR. BRAD A. MYERS

TABLE OF CONTENTS

Page

I.    Introduction ............................................................................................................ 1
II.   Summary of Opinions .......................................................................................... 1
III.  My Qualifications ................................................................................................ 2
IV.   Report Preparation .............................................................................................. 3
V.    Instructions ........................................................................................................... 3
VI.   Person of Ordinary Skill in the Art .................................................................. 7
VII.  Overview of the Patent ....................................................................................... 7
VIII. Claim Construction ............................................................................................ 11
      A.   Thumbnail visual image ............................................................................ 11
      B.   Image server ................................................................................................ 11
      C.   Home page .................................................................................................... 11
      D.   Hyperlink ..................................................................................................... 12
      E.   Hovering over .............................................................................................. 12
      F.   Visualization functionality ....................................................................... 12
IX.   Infringement Analysis ....................................................................................... 12
      A.   Snap.Com Classic and Enhanced, and Snap Shots .............................. 13
      B.   Smartdevil (Thumbshots) ......................................................................... 17
      C.   Amazon/Alexa/AWS ................................................................................. 18
X.    Validity ................................................................................................................. 19
XI.   Secondary Considerations ................................................................................ 22
      A.   Long-felt But Unsolved Need, and Failure of Others ......................... 22
      B.   The Commercial Success of the Claimed Invention ........................... 22
           1.   Commercial Success of Thumbnails in General .......................... 22
           2.   Commercial Success of Supplying Images from Separate Servers and Substituting
                Home Pages for the Target Pages .................................................... 25

**Myers Declaration Exhibits:**
Exhibit A:     CV of Brad A. Myers, Ph.D.
Exhibit B:     List of cases where Brad A. Myers has testified
Exhibit C:     Excerpts from the file history of U.S. Patent No. 6,864,904.
Exhibit D:     Claim chart comparing the '904 patent to Snap Classic
Exhibit E:     Claim chart comparing the '904 patent to Snap Enhanced
Exhibit F:     Claim chart comparing the '904 patent to Snap Shots
Exhibit G:     Claim chart comparing the '904 patent to Smartdevil (Thumbshot) products
Exhibit H:     Claim chart comparing the '904 patent to Amazon/Alexa/AWS
Exhibit I:     Excerpts from Amazon/Alexa/AWS webpages
Exhibit J:     Excerpts from Snap webpages
Exhibit K:     Excerpts from Smartdevil (Thumbshots) webpages
Exhibit L:     Article entitled "Visual Relevance: the Affect of Ask's Preview Tool on Click
               Throughs" July 12, 2006
Exhibit M:     Screen shots used in Claim Charts

i

DECLARATION OF DR. BRAD A. MYERS

## I.      Introduction

1.      In this litigation, Girafa.com ("Girafa") has asserted that Amazon Web Services LLC, Amazon.com, Inc., Alexa Internet, Inc., IAC Search & Media, Inc., Snap Technologies, Inc., Yahoo! Inc., Smartdevil Inc., Exalead, Inc., and Exalead S.A, ("defendants") have infringed (directly and/or under the doctrine of equivalents) various claims of US patent 6,864,904 ("'904 patent") assigned to Girafa.

2.      The '904 patent was filed on Nov. 8, 2000, and claims priority from Provisional Application Ser. No. 60/169,328, filed Dec. 6, 1999 (see '904 patent at (60) and col. 1, lines 5-6).

3.      I have been retained as a technical expert in this case by Girafa.com to address infringement and validity issues.  I am being compensated for the time that I spend consulting in this matter at $400/hour. This compensation is not dependent on the outcome of the case.  I have no personal interest in this litigation.

## II.     Summary of Opinions

4.      Based on my understanding of the patent and its claims, and my analysis of the various products with the information available to me at this time, I believe that certain products do infringe the '904 patent.

5.      In particular, I believe that Snap Classic from Snap Technologies, Inc., infringes claims 1, 4, 5, 7, 12, 15, 18, 21, 22, 24, 29, 32, 35, 38, 39, 41, 44, 45, 46, 49, 50, 52, 55, and 56 of the '904 patent.

6.      I believe that Snap Enhanced from Snap Technologies, Inc., infringes claims 1, 4, 7, 12, 18, 21, 24, 29, 35, 38, 41, 44, 46, 49, 52, and 55 of the '904 patent.

7.      I believe that the Snap Shots browser add-on from Snap Technologies, Inc., infringes claims 35, 38, 39, 41, 45, 46, 49, 50, 52, and 56 of the '904 patent.

8.      I believe that Smartdevil (Thumbshots) from Smartdevil Inc. infringes claims 1, 4, 6, 7, 12, 13, 14, 18, 21, 23, 24, 29, 30, 31, 35, 38, 40, 41, 42, 44, 46, 49, 51, 52, and 53 of the '904 patent.

1

DECLARATION OF DR. BRAD A. MYERS

9.      I believe that Amazon/Alexa/AWS from Amazon Web Services LLC, Amazon.COM, Inc., and Alexa Internet, Inc., infringes claims 1, 4, 6, 7, 12, 13, 14, 18, 21, 23, 24, 29, 30, 31, 35, 38, 40, 41, 42, 44, 46, 49, 51, 52, and 53 of the '904 patent.

### III.    My Qualifications

10.     I am currently a Professor in the Human-Computer Interaction Institute, which is part of the School of Computer Science at Carnegie Mellon University.  My areas of expertise include user interface design, user interface software, computer science, visual programming, handheld devices, and demonstrational interfaces.

11.     I have been working in the field of user interfaces (also called Human Computer Interaction or "HCI") for over 25 years, and I am the author or editor of over 325 publications.  I have been on the editorial board of five journals, including the premier journals in the field of HCI.  I have been a consultant on user interface design and implementation to over 60 companies.

12.     I received a Bachelor of Science in Computer Science and Engineering and Master of Science in Computer Science from the Massachusetts Institute of Technology ("MIT") in 1980.  I received my Doctorate in Computer Science from the University of Toronto in 1987.

13.     I worked at the Three Rivers Computer Corporation (later renamed Perq Systems Corporation) from 1980 to 1983 where I designed and implemented software, including one of the first commercial window managers.

14.     Over the course of my career, I have authored multiple articles relating to, among other subjects, window management, handheld computing, user interface software, visualization, intelligent interfaces, and novel interaction techniques.  In recognition of my contributions to research, I was selected as a Fellow of the Association for Computing Machinery ("ACM") in 2005, and elected to the "CHI Academy" by the Special Interest Group on Computer-Human Interaction ("SIGCHI") of the ACM in April 2004, as one of the top 25 "principal leaders of the field" of HCI.  I have also received a number of "best paper" awards, for example at the 27th

International Conference on Software Engineering in 2005, at the ACM SIGACCESS Conference on Computers and Accessibility in 2004, and at the ACM SIGCHI 2006 Conference on Human Factors in Computing Systems.

15.    I regularly teach courses on user interface design and software. In particular, I have taught a course on Human-Computer Interaction in eCommerce since 2001.

16.    I am listed as an inventor on U.S. Patent No. 5,581,677, relating to interaction techniques for creating charts and graphs.  I am also listed as an inventor on two pending patent applications, one relating to a more stable technique of entering text for handheld devices for people with muscular disabilities, and the other relating to a technique for debugging computer programs that displays a visualization to show why certain events happen in a program.

17.    My qualifications for forming the opinions set forth in this report are listed in this section and in Exhibit A attached which is my *curriculum vitae*.  Exhibit A also includes a list of my publications.

18.    Exhibit B provides a listing of when I have testified as an expert at trial or in a deposition within the last four years.

**IV.    Report Preparation**

19.    In developing the opinions discussed in this report, I studied the '904 Patent, its prosecution history and the references cited during prosecution of the patent. I also operated the systems and software plugins and examined the websites discussed in this report. I also reviewed the "Complaint for Patent Infringement" filed on December 5, 2007.

20.    I reserve the right to supplement this declaration if necessary based on new information about the systems.

**V.    Instructions**

21.    I am not an attorney.  For the purposes of this report, I have been informed about certain aspects of the law that are relevant to my analysis and opinion.  In formulating my opinions, I have taken into account the following principles of the law regarding patent infringement and validity, which I understand to be accurate statements of the law:

22.     I understand that infringement involves a two-step analysis and that the first step is determining the proper construction of the asserted claims.

23.     I have been instructed that ultimately claims are construed by the judge in light of how one of ordinary skill in the art would understand the claims. It is my understanding that what is to be considered includes the claims, the patent specification and drawings, and the prosecution history including any art listed by the Examiner or the applicant. It is my understanding that information external to the patent, including expert and inventor testimony and unlisted prior art, are to be considered in construing the claims only if ambiguities remain. However, expert testimony may be useful in helping to explain the technology. I further understand technical dictionaries, encyclopedias, and treatises may also be used in claim construction, as long as these definitions do not contradict any definition found in or ascertained by a reading of the patent documents.

24.     I understand that the second step of the infringement analysis is determining whether the accused products contain the elements of the asserted claims.  A product is covered by and, thus, infringes a patent claim if the product meets or embodies each and every limitation of the patent claim, either literally or under the doctrine of equivalents.  A method claim is infringed when each of the recited steps are performed.

25.     I understand that an accused product literally infringes if it contains every limitation of the claim. I further understand that the failure to meet a single limitation is sufficient to negate literal infringement of a claim.

26.     It is my understanding that an accused product that does not literally infringe a claim may nonetheless infringe the claim under the doctrine of equivalents. It is my understanding that, to establish infringement under the doctrine of equivalents, the accused product must be shown to include an equivalent for each claim limitation that is literally absent.

27.     It is my understanding that infringement under the doctrine of equivalents may be established by showing that the elements of the accused product perform substantially the same function, in substantially the same way, to achieve substantially the same result as the

4

corresponding elements of the patented invention. An insubstantial change to the claimed element is an equivalent. I understand that if it is known at the time of infringement that two elements are interchangeable, then their differences may be insubstantial for purposes of the doctrine of equivalents.

28.    I understand that patents are presumed to be valid. I understand that invalidity must be proven by clear and convincing evidence, and that is the standard I have used throughout my report. Further, I understand that each patent claim is considered separately for purposes of invalidity.

29.    I am informed that a patent claim is invalid as "anticipated" if each and every feature of the claim is found, expressly or inherently, in a single prior art reference or product. Claim limitations that are not expressly found in a prior art reference are inherent if the prior art necessarily functions in accordance with, or includes, the claim limitations. It is acceptable to examine evidence outside the prior art reference (extrinsic evidence) in determining whether a feature, while not expressly discussed in the reference, is necessarily present in it.

30.    I understand that a patent claim is invalid as "obvious" if, in view of a prior art reference or a combination of prior art references, it would have been obvious to a person of ordinary skill in the art at the time of the invention, taking into account:

- •    the scope and content of the prior art;
- •    the differences between the prior art and the claim under consideration;
- •    the level of ordinary skill in the art.

31.    I am informed that legal principles regarding invalidity of a claim due to obviousness were recently addressed by the U.S. Supreme Court. I am informed that the principles relating to a motivation," "suggestion," or "teaching" in the prior art to combine references to produce the claimed alleged invention remain an appropriate approach in a validity analysis. I am informed that the suggestion or motivation may be either explicit or implicit, may come from knowledge generally available to one of ordinary skill in the art, and may come from the nature of the problem to be solved. The test for an implicit motivation, suggestion, or

teaching is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art. The problem examined is not the specific problem solved by the invention but the general problem that confronted the inventor before the invention was made.

32.   I am informed, however, that the U.S. Supreme Court clarified that additional principles may also be applied in such an analysis. I set forth some such additional principles below.

33.   As I understand it, it is no longer always required to present evidence of a teaching, suggestion, or motivation to combine prior art references for purposes of determining whether an invention is obvious. Prior art can be combined based on either a teaching, suggestion, or motivation from the prior art itself, or from a reasoned explanation of an expert or other witness.

34.   A patent claim composed of several elements, however, is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.  In order to prove obviousness it must be shown that the improvement is not more than the predictable use of prior-art elements according to their established functions. To determine whether there was an apparent reason to combine the known elements in the way a patent claims, it will often be necessary to look to interrelated teachings of multiple peaces of prior art, to the effects of demands known to the design community or present in the marketplace, and to the background knowledge possessed by a person having ordinary skill in the art. Also, in determining obviousness, one must be aware of the distortion caused by the hindsight bias and be cautious of arguments reliant upon hindsight reasoning. An obviousness argument cannot be sustained by mere conclusory statements; instead, it must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.

35.   In an obviousness analysis, it is my understanding that there are "secondary considerations" that should be analyzed if they apply.  I am told that these considerations include

whether the prior art teaches away from the claimed invention, whether there was a long felt but unresolved need for the claimed invention, whether others tried but failed to make the claimed invention, whether the claimed invention was commercially successful, whether the claimed invention was praised by others and whether the claimed invention was copied by others.

## VI.     Person of Ordinary Skill in the Art

36.     The patent says the field of the invention is "Internet methodologies and systems generally and more particularly to systems and methodologies for displaying information received over the Internet" (col. 1, lines 12-15). Thus, one of ordinary skill in the art would have a bachelor's degree in computer science or related degree or equivalent experience, and at least 2 years of experience in Internet technologies or user interface design.

## VII.    Overview of the Patent

37.     This patent describes a way to present a web page in a browser, and at the same time, present thumbnail images of other web pages that are hyperlinked from the web page. Some of the web pages are said to be comprised of HTML (e.g., col. 1, lines 66-67). HTML is the HyperText Markup Language, which is the predominant encoding for describing formatted text-based information for the web. There are at least three embodiments described in the specification.

38.     The first embodiment is represented in FIG. 1 of the patent, and has the thumbnail pictures along side the original web page. This embodiment is explained at col. 5, lines 61-65: "to provide to a user, via the web browser 100, an annotated web page 110, which preferably includes the web page 101 having alongside it images 112 of homepages linked with web page 101."



**Excerpt of FIG. 1**

39.     The second embodiment is represented in FIG. 2 of the patent, and has the thumbnail pictures included in the web page, by modifying the html of the original web page to include the thumbnails. This embodiment is described in col. 6, lines 26-32: "The visualization functionality 206 is operative to embed within a dynamically generated web page, such as an HTML page, commands to the web browser 200 to download via the image server 210 from the image database 212 images of web pages which are referenced in hyperlinks contained in a web page 213 and to provide to a user, via the web browser 200, the web page 213 annotated to include therewithin images 216 of homepages linked therewith."

DECLARATION OF DR. BRAD A. MYERS



**Excerpt of FIG. 2**

40.      The third embodiment has the thumbnail images pop-up on top of the image of the web page, so they appear to be hovering, like a pop-up window or pop-up menu. This embodiment is described in col. 6, lines 32-40: "It is also appreciated that either or both of the embodiments FIGS. 1 and 2 may provide images of web pages which are referenced in hyperlinks contained in a web page, which images hover either over or alongside the hyperlinks."

41.      In allowing the claims '904 patent, the examiner mentioned two elements that were missing from the prior art: the particular use of image servers, and for some claims, the display of home pages instead of the directly hyperlinked target webpages (see US patent 6,864,904 file history[1] at pp. 115-116 in Exhibit C. See also the discussion in section X below).

---

[1] I have provided an excerpt of the file history for US patent 6,864,904 with page numbers for easier reference. See attached Exhibit C.

42.     The patent explains that the thumbnail images are provided by a *separate server* from the web server that provides the original web page. The separate image server is described in the specification at various places, including FIGS 1 and 2, and col. 5, lines 48-51: "The web browser 100 preferably includes visualization functionality 103 which interfaces, typically via the Internet, with an image server 104."

43.     In their letter to the examiner of June 10, 2004, the inventors say (p. 18): "The system and method of the present invention, as recited in claims 41 and 52, provide a separate web server and image server. According to the prior art method, wherein the image server and web server are combined, the web server and image server are each limited by the limitations of the other. Additionally, an image server provider would be required to adapt his technology to every web server. These limitations are not present in the system and method of the present invention. Additionally, the system and method of the present invention, which separates the image server from the web server, allows a single image server to capture and serve images of web pages from multiple web servers." ('904 patent file history at page 90 in Exhibit C).

44.     Another important element (reflected in some but not all claims) is that the thumbnail image is not an image of the web page which is the target of the hyperlink. Instead, the image is of the *home page* of the site of the target web page. This is described in various places including col. 5, lines 59-65: "The visualization functionality 103 is operative to download via the image server 104 from the image database 106 images of web pages which are referenced in hyperlinks contained in the web page 101 and to provide to a user, via the web browser 100, an annotated web page 110, which preferably includes the web page 101 having alongside it images 112 of homepages linked with web page 101." See also: col. 8, lines 4-7: "Each downloader 606 retrieves from the Internet, the homepage and the embedded objects corresponding to the URL supplied to it by the controller". FIG. 4 and the discussion of col. 6, line 64 – col. 7, line 62 explains how to obtain the home page from the hyperlink URL.

45.     In differentiating their invention from the prior art, the inventors emphasize this element: "While the applicant agrees that Miller teaches displaying thumbnails of documents, the applicant respectfully submits that Miller displays thumbnails of linked pages and does not show or suggest displaying thumbnails of **the home pages of the linked pages**, as recited in amended claims 1 and 21." ('904 patent file history at page 88 in Exhibit C, emphasis in original)

## VIII.   Claim Construction

46.     In general, the terms in the asserted claims should have their plain and ordinary meaning. I have addressed some of these terms below. I reserve the right to provide further claim constructions and clarifications if necessary.

### A.     Thumbnail visual image

47.     A "thumbnail visual image" is an image that is a smaller version of a larger image. Support for this construction is in the specification at col. 2, lines 53-54: "causing said thumbnail generator to shrink said rendered image of the web page". See also col. 9, lines 24-25: "This snapshot is resized to a desired thumbnail size."

### B.     Image server

48.     An "image server" is a type of server that stores and delivers images. The prosecution history makes it clear that in the claims of this patent, the image server must be separate from the web server. Support for this construction is provided in FIGS 1 and 2, and at col. 2, lines 7-8: "download via the image server from an image database images of web pages"

### C.     Home page

49.     A "home page" is the main or front page of a web site. Support for this construction comes from the specification at FIG. 4 and col. 6, line 64 – col. 7, line 62.

### D.      Hyperlink

50.     A "hyperlink" is an element on a web page that links to another place on that web page or to an entirely different web page. Support for this construction comes from the specification at col. 2, line 8: "web pages which are referenced in hyperlinks".

### E.      Hovering over

51.     When an image appears "hovering over" a web page, that image is displayed so that it looks like it is in a layer in front of the other content. Support for this construction comes from the specification at col. 6, lines 32-40.

### F.      Visualization functionality

52.     "Visualization functionality" is software or hardware that provides one or more images to the user. Support for this construction comes from the specification at col. 5, lines 59-65: "The visualization functionality 103 is operative to download via the image server 104 from the image database 106 60 images of web pages which are referenced in hyperlinks contained in the web page 101 and to provide to a user, via the web browser 100, an annotated web page 110, which preferably includes the web page 101 having alongside it images 112 of homepages linked with web page 101".

## IX.     Infringement Analysis

53.     The infringement analysis presented below and in my detailed claim charts attached in Exhibits D through H are based on information that I have at this time, and I reserve the right to revise them to add or remove claims and evidence as new information becomes available.

DECLARATION OF DR. BRAD A. MYERS

A.      **Snap.Com Classic and Enhanced, and Snap Shots**

54.      I went to the web site www.snap.com on January 31, 2008 using Internet Explorer version 6.0, and analyzed the system, taking screen shots shown below and in the claim charts in Exhibits D, E and F.



www.snap.com home page, captured January 31, 2008

55.      To analyze "Snap Classic," I clicked on the link "Classic Web Search" at the bottom of the Snap.com home page. See my detailed analysis of Snap Classic in the claim chart

in Exhibit D. Below is a screen shot of Snap Classic providing a web page and a thumbnail image; see also a full-size picture in Exhibit M-1.



56.    To analyze "Snap Enhanced," I clicked on the link "Enhanced Web Search" at the bottom of the Snap.com home page. See my detailed analysis of Snap Enhanced in the claim chart in Exhibit E. Below is a screen shot of Snap Enhanced providing a web page and a thumbnail image; see also a full-size picture in Exhibit M-5.



**DECLARATION OF DR. BRAD A. MYERS**

57.    To analyze "Snap Shots," I clicked on the "Download" button in the section of the Snap.com home page that says "End Users".  This allowed me to download the Snap Shots add-on installer for Internet Explorer. This installed Snap Shots version 1.1.0.84 as a plug-in for Internet Explorer. See my detailed analysis of Snap Shots in the claim chart in Exhibit F. Below is a screen shot of Snap Shots providing a thumbnail image; see also a full-size picture in Exhibit M-9.



**DECLARATION OF DR. BRAD A. MYERS**

B.       **Smartdevil (Thumbshots)**

58.      I navigated to http://www.thumbshots.net/ on January 31, 2008 and on February 3, 2008 using Internet Explorer version 6.0, and analyzed the system, taking screen shots shown below and the claim chart in Exhibit G.



**www.thumbshots.net** home page, captured February 3, 2008

59.      Below is a screen shot of Smartdevil (Thumbshots) providing a web page and thumbnail images; see also a full-size picture in Exhibit M-12.



DECLARATION OF DR. BRAD A. MYERS

C.      Amazon/Alexa/AWS

60.      I navigated to http://www.alexa.com on January 31, 2008 and on February 3, 2008 using Internet Explorer version 6.0, and analyzed the system, taking screen shots shown below and in the claim chart in Exhibit H.



www.alexa.com home page, captured February 3, 2008

61.      Below is a screen shot of Amazon/Alexa/AWS providing a web page and thumbnail images; see also a full-size picture in Exhibit M-16.



18

## X.      Validity

62.     I have examined the prior art references cited by the inventors and the examiner, and agree with the examiner that the invention is patentable over the prior art references.

63.     Two patents formed the basis for many of the examiner's comments: US 6,613,100 to Miller, and US 6,665,838 to Brown et al.

64.     US 6,613,100 to Miller is titled, "Method and apparatus for displaying miniaturized graphical representations of documents for alternative viewing selection", and shows putting thumbnail pictures of related documents around a web page. FIG. 5 shows one embodiment of this idea.



FIG. 5 from US 6,613,100 to Miller

65.    Miller explains: "As depicted in FIG. 5, the web browser 100 encompasses the entire area defined by the display panel 260 of the GUI 200. The thumbnails 270 appearing on each of the selection panels 220 - 250 of the GUI 200 could be representative of alternative web pages for selection by the user (i.e., the thumbnail 270 is a miniaturized picture of the actual web page that it represents). Each thumbnail 270 is essentially a 'link' to an alternative web page, and, when selected by the user, causes the web browser 100 to display the selected web page on the web browser's display section 130." ('100 patent at col. 8, lines 9-21)

66.    US 6,665,838 to Brown, Lawrence and Paolini is titled, "Web page thumbnails and user configured complementary information provided from a server". It describes generating thumbnails for the hyperlinks on a page, and showing the thumbnails next to where the hyperlinks appear on the page. FIG. 8 shows one embodiment of this idea.



FIG. 8 from US 6,665,838 to Brown et al.

67.     Brown et al. explains: "If the thumbnail option has been selected, then the server parses the web page for links to other web pages... The server then generates thumbnails of each linked page that does not already have a thumbnail in the cache... Next, the server sends the thumbnails to the user (step 750). In one embodiment, the web page is regenerated with the thumbnails included and the modified web page is sent to the user. ... One method of modifying the web page prior to sending the web page with thumbnails is generating the web page such that, when the web page is viewed by the user, the thumbnails are displayed in-line (that is each thumbnail is placed below the preceding thumbnail in a vertical line) near the corresponding link on the currently displayed web page as illustrated in FIG. 8." ('838 patent at col. 7, lines 8-29)

68.     What is missing from the Miller and Brown et al. patents, that is also not found in any of the other prior art references, include at least the two elements discussed above in section VII: using an image server to provide the thumbnails that is separate from the web server that provides the web page, and using an image of the homepage instead of an image of the target web page of the hyperlink.

69.     In particular, in allowing the claims, the examiner said on Sept. 20, 2004:

> Prior art references do not anticipate or suggest the limitation "providing a thumbnail visual image of the home page of at least one web site which is represented by said at least one hyperlink via the Internet by employing an image server that stores and provides said thumbnail visual image" in combination with the other claim limitations in claims 1 and 21. ...

> Prior art references do not anticipate or suggest the limitation "providing a thumbnail visual image comprising employing a web browser which interfaces via the Internet with a web server, separated from said image server, including visualization functionality, said visualization functionality being operative to embed commands to the web browser to download, via said image server thumbnail visual images of web pages which represent hyperlinks contained in the web page and to provide to a user, via the web browser, an annotated web page" in combination with the other claim limitations in claims 41 and 52. ('904 patent file history at pp. 115-116 —see Exhibit C)

## XI.     Secondary Considerations

### A.     Long-felt But Unsolved Need, and Failure of Others

70.     Many of the prior art references discuss the advantages of using thumbnail images as a way to visualize web pages which have not yet been loaded, where those pages are hyperlinked from the current page. US patent 5,963,964 to Nielsen filed in 1996, US patent 6,613,100 to Miller filed in 1997, US patent 6,421,070 to Ramos filed in 1998, US patent 6,456,307 to Bates filed in 1998, US Patent US 6,526,424 to Kanno filed in 1998, and US patents 6,356,908 and 6,665,838 to Brown filed in 1999, all discuss the advantages of thumbnails for web pages.

71.     However, these prior art systems, unlike the '904 patent, did not provide a practical way to provide thumbnails, which includes using a separate image server from the web server to provide the thumbnails, and providing thumbnails of homepages instead of the target webpage. Advantages of having a separate image server include avoiding having to generate the thumbnails in real-time, and the ability to have the image server as a separate business from the web page provider (such as the search engine). Advantages of providing thumbnails of homepages instead of the target webpage include avoiding the requirement to create thumbnails on the fly for the target web pages, which might be dynamically generated. Also, since many sites are large, there are many more web pages than homepages, so storing homepages on the image server saves space. Thus, there was a long-felt but unsolved need, which others had failed to recognize and solve.

### B.     The Commercial Success of the Claimed Invention

#### 1.     Commercial Success of Thumbnails in General

72.     Snap.com advertises that the visual thumbnails are important to the appeal of its products and have been used millions of times. For example, in a press release dated March 5,

2007 announcing "Snap.com And Xanga Team Up To Deliver Instant Web Previews" (see

Exhibit J at pages 11-12), Snap.com says:

> Snap Preview Anywhere, the fastest-growing website enhancement service that delivers instant site previews, is now immediately available to all members of the Xanga.com weblog community. With Snap Preview Anywhere, visitors to a Xanga weblog now have access to instant previews of linked sites, adding to Xanga's already highly-customizable, user-generated community.
>
> "Our users have really embraced Snap Previews." said Bob Hiler, VP of Advertising at Xanga.com. "The response has been tremendous - less than 0.1% of our millions of users have opted-out of having Snap Previews on their Xanga sites."
>
> Snap Preview Anywhere gives website owners, bloggers and web publishers the ability to leverage Snap.com's award-winning visual search technology and massive library of webpage images for use on their own sites. By rolling over any link on a site that contains the Snap Preview Anywhere code, users instantly see a floating window with a visual preview of the corresponding webpage. This allows users to quickly decide if a site is worth visiting before actually clicking on the link.
>
> Since its introduction in November, Snap Preview Anywhere has seen rapid adoption, serving more than 350 million previews on more than 700,000 websites, and continues to grow exponentially every day. ...
>
> **About Snap Preview Anywhere**
> Snap Preview Anywhere gives website owners, bloggers and web publishers the ability to leverage Snap.com's award-winning visual search technology and massive library of webpage images for use on their own sites. By rolling over any link on a site that contains the Snap Preview Anywhere code, users instantly see a floating window with a visual preview of the corresponding webpage. This allows users to quickly decide if a site is worth visiting before actually clicking on the link.

73.    A few months later, Snap.com said in a press release from November 5, 2007

titled  (see Exhibit J at page 15):

> Currently, nearly 2,000,000 site owners and bloggers use Snap Shots to deliver a more compelling user experience; such sites include TechCrunch, Guy Kawasaki, Xanga.com, Wordpress, LiveJournal, et al. When mousing over a hyperlink, a small SnapShot window reveals content from the linked site formatted according to the content type, such as a video player from a YouTube link, a brief summary from a Wikipedia link, etc. Currently, Snap

Shots are used about 15 million times daily and have been translated into 43 languages by volunteers. ...

74.     Smartdevil also advertises the advantages of thumbnail images. For example (see Exhibit K, page 7):

> **A Picture Is Worth A Thousand Words**
> ... Thumbshots emphasize visual cues for content retrieval. Our preview technology embeds a tiny screenshot alongside the search results or directory listings will improve the information retrieval process. Thumbshots increase your productivity and improve user satisfaction because users are able to find the results they want faster and accurately. Users feel empowered because they know what to expect when clicking to a site. After all, searching shouldn't be a guessing game!
>
> Studies from Microsoft Research show search performance is significantly improved using thumbshot images. According to University of Calgary, users are extremely enthusiastic about the preview functionality because it helps locate web sites easier and faster.

75.     Smartdevil quotes from those studies. For example (see Exhibit K, page 11):

> Thumbshots improve user satisfaction by locating the information users want easily and removing the frustrations associated with searching. Studies confirm, thumbshots help reduce failed searches and increase user satisfaction:
>
> Microsoft Research: We examined the contribution of the thumbnail image to the speed and success of finding the target web page [...] We observed an initial significant slowdown in retrieval times when the thumbnail images were not available for inspection. It is clear that the significant drop in performance was due to the thumbnail cueing condition only." On average, subjects ranked the thumbnail images as the most helpful.
>
> University of Calgary: Five of the seven subjects were enthusiastic about the system, three of them extremely so, making statements such as "It'd be great to have a system like this."

76.     Smartdevil's press releases advertise the commercial success of using thumbnails. For example, one from June 16, 2005 says (see Exhibit K, page 25):

> Tuscany-Tuscany.org's team monitors the number of clicks each listing receives. Since the directory integrated thumbshots in December 2004, the team noticed a visible percentage increase in the number of clicks for listings with thumbshots receive in comparison to those without screenshots by up to 5

times. Thumbshots are screenshots of web pages in thumbnail sizes providing users a preview of the sites before they click on any of them.

77.     An article from July 12, 2006 about Ask.Com, which is not a party in the current action, also provides evidence of the commercial importance of thumbnail images for web pages (see Exhibit L):

> When Ask recently unveiled its newly updated site it surprised us with some exciting new features and brought attention to some of its older ones. One of these being a site preview tool in the form of a small set of binoculars that was introduced in June 2004. ... This enables the user to not only view the site's information but also preview the site directly from the SERPs [search engine results pages]. ... In [an] independent study, the binoculars reduced the number of clicks required to find relevant search results by 50-70% per search. ... After analyzing the results of [another small] survey, I was able to come up with a few conclusions: ... the ability to preview a site will indeed have an effect on click through rates.

### 2.     Commercial Success of Supplying Images from Separate Servers and Substituting Home Pages for the Target Pages

78.     The ability to supply images from separate servers, and to be able to substitute home pages for the target pages, seems to have spawned a new industry of apparently commercially-successful companies. For example, Girafa, Snap, Smartdevil, and Alexa all are in this market and apparently use image servers to provide thumbnail images to their customers. Since many of these thumbnails augment the web pages provided by others (for example, adding thumbnails to web pages of search results provided by Google), this industry relies on having the images come from different servers from the servers providing the web pages.

79.     Having a separate image server is advertised as an important feature by Smartdevil in the FAQ (frequently asked questions) for Thumbshots:

**DECLARATION OF DR. BRAD A. MYERS**

### Who will host the thumbshots?

We take care of everything. You do not need to add any machine or bandwidth. There is no change to your backend system. You continue to host your web pages as before. Thumbshots are pulled from our servers directly by the end users.

(see   http://www.thumbshots.com/simple/faq.aspx,   captured   on   2/3/2008, reproduced in exhibit K, page 20)

80.      Alexa also advertises the advantages of using their servers for providing thumbnail images for the home pages for web pages that come from separate web servers:

The Alexa Site Thumbnail web service provides developers with programmatic access to thumbnail images for the home pages of web sites. It offers access to Alexa's large and growing collection of images, gathered from its comprehensive web crawl.

This web service enables developers to enhance web sites, search results, web directories, blog entries, and other web real estate with Alexa thumbnail images. Including web site thumbnails improves user experience by allowing end users to preview sites before clicking on the thumbnail's associated link.

### Service Highlights

- **Ease of use** - Retrieve up to twenty thumbnail images at once by adding a single line of code to your web pages

- **Broad and expanding image collection** - retrieve thumbnails for home pages of web sites including all of the top sites on the Internet, all of the web sites in the DMOZ directory, with more becoming available daily.

- **Responsive** - If a requested thumbnail image does not yet exist, it will be automatically generated within 24 hours.

- **Multi-size access** - Thumbnail images are available in large (147x201 pixels) and small (82x111 pixels) sizes.

(see   http://www.amazon.com/gp/browse.html?node=236156011,   captured   on 2/4/2008, reproduced in exhibit I, page 11)

81.      Thus, the claimed invention appears to be commercially successful.

26

**DECLARATION OF DR. BRAD A. MYERS**

82.   I expect to testify at trial consistent with the opinions expressed in this report.


Dated: March 12, 2008

_____
Dr. Brad A. Myers