# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GIRAFA.COM, INC. )
)
        Plaintiff, )
)
      v. )    C.A. No. 07-787-SLR
)
AMAZON WEB SERVICES LLC, )    **JURY TRIAL DEMANDED**
AMAZON.COM, INC., ALEXA INTERNET, )
INC., IAC SEARCH & MEDIA, INC., )    **PUBLIC VERSION**
SNAP TECHNOLOGIES, INC., YAHOO! INC., )
SMARTDEVIL INC., EXALEAD, INC., and )
EXALEAD S.A., )
)
        Defendants. )

---

## DECLARATION OF R. DAVID DONOGHUE IN SUPPORT OF THE DEFENDANTS AMAZON WEB SERVICE, LLC, AMAZON.COM, INC., AND ALEXA INTERNET INC.'S OPPOSITION TO GIRARA.COM, INC.'S MOTION FOR PRELIMINARY INJUNCTION

OF COUNSEL:

Thomas G. Pasternak
R. David Donoghue
DLA Piper US LLP
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601-1293
Tel: (312) 368-4000

M. Elizabeth Day
Gregory J. Lundell
DLA PIPER US LLP
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000

Dated: May 16, 2008
Public Version Dated: May 22, 2008

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*
*Amazon Web Services LLC, Amazon.com, Inc.,*
*and Alexa Internet, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GIRAFA.COM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-787-SLR |
| | ) | |
| AMAZON WEB SERVICES LLC, | ) | **JURY TRIAL DEMANDED** |
| AMAZON.COM, INC., ALEXA INTERNET, | ) | |
| INC., IAC SEARCH & MEDIA, INC., | ) | **PUBLIC VERSION** |
| SNAP TECHNOLOGIES, INC., YAHOO! INC., | ) | |
| SMARTDEVIL INC., EXALEAD, INC., and | ) | |
| EXALEAD S.A., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF R. DAVID DONOGHUE IN SUPPORT OF THE DEFENDANTS AMAZON WEB SERVICE, LLC, AMAZON.COM, INC., AND ALEXA INTERNET INC.'S OPPOSITION TO GIRARA.COM, INC.'S MOTION FOR PRELIMINARY INJUNCTION

By this declaration, R. David Donoghue declares as follows:

1.      I am one of the attorneys representing Defendants Amazon Web Service, LLC, Amazon.com, Inc., and Alexa Internet, Inc. in this case.

2.      Attached as Exhibit A is a true and correct copy of selected pages from the transcript of the April 9, 2008 deposition of Shirli Ran (filed under seal).

3.      Attached as Exhibit B is a true and correct copy of pages from the transcript of the April 18, 2008 deposition of Brad Allen Myers, Ph.D.

4.      Attached as Exhibit C is a true and correct copy of online pages from the September 9, 2004 article "Girafa.com Gets The Picture," published by the *Jerusalem Post*.

5.    Attached as Exhibit D is a true and correct copy of documents produced by Plaintiff and bates labeled GIR 000533-46, which purport to be Girafa.com Inc.'s Consolidated Audited Financial Statements for calendar years 2000-2006 (filed under seal).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2008                          Respectfully Submitted,

Public Version Dated: May 23, 2008

                                             By:    /s/ R. David Donoghue

865578 / 32639

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 22, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I further certify that on May 22, 2008, the attached document was Electronically Mailed

to the following person(s):

Steven J. Balick
John G. Day
Tiffany Geyer Lydon
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
*Attorneys for Plaintiff Girafa.com, Inc.*

William H. Mandir
John F. Rabena
Trevor C. Hill
Chandran B. Iyer
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., N.W.
Washington, D.C. 20037
wmandir@sughrue.com
jrabena@sughrue.com
thill@sughrue.com
cbiyer@sughrue.com
*Attorneys for Plaintiff Girafa.com, Inc.*

Anne Shea Gaza
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
gaza@rlf.com
*Attorneys for Defendant IAC Search & Media Inc.*

Antonio R. Sistos
Jennifer A. Kash
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
50 California Street 22nd Floor
San Francisco, CA 94111
antoniosistos@quinnemanuel.com
jenniferkash@quinnemanuel.com
*Attorneys for Defendant IAC Search & Media Inc.*

Claude M. Stern
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
555 Twin Dolphin Dr., Suite 560
Redwood Shores, CA 94065
claudestern@quinnemanuel.com
*Attorneys for Defendant IAC Search &
Media Inc.*

Daniel M. Cislo
Mark D. Nielsen
CISLO & THOMAS LLP
1333 2nd Street, Suite 500
Santa Monica, CA 90401
dan@cislo.com
mnielsen@cislo.com
*Attorneys for Snap Technologies Inc.*

Harold V. Johnson
Scott A. Timmerman
BRINKS HOFER GILSON & LIONE
NBC Tower, Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL 60611-5599
hjohnson@usebrinks.com
stimmerman@usebrinks.com
*Attorneys for Defendants Exalead Inc.
and Exalead S.A.*

Jack B. Blumenfeld
Rodger D. Smith II
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
Wilmington, DE 19899-1347
jblumenfeld@nmat.com
rsmith@mnat.com
*Attorneys for Defendant Yahoo! Inc.*

Arthur G. Connolly, III
CONNOLLY, BOVE, LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
aconnollyIII@cblh.com
*Attorneys for Snap Technologies Inc.*

Thomas C. Grimm
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
tgrimm@mnat.com
*Attorneys for Defendants Exalead Inc. and
Exalead S.A.*

Justin Lim
2156
Montreal, Quebec H8N 1K7
Canada
jhlim@smartdevil.com
*Attorneys for Defendant Smartdevil Inc.*

Matthew D. Powers
Douglas E. Lumish
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
matthew.powers@weil.com
doug.lumish@weil.com
*Attorneys for Defendant Yahoo! Inc.*

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

842506 / 32639

# Exhibit A

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# Exhibit B

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME I
CONDUCTED ON FRIDAY, APRIL 18, 2008

1 (Pages 1 to 4)

**Page 1**

1   CONFIDENTIAL * ATTORNEYS EYES ONLY
2   IN THE UNITED STATES DISTRICT COURT
3   FOR THE DISTRICT OF DELAWARE
4
5   GIRAFA.COM, INC.,      Case No. 07-787-(SLR)
6      Plaintiff,
7   v.
8   AMAZON WEB SERVICES LLC,
9   AMAZON.COM, INC., ALEXA
10  INTERNET, INC., IAC SEARCH &
11  MEDIA, INC., SNAP TECHNOLOGIES,
12  INC., YAHOO!, INC., EXALEAD S.A.,
13  and EXALEAD, INC.,
14     Defendants.
15
16      VIDEOTAPED DEPOSITION OF BRAD A. MYERS
17           Volume I
18          Washington, DC
19        Friday, April 18, 2008
20           8:00 a.m.
21  Job No. 1-126469
22  Pages 1-361

**Page 2**

1      CONFIDENTIAL * ATTORNEYS EYES ONLY
2   Reported by: Linda S. Kinkade, CSR, RMR, CRR
3   Videographer: Scott Forman, L.A.D. Reporting
4
5
6      Videotaped Deposition of BRAD A. MYERS, held
7   at the offices of:
8
9
10     Sughrue Mion, PLLC
11     2100 Pennsylvania Avenue, Northwest
12     Washington, D.C. 20037-3213
13
14
15
16
17     Pursuant to applicable Rules of Civil
18  Procedure, before Linda S. Kinkade, CSR, RMR, CRR, a
19  Notary Public, in and for the District of Columbia.
20
21
22

**Page 3**

1     CONFIDENTIAL * ATTORNEYS EYES ONLY
2   APPEARANCES:
3     On Behalf of Plaintiff:
4        JOHN F. RABENA, ESQUIRE
5        WILLIAM H. MANDIR, ESQUIRE
6        CHANDRAN IYER, ESQUIRE
7        TREVOR HILL, ESQUIRE
8     Sughrue Mion, PLLC
9     2100 Pennsylvania Avenue, Northwest
10    Washington, D.C. 20037-3213
11    Telephone: (202) 663-7472
12
13
14    On Behalf of Defendant AMAZON WEB SERVICES, LLC,
15  AMAZON.COM, INC., ALEXA INTERNET, INC.:
16       THOMAS G. PASTERNAK, ESQUIRE
17       R. DAVID DONOGHUE, ESQUIRE
18    DLA Piper
19    203 North LaSalle Street
20    Suite 1900
21    Chicago, Illinois 60601
22    Telephone: (312) 368-4000

**Page 4**

1     CONFIDENTIAL * ATTORNEYS EYES ONLY
2
3   APPEARANCES (continued):
4
5     On Behalf of Defendant SNAP TECHNOLOGIES:
6        MARK D. NIELSEN, Ph.D., ESQUIRE
7        Attorney at Law
8     Cislo & Thomas, LLP
9     1333 2nd Street, Suite 500
10    Santa Monica, California 90401
11    Telephone: (310) 451-0647
12
13
14    On Behalf of Defendant IAC SEARCH & MEDIA, INC.:
15       ALISON MONAHAN, ESQUIRE
16    Quinn Emanuel Urquhart Oliver & Hedges, LLP
17    50 California Street
18    22nd Floor
19    San Francisco, California 94111
20    Telephone: (415) 875-6394
21
22

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

2 (Pages 5 to 8)

**5**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2
3    APPEARANCES (continued):
4
5    On Behalf of Defendants EXALEAD S.A. and EXALEAD,
6    INC.:
7        HAROLD V. JOHNSON, ESQUIRE
8        Brinks Hofer Gilson & Lione
9        NBC Tower, Suite 3600
10       455 N. Cityfront Plaza Drive
11       Chicago, Illinois 60611
12       Telephone: (312) 321-4200
13
14
15
16
17
18
19
20
21
22

**7**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2
3        I N D E X  (continued)
4
5
6    EXHIBIT  DESCRIPTION                    PAGE
7    8      US Patent No. 6,613,100        180
8    9      Screenshot http://shots.snap.com   312
9    10     Brad A. Myers Invoices         334
10
11
12
13
14
15
16
17
18
19
20
21
22

**6**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2        I N D E X
3
4    EXAMINATION OF BRAD A. MYERS          PAGE
5    BY MR. PASTERNAK            9
6    BY MR. DONOGHUE            132
7    BY MR. NIELSEN            180
8
9        E X H I B I T S
10       (Attached to transcript)
11
12   EXHIBIT  DESCRIPTION                    PAGE
13   1    Amazon Web Services Notice of      11
14        Deposition
15   2    "Amazon v. Girafa PI Papers"      11
16   3    Declaration of Dr. Brad A. Myers  11
17   4    Girafa.com Opening Memorandum of  11
18        Law in Support of Motion for
19        Preliminary Injunction
20   5    US Patent No. 6,864,904           11
21   6    Declaration of Dr. Brad A. Myers  147
22   7    Compilation of e-mail documents   156

**8**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2        P R O C E E D I N G S
3        VIDEOGRAPHER:  Here begins tape number one
4    in the deposition of Brad A. Myers in the matter of
5    Girafa.com, Inc. vs. Amazon Web Services, LLC, et al.
6    pending in the U.S. District Court for the District of
7    Delaware, case number 07-787.  Today's date is April
8    18th, 2008.  The time is 8:06 a.m.
9        The video operator is Scott Forman of L.A.D.
10   Reporting.  This deposition is taking place at Sughrue
11   Mion, 2100 Pennsylvania Avenue, Northwest, Washington,
12   DC.
13       Would counsel identify themselves and state
14   whom they represent.
15       MR. RABENA:  On behalf of the plaintiff and
16   the witness, I'm John Rabena with Sughrue Mion, and
17   I'm here with Chandran Iyer, also of Sughrue Mion.
18       MR. PASTERNAK:  Tom Pasternak, DLA Piper,
19   for Amazon Web Services, LLC, Amazon.com, Inc. and
20   Alexa Internet, Inc.
21       MR. DONOGHUE:  David Donoghue also of DLA
22   Piper and also representing Amazon Web Services,

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME I
CONDUCTED ON FRIDAY, APRIL 18, 2008

3 (Pages 9 to 12)

**9**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2    Amazon.com and Alexa Internet.
3        MR. NIELSEN: Mark Nielsen, Cislo & Thomas,
4    representing Snap Technologies.
5        MS. MONAHAN: Alison Monahan, Quinn Emanuel,
6    representing IAC Search & Media.
7        MR. JOHNSON: Harold Johnson, Brinks, Hofer,
8    Gilson & Lione, representing Exalead and Exalead S.A.
9        VIDEOGRAPHER: Thank you very much. The
10   court reporter today is Linda Kinkade of L.A.D.
11   Reporting.
12        BRAD ALLAN MYERS, Ph.D.
13   Being first duly sworn, testified as follows:
14        EXAMINATION
15   BY MR. PASTERNAK:
16       Q. Good morning, doctor. Could you state your
17   full name?
18       A. Brad Allan Myers.
19       Q. And what's your home address?
20       A. 400 South Homewood Avenue, Pittsburgh,
21   Pennsylvania 15208.
22       Q. Do you have a business?

**10**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2        A. Yeah. I'm a professor at Carnegie Mellon
3    University.
4        Q. And what's the address there?
5        A. 5000 Forbes Avenue, Pittsburgh,
6    Pennsylvania 15213.
7        Q. How many times have you been deposed?
8        A. About ten.
9        Q. So you're familiar with the drill?
10       A. Yes.
11       Q. Do you have any -- are you on any
12   medications today?
13       A. No.
14       Q. Is there anything else going on in your
15   life such that you can't tell the truth today?
16       A. No.
17       Q. I'm going to mark about five exhibits up
18   front that you may want to refer to throughout just to
19   make it a little easier, so bear with me while I go
20   through some housekeeping here.
21       The first one is, I'm going to mark as -- what
22   should I call it -- Myer Exhibit 1, it's the

**11**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2    deposition notice.
3        (Exhibit Nos. 1 through 5, inclusive, marked
4    for identification and attached hereto.)
5        MR. PASTERNAK: And I've got some copies. I
6    don't know if I have enough for the whole table.
7        Exhibit 2, Myer Exhibit 2, are copies of all
8    the exhibits to your declaration.
9        Myer Exhibit 3 -- I'm sorry, I'm saying
10   "Myer." It should be Myers, correct?
11       THE WITNESS: M-Y-E-R-S.
12       MR. PASTERNAK: Myers Exhibit 3 is the
13   actual declaration.
14       Myers Exhibit 4 is plaintiff's opening
15   memorandum here.
16       And, last but not least, is the patent, and
17   that will be Myers Exhibit 5, U.S. patent 6,864,904.
18       So you don't need to look at those particularly
19   right now, but, as we get into it, I'm sure we'll be
20   wanting to look at some of them.
21   BY MR. PASTERNAK:
22       Q. So, why don't we talk about image servers.

**12**

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2    What's an image server?
3        A. Well, I think I define that pretty well in
4    my report.
5        Q. Can you define it?
6        A. Sure. It's a server that provides images.
7        Q. Is that your definition?
8        A. Let me see what I formally said.
9        Q. All right. And now what are you looking
10   at?
11       A. At my report, my declaration.
12       Q. All right. Let me grab that, too. So
13   you're looking at Exhibit 3?
14       A. Yes.
15       Q. Okay.
16       A. In paragraph 48 on page 11 I define an
17   image server as a type of server that stores and
18   delivers images.
19       Q. And that's the first sentence of paragraph
20   48?
21       A. Right.
22       Q. Okay. Is that your definition?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

30 (Pages 117 to 120)

117

CONFIDENTIAL * ATTORNEYS EYES ONLY

2 their brief and could I please put some language in my
3 report about what HTML was. And so I added the last
4 sentence of paragraph 37, the second-to-last sentence.
5    Q  Tell me generally how you went about coming
6 up to your opinion that Alexa infringes.
7    A  Well, I operated the system in the way I
8 described in this report and in the appendix, matching
9 up what the system did with the claims.
10    Q  Was that -- was that your decision to do it
11 that way or were you kind of guided through it?
12    A  Well, that's the way I always do it.
13 That's the way I've been instructed is the proper way
14 to do it.
15    Q  Well, let me ask it this way. Were you
16 told by counsel, here's how we think they infringe,
17 here's how we came up with the conclusion, or did they
18 say, go figure out whether you think Alexa infringes?
19    A  Well, it was more like the latter.
20 Obviously I knew -- they informed me which products
21 they wanted me to look at and told me where to start,
22 you know, what web page to start from. And then I did

118

CONFIDENTIAL * ATTORNEYS EYES ONLY

2 my own analysis.
3    Q  And did they tell you what claims they
4 thought infringed?
5    A  Well, as we said a few minutes ago, we did
6 that together.
7    Q  Before you met, did they have an idea of
8 what claims they thought infringed to your
9 understanding?
10    A  I don't know.
11    Q  Did they give you a claim chart with claims
12 written on it?
13    A  Sure.
14    Q  So they had an idea what claims they
15 thought infringed?
16    MR. RABENA:  Objection to the form.
17    THE WITNESS:  Well, as I recall, the claim
18 chart had virtually all the claims in it. And
19 there's, you know, a variety of defendants. And the
20 issue was which particular defendants infringe which
21 particular claims, and which particular systems of the
22 defendants like Snap has multiple systems. And so I

119

CONFIDENTIAL * ATTORNEYS EYES ONLY

2 recall the claim chart was a superset of all the
3 claims that were, you know -- it was pretty much all
4 the claims in the patent except for the ones that had
5 to do with the generation of the thumbnails.
6 BY MR. PASTERNAK:
7    Q  Did you delete any claims from the claim
8 chart?  Did you come to the conclusion, no, I don't
9 think these infringe, we ought to take them out?
10    A  Sure.
11    Q  Which claims did you take out with respect
12 to Alexa?
13    A  Oh, I don't remember specifically, but, you
14 know, we have in this chart which ones we ended up
15 deciding.  Was it H?
16    So these are the ones that I decided had the
17 most clear evidence of infringement and the other ones
18 we took out.
19    Q  So with respect to Alexa now, there were
20 more claims being discussed at first and some were
21 deleted?
22    A  I just don't recall.

120

CONFIDENTIAL * ATTORNEYS EYES ONLY

2    Q  Well, you just said you took some out, so
3 I'm asking you, did you or didn't you?
4    A  Well, as I said, the claim chart had
5 virtually all the claims of the chart in it and the
6 ones that aren't here we took out.  But whether we
7 discussed that, I don't recall, or whether we even
8 considered whether Alexa had those or not, I don't
9 recall any specifics.
10    Q  Let's go to page 22.  And from page 22 to
11 the end, the section about secondary considerations,
12 commercial success, etcetera, do you see that section?
13    A  Yes.
14    Q  Who wrote that section?
15    A  I did.
16    Q  From scratch?
17    A  Yeah.
18    Q  What is your -- what is your qualification
19 for being able to opine on whether something's
20 commercially successful?
21    A  Well, I didn't have any particular
22 instruction on how commercially successful is defined.

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

31 (Pages 121 to 124)

121

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  So I just generally used whether the defendants
2  themselves seemed to be saying that they were. And so
3  I'm sure there are people who are more focused on
4  business aspects who could talk to whether -- their
5  business definitions of success, but from my point of
6  view, my general understanding, is that it was
7  sufficient to talk about what the defendants said.
8      Q   So all you looked at in opining on
9  commercial success here was what the defendants were
10  saying in the press about themselves?
11     A   Yeah, I think that's fair, and in their web
12  sites.
13     Q   All right. Did you look at any numbers?
14     A   Just the ones they proposed, I mean, just
15  the ones -- just the numbers that the defendants said
16  on their sites and press releases.
17     Q   Do you have any knowledge of any of the
18  defendants' actual financials with respect to the
19  accused infringing products?
20     A   No.
21     Q   But you still think you can opine that they

122

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  are commercially successful?
2      A   I think it's reasonable to say what they
3  said they were. So if they are claiming that they are
4  commercially successful, that's what I'm putting
5  forward.
6      Q   Where are they claiming that they are
7  commercially successful?
8      A   Well, just by way of example, Snap, reading
9  in the middle paragraph on page 23, Snap Preview
10  Anywhere has seen rapid adoption, serving more than
11  350 million previews on more than 700,000 web sites.
12     So that says to me that they are successful in
13  the sense of getting lots of commercial, you know,
14  that they are getting companies to use their products.
15     Q   Did you do any analysis of the commercial
16  success of Girafa's product?
17     A   No.
18     Q   Why not?
19     A   I wasn't asked to.
20     Q   Did you ever talk to anyone at Girafa about
21  their numbers?

123

CONFIDENTIAL * ATTORNEYS EYES ONLY

1      A   No.
2      Q   Do you have any business training?
3      A   No.
4      Q   Do you think it would have been appropriate
5  to actually look at numbers to come up with this sort
6  of an opinion?
7      MR. RABENA:  Object to the form.
8      THE WITNESS:  If I had been given
9  information about actual numbers, I would have
10  certainly looked at it. But from the information I
11  had at the time I wrote the report, this is what I
12  could say.
13  BY MR. PASTERNAK:
14     Q   All right. But that wasn't my question.
15  My question is, sitting here today, don't you think it
16  would have been appropriate to actually look at
17  financial numbers as opposed to statements in the
18  press to come up with an opinion of commercial
19  success?
20     MR. RABENA:  Object to the form.
21     THE WITNESS:  The opinion that I expressed

124

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  here is based on the information I was presented, and
2  I would have liked to have had more information.
3  Sure, I would have liked to have had a lot of
4  information about a lot of different things, but I am
5  very comfortable with the positions I'm presenting
6  here based on the information I had at the time.
7  BY MR. PASTERNAK:
8      Q   What information would you have liked to
9  have with respect to the commercial success issue?
10     A   Whatever was available, you know, what sort
11  of numbers the other web sites were having.
12     Q   Would you have liked to have had the
13  financials from these companies?
14     A   Since, as you said, I don't have any
15  business background, I would have expected that, if
16  there were lots of financial kind of numbers, that
17  some other expert would have been more appropriate to
18  opine on that issue.
19     Q   Do paragraphs 70 and 71 accurately reflect
20  your opinion today?
21     A   I'm sorry?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME I
CONDUCTED ON FRIDAY, APRIL 18, 2008

32 (Pages 125 to 128)

---

**125**

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  
2  Q  Do paragraphs 70 and 71 of your declaration
3  accurately reflect your opinion today?
4  A  With respect to the stuff I have here, I
5  don't have -- I haven't changed my mind on what I
6  said. Is that your question?
7  Q  Yes. What was the long felt but unsolved
8  need that you mentioned at the end of paragraph 71?
9  A  So the prior art that I mention and the
10  other prior art mentioned by the, you know, in the
11  patent and so forth, talk about providing thumbnails,
12  as we've discussed, and yet no one had come up with
13  this idea of providing home pages of web sites instead
14  of the target pages or of using a separate image
15  server, as far as I know. And so the long-felt need
16  was for having thumbnails for web pages, and it was
17  unsolved in the sense that nobody had figured out a
18  way of doing that practically.
19  Q  Is there any basis for the statement,
20  though, that there was a long-felt need for this other
21  than the fact that no one had come up with it in your
22  point of view?

---

**126**

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  
2  A  Well, sure. Lots of people had produced
3  patents in other prior art systems that talked about
4  the advantages of this and how it would be a good idea
5  to have thumbnails for web pages and for other
6  information. And from the evidence I've seen, no one
7  had figured out a way of doing that in a practical way
8  until this patent.
9  Q  So that the idea was out there, no one had
10  just figured out how to implement it; is that what
11  you're saying?
12  A  Well, the need was for thumbnails of web
13  pages, so that idea was out there, but the idea of
14  providing home pages instead of the target page and of
15  using a separate image server, those ideas were not
16  out there until this patent, as far as I know.
17  Q  Well, what -- what makes you say that there
18  was a need or a desire to provide the actual home
19  pages as opposed to linked pages other than the fact
20  that, according to you, no one had done it?
21  MR. RABENA: Object to the form.
22  THE WITNESS: My understanding of this

---

**127**

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  
2  secondary consideration is that that's not the proper
3  question. It's my understanding that you look at the
4  general goal, which is to provide thumbnails of web
5  pages, and not that you look at the exact way that the
6  inventor solved that goal. And so the inventor came
7  up with a novel way of addressing that general,
8  long-felt need, and that's what we discussed. I don't
9  know of any evidence that there is a long-felt need
10  for home pages instead of the -- instead of the target
11  pages. That was the invention that solved the
12  long-felt need of getting thumbnails.
13  BY MR. PASTERNAK:
14  Q  So the long-felt need you're referring to
15  is getting thumbnails?
16  A  Well, the advantage of having thumbnails
17  for web pages in particular.
18  Q  So I'm clear, the long-felt need is having
19  thumbnails for web pages.
20  A  Right.
21  Q  And I think you're saying that was already
22  out there.

---

**128**

CONFIDENTIAL * ATTORNEYS EYES ONLY

1  
2  A  Well, the idea was out there.
3  Q  Okay.
4  A  People hadn't figured out a way of doing it
5  in a practical way.
6  Q  Okay.
7  A  That's my understanding of how to do this
8  analysis. If you have other instructions on how this
9  is supposed to be done, then I'll try and do that
10  analysis.
11  Q  In paragraph 78, you say that the ability
12  to supply images from separate servers and to be able
13  to substitute home pages for the target pages seems to
14  have spawned a new industry...
15  Has it or hasn't it in your view?
16  A  Well, there are these companies out there,
17  but, as you pointed out, I don't really have business
18  numbers or anything like that. So I wasn't
19  comfortable asserting for sure that there is this
20  whole industry. But given that there is at least
21  these four companies in this area, that seemed like a
22  certain amount of evidence.

---

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME I
CONDUCTED ON FRIDAY, APRIL 18, 2008

33 (Pages 129 to 132)

129

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2    Q  And then in the next sentence you say, for
3    example, Girafa, Snap, Smartdevil and Alexa all are in
4    this market and apparently use image servers...
5        Why did you say "apparently"?
6        A  Well, as I said, I haven't analyzed the
7    Girafa system.
8        Q  So the "apparently" is only with respect to
9    Girafa?
10       A  As far as I know at this time, right.
11       Q  The last sentence of your declaration you
12   say, thus, the claimed invention appears to be
13   commercially successful.
14       A  Wait, wait, that's not the last sentence.
15       Q  Oh, I'm sorry. Before your --
16   second-to-last sentence. Quote, thus, the claimed
17   invention appears to be commercially successful, end
18   quote.
19       A  Right.
20       Q  Again, you qualify it and you say "appears"
21   as opposed to "is", right?
22       A  Right.

130

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2    Q  Is that -- that's because why?
3    A  Well, you know, I provide a certain amount
4    of evidence here.  As I said, it would have been nice
5    to have more evidence.  Given the evidence I have at
6    the time, I'm comfortable with the statements that are
7    here.  And, you know, as we said, we don't have
8    evidence for necessarily all of the -- all of the
9    defendants that we'd like to have.
10       Q  Tell me what you mean by that, you don't
11   have evidence for all the defendants.  Are there other
12   defendants that you think there is deficient evidence?
13       A  Well, we were talking about commercially
14   successful.  And we have these nice numbers that Snap
15   is advertising.  But we weren't able to find, you
16   know, equivalent numbers just on Alexa's web site, for
17   example.  And there would be nice -- you know, would
18   certainly be nice to have more information.
19       Q  Did you express any discomfort with this
20   part of your opinion talking to counsel?
21       A  Well, that's, you know, as I'm expressing
22   it, I'm comfortable with it.  That's why there are

131

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2    words like, you know, appears to be commercially
3    successful.  I think -- I presented the evidence that
4    we have at this time and I believe it supports the
5    conclusions that I present.
6        Q  So during the drafting did you soften the
7    language to use more qualified terms?
8        A  This is what I wrote.  I don't know -- I
9    didn't -- I don't recall any particular softening or
10   anything like that.  This is -- I wrote this and this
11   is the way I wrote it.
12       Q  Okay.
13       MR. PASTERNAK:  One more break and then I
14   think we'll finish up.  Can I talk to you about an
15   issue in the hall?
16       MR. RABENA:  Yeah.  Are you going -- do you
17   want to do lunch now or just a short break?
18       THE WITNESS:  That would be silly.
19       MR. PASTERNAK:  I think a half hour.
20       VIDEOGRAPHER:  We're going off the record.
21   The time is 11:00 a.m.
22       (Brief recess.)

132

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2    VIDEOGRAPHER:  We're back on the record.
3    The time is 11:11 a.m.
4        MR. PASTERNAK:  Mr. Rabena has accommodated
5    me and he's going to allow Mr. Donoghue to complete
6    our questioning.  I'm losing my voice, I think.
7                    EXAMINATION
8    BY MR. DONOGHUE:
9        Q  Dr. Myers, my name is Dave Donoghue, and I
10   also represent Amazon, Amazon Web Services and Alexa.
11       You understand you're still under oath,
12   correct?
13       A  Yes.
14       Q  I want to talk to you a little bit this
15   morning about how you prepared your declaration and
16   prepared for today.  So we've talked a lot about your
17   declaration, Exhibit Myers 3, and I think you
18   mentioned that you first learned of this case in
19   January of 2008; is that correct?
20       A  That's my recollection.
21       Q  Do you remember how you learned of the
22   case?

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

34 (Pages 133 to 136)

133
CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2      A   Well, as I said in answer to the previous
3   question, I'm pretty sure that one of these guys,
4   probably John, called me in my office.
5      Q   That was sometime in January?
6      A   I think so.
7      Q   Early January?
8      A   Well, you have the retention letter. You
9   can look it up. It was, you know, pretty much
10  immediately before that.
11     Q   And do you remember what you discussed in
12  that first phone call?
13     A   Well, not specifically, but my general
14  recollection is that we talked about the parties and
15  whether I had any conflicts of interest with any of
16  the parties and the particular patent and whether I
17  was comfortable with the material of the patent.
18     Q   And were you comfortable with the material
19  of the patent?
20     A   Yes.
21     Q   And did you have any conflicts?
22     A   No.

134
CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2      Q   Do you remember when you next spoke with
3   counsel for Girafa?
4      A   No.
5      Q   But you have spoken to counsel since,
6   correct?
7      A   Sure.
8      Q   And you mentioned a meeting at the end of
9   January in Pittsburgh?
10     A   I don't remember when it was, but -- you
11  have all the e-mails, and somewhere in the e-mails is
12  the arrangements for the trip. So you can look it up.
13     Q   But it was in January to the best of your
14  memory?
15     A   I can't remember.
16     Q   So you met in Pittsburgh with Girafa's
17  counsel, correct?
18     A   Right.
19     Q   Was that your first extended substantive
20  discussion about the claims and the alleged infringing
21  technology?
22     A   I really don't remember.

135
CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2      Q   What did you discuss at the meeting in
3   Pittsburgh?
4      A   So, we, as I said before, we discussed the
5   particular defendants' systems and the claims and I
6   started writing my report, and we went through the
7   systems and looked at which -- which claims seemed to
8   be infringed by each of the systems, and then we
9   discussed the claim construction.
10     Q   So you said you looked at the systems.
11  That means of each of the defendants in the case?
12     A   The three that are on the preliminary
13  injunction, yes.
14     Q   All right. So, among others, you looked at
15  Alexa's system?
16     A   Right.
17     Q   And how did you look at the system?
18     A   Well, we brought up the web pages on my
19  computer.
20     Q   So you looked at it on the Internet.
21     A   Right.
22     Q   Did you have any written materials that

136
CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2   went along with that?
3      A   I don't recall.
4      Q   You said you talked about the claims. Were
5   you just looking at the patent to discuss the claims?
6      A   As opposed to what else?
7      Q   Well, anything else. Were there reports,
8   claim charts, any other documents about the claims?
9      A   Well, they sent me a blank claim chart and
10  I -- as I recall, we started filling that out while
11  they were there. So I had that. I don't remember
12  what other material I had when, like when I got the
13  patent history or -- I don't recall when that arrived.
14     Q   All right. So counsel sent you a blank
15  claim chart, that means a claim chart without analysis
16  filled in?
17     A   Correct.
18     Q   And you worked with counsel to begin
19  drafting that.
20     A   Filling it in, yes.
21     Q   And by "filling it in," you mean putting in
22  information about how the systems you looked at, for

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

75 (Pages 297 to 300)

**297**

CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2  certainly infringe. It wouldn't necessarily say
3  that's the only way to do it.
4       Q   What other ways would you do it or could
5  you do it?
6       A   Well, there are certain technologies that
7  will -- I mean, just looking at the within clause, not
8  the --
9       I mean, if you're talking about this patent, I
10  mean this claim, as a whole, right --
11      Q   Uh-huh.
12      A   Yeah, I guess that's -- doesn't matter. It
13  would be possible to have a web plug-in that modifies
14  the, what's called the DOM, the document object model,
15  that is actually how the web page looks to the user.
16  So after you download the HTML, you can have a plug-in
17  that will modify the way the page is displayed without
18  changing the HTML. And it's my impression that that's
19  how, like the Snap plug-in works.
20      And so what the user sees is -- could be -- you
21  could use that mechanism to actually modify the way it
22  looks and put the thumbnails directly within the

**298**

CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2  visual image of the web page, but I'm not aware of
3  anybody actually doing that.
4       Q   Let's look at paragraph 40 of your
5  declaration. It says, the third embodiment has the
6  thumbnail images pop up on top of the image of the web
7  page so they appear to be hovering like a pop-up
8  window or pop-up menu. Do you see that?
9       A   Yes.
10      Q   Now, again, are these just appearing to be
11  hovering or are they actually in a layer -- are they
12  just part of the web page and blocking something on
13  the web page or are they actually a separate window or
14  something like a window above the web page?
15      A   I'm not sure that's a very well formed
16  question.
17      Q   It may not be.
18      A   I'm trying to be clear by giving an analogy
19  to things that I was hoping the readers would be more
20  familiar with, like pop-up windows and pop-up menus.
21  These are well-known ways of having content that, you
22  know, like I said, appears to be in the layer in front

**299**

CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2  of other content.
3       So, I'm trying to explain the concept of
4  hovering by using an analogy to a popular interaction
5  technique.
6       Q   Okay. And these pop-up windows that you're
7  using as an analogy, you can drag those around inside
8  the visual image of the web page, can you not?
9       A   Sometimes.
10      Q   I suppose there are instances where a
11  pop-up window might not be draggable. Are the
12  thumbnail images referenced in Girafa's patent here,
13  this third embodiment, can you drag those, do you
14  know?
15      A   I don't think there is any discussion of
16  that.
17      Q   Do you know if they can be dragged or not?
18      A   I don't think there is any discussion about
19  whether you can or not.
20      Q   That's not what I'm asking, though. I'm
21  just asking if these thumb -- let me back up.
22      Have you ever used the Internet where it's --

**300**

CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2  where Girafa's software has been included with it so
3  it pops up thumbnails among -- on a given web page?
4       A   I did not see any Girafa software that had
5  that functionality.
6       Q   Have you used Girafa's technology at all
7  and pulled up web pages with the thumbnails that have
8  been supplied by Girafa?
9       A   Yes.
10      Q   Okay. Did you ever determine if you could
11  drag those thumbnails that were supplied by Girafa?
12      A   The only implementation of the Girafa
13  technology that I tried had the thumbnails in the
14  sidebar alongside the web page, and I didn't actually
15  try to drag them inside the sidebar.
16      Q   They probably wouldn't drag anyway there
17  most likely.
18      A   I don't have any knowledge of that.
19      Q   Okay.
20      A   I could try it, but I didn't.
21      Q   Do you know if Snap's thumbnails in the,
22  oh, the -- I think it's the Classic embodiment -- do

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

76 (Pages 301 to 304)

301

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2  you know if those thumbnails can be dragged?
3      A  Yes.
4      Q  And can they?
5      A  Yes.
6      Q  Okay.  Do you know what file format their
7  thumbnails are, Snap, in the Enhanced version -- or,
8  sorry -- in the Classic version?
9      A  I'm not sure the question.  Do I know what
10  file format the pictures are stored in?
11      Q  What you're -- in the Enhanced -- in the
12  Classic version, sorry, where it's more of like the
13  pop-up window type; do you know what types of files
14  are being served as what we're calling thumbnails?
15      A  Oh, I know what I want.  I would look in --
16  oh, well, yeah.  So, let's make sure this is the right
17  one.  What exhibit is Snap regular, Snap Classic?
18      Q  I believe it's D.
19      A  Okay.  So if you look at page 3 --
20      Q  Page 3 of Exhibit D?
21      A  Yes.  So I right clicked on the actual
22  thumbnail image itself and asked for its properties,

303

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2      Q  Right.  So serving the link pages instead
3  of the home pages itself, that's not something that's
4  innovative, is it?
5      A  The idea of doing that is totally different
6  from the issue of whether it's hard to implement or
7  not.  There are many significantly innovative ideas
8  that, once you have them, are relatively easy to
9  implement.  Just because something is easy to
10  implement has really almost no bearing on whether it's
11  innovative or not.
12      Q  Is the idea of having thumbnails of home
13  pages as opposed to thumbnails of linked pages, is
14  that innovative?
15      A  I think so, sure.
16      Q  How?
17      A  It was something no one had done before and
18  it enabled, you know, as we say in this document, it
19  enabled the inventors to provide a practical product
20  where other people had not.  So it seemed to be a new
21  idea that no one had done and one that was
22  commercially important.

302

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2  and this is the window that popped up, which says it's
3  a JPEG image.
4      Q  Okay.  Let's look at paragraph 45 in your
5  declaration.  Again, we're back to Miller.  You say
6  that Miller displays thumbnails of linked pages and
7  does not show or suggest displaying thumbnails of the
8  home pages of the linked pages.  Do you see that?
9      A  Yeah.  I'm quoting from the patent file
10  history.
11      Q  Okay.  Right.  So you didn't say it, the
12  patent file history.
13      To a person who's got a degree in computer
14  science or the equivalent background and some years --
15  several years -- of experience in the field,
16  technologically speaking, would it be difficult for
17  such a person to implement serving thumbnails of
18  linked pages versus home pages?
19      A  Well, I think if somebody was told to
20  implement that algorithm, for example, the algorithm
21  in column 7, they wouldn't have any trouble
22  implementing it.

304

CONFIDENTIAL * ATTORNEYS EYES ONLY

1
2      Q  Now, somebody who was -- someone like
3  Miller, using his system to display thumbnails of
4  linked pages; what if one of those links was to a home
5  page, wouldn't it be displaying a home page as a
6  thumbnail?
7      A  The Miller system shrinks every page, so if
8  the -- what he calls the Children page, if one
9  Children page was a home page, then it would shrink
10  it, sure.
11      Q  So, theoretically -- not even
12  theoretically -- in reality, Miller at times will
13  display thumbnail images of home pages; is that
14  correct?
15      A  Sure.  To the extent that any of the actual
16  target pages reference a home page, then it's going to
17  shrink it.
18      Q  Okay.  Paragraph 46, you say that, in
19  general, the terms in the asserted claims should have
20  their plain and ordinary meaning.  Do you see that?
21      A  Yes.
22      Q  Do you believe that you've given the terms

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

77 (Pages 305 to 308)

305
CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2    you've construed here in your report their plain and
3    ordinary meaning?
4        A  To the most part. I'm not sure, for
5    example, visualization functionality has a plain and
6    ordinary meaning. It's not a term that people would
7    necessarily just normally use. But to the extent that
8    the terms are plain and ordinary terms, I think I give
9    them the plain and ordinary meaning.
10       Q  Okay. What would be the plain and ordinary
11   meaning for "providing" in the Internet context?
12       A  Well, I don't know, whatever provide
13   means -- give, show, produce.
14       Q  Does "provide" really mean show?
15       A  Sure. It can. Why not?
16       Q  Can you give me an example?
17       A  Well, you ask -- you asked the -- I don't
18   know. It seems pretty clear to me. When you -- I
19   mean, anytime you're given something and you can see
20   it, so, you know, if you ask somebody to provide you
21   something, it was because you wanted to see it, so,
22   you know. If you said, can you provide me a picture

306
CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2    of the President, you might have been asking just
3    because you wanted to see it, not necessarily because
4    you needed to have it.
5        Q  Can I provide you a picture of the
6    President by handing it to you in an envelope?
7        A  Sure, you could.
8        Q  And that would be providing, right? I've
9    given it to you.
10       A  That's one way of providing, sure.
11       Q  Providing doesn't necessarily mean that you
12   see what it is; it's just being given the object. Is
13   that accurate?
14       A  The word by itself has, you know, a lot of
15   general meanings. And taken by itself, one way of
16   providing something is to give it in a hidden way, but
17   you could also provide it by giving it in a way that
18   you can see it.
19       Q  How is information provided over the
20   Internet?
21       A  Well, there is all sorts of different
22   places where information is provided. So if you look

307
CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2    at the patent itself, there is all these arrows, and
3    all of these arrows are information being provided
4    from one box to another, one piece.
5        Q  Exactly. And I don't mean to interrupt
6    you, but that's the exact point I wanted to focus on,
7    which is, when you send information over the Internet
8    from point A to point B, how is it transmitted or
9    provided?
10       A  Well, there's a variety of protocols. But
11   what I was going to finish up with was the final step
12   where you provide it to the user is done in a totally
13   different way than where the content is provided from,
14   you know, for example, from the image server to the
15   web browser. That's usually, you know, that uses
16   Internet protocols like HTTP and stuff like that.
17       If you're going to look at the patent claims,
18   it specifically is talking about providing to a user,
19   right? That's in Claim 1. And I'm pretty sure it's
20   the same language in other places.
21       So that providing is actually not one of these
22   arrows. It's this user over here who is looking at

308
CONFIDENTIAL * ATTORNEYS EYES ONLY
1
2    the web page and the other parts.
3        Q  Why isn't it just one of the arrows, the
4    providing? How is providing from point A -- well,
5    I'll look at the figure.
6        How is providing between the image server and
7    the web browser different than providing from the web
8    browser to the user? I mean, isn't the information
9    sent the same way?
10       A  To the user? No. The way it's provided to
11   the user is by showing this visual image on the
12   screen. The way it's provided from the image database
13   to the image server, you don't have any idea. It
14   certainly doesn't use Internet protocols. But the way
15   it provides an image server to the visualization
16   functionality is likely to use Internet protocols.
17   The way it's provided -- I guess the user providing
18   would be this arrow over here, which is marked, where
19   it shows it to the user. And, clearly, it's showing
20   it by providing it, by drawing it on the screen. It's
21   providing the visual image.
22       Q  Isn't that image provided to the user --

CONFIDENTIAL VIDEOTAPED DEPOSITION OF BRAD ALLAN MYERS, PH.D. - VOLUME 1
CONDUCTED ON FRIDAY, APRIL 18, 2008

78 (Pages 309 to 312)

| 309 |
|---|
| CONFIDENTIAL * ATTORNEYS EYES ONLY |

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2    scratch that.
3        What if the user's monitor is turned off, is
4    the image still provided to the user under this --
5    under FIG. 1?
6        A  Well, again, if you're going back to the
7    language of the claim, and you're asking are you
8    providing -- are you executing this method in its
9    entirety by creating, you know, doing all the steps
10   except that the user doesn't see it because the
11   monitor's turned off, I would say that, because the
12   user is allowed to turn his monitor back on and see
13   it, then -- then you'd probably be executing this
14   method.
15       So I'm not sure that just turning the monitor
16   off -- because the user now has the ability to turn it
17   back on -- I don't think that necessarily prevents you
18   from performing the method.
19       Q  Okay. I'm just trying to focus in on when
20   the providing to the user actually occurs. Is it the
21   sending of the thumbnail?
22       A  Well, in the context, for example, of Claim

| 311 |
|---|
| CONFIDENTIAL * ATTORNEYS EYES ONLY |

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2    The time is 4:43 p.m.
3        (Brief recess.)
4        VIDEOGRAPHER:  We're back on the record.
5    The time is 4:53 p.m.
6    BY MR. NIELSEN:
7        Q  Is it accurate to say that a web server
8    serves non-image content in the context of this
9    patent?
10       A  Sure. That's one of the things it does,
11   sure.
12       Q  And the server that serves HTML, that's a
13   web server, right?
14       A  Well, that's -- that's one of the things
15   the web server does is serve HTML content.
16       Q  Okay. What about a server that serves
17   JavaScript, would that be construed as a web server as
18   well or could it be construed as a web server as well?
19       A  Web servers serve a variety of kinds of
20   content.
21       Q  Is JavaScript one of them?
22       A  Sure.

| 310 |
|---|
| CONFIDENTIAL * ATTORNEYS EYES ONLY |

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2    1, it talks about providing to the user a visual
3    image. So I would think that happens at the point
4    where some parts of the system show the image on the
5    screen. So that the user -- that's, you know -- and
6    then it's provided continuously because the user can
7    continue to see it.
8        Q  Is a JPEG a visual image?
9        A  Well, when it's provided to the user so
10   that they can see it in the context of this claim,
11   then it becomes a visual image. But in the context of
12   this claim, to the extent that it's still setting on
13   the disk, then it doesn't count.
14       Q  When it's setting on the disk, has it been
15   provided?
16       A  Not yet.
17       Q  So providing requires viewing.
18       A  In the context of Claim 1, the steps of
19   providing to a user and providing the thumbnail visual
20   image to the user require that the user be able to see
21   it in my interpretation.
22       VIDEOGRAPHER:  We're going off the record,

| 312 |
|---|
| CONFIDENTIAL * ATTORNEYS EYES ONLY |

1    CONFIDENTIAL * ATTORNEYS EYES ONLY
2        MR. NIELSEN:  We'll mark as Exhibit 9 a
3    screenshot.
4        (Exhibit No. 9 marked for identification and
5    attached hereto.)
6    BY MR. NIELSEN:
7        Q  Take a look at this for a second, the web
8    address or the URL.
9        A  So is this one that I made?
10       Q  No.
11       A  Okay.
12       Q  I'll represent it's one I made.
13       A  Okay.
14       Q  What format is this?
15       A  So, you can tell both from looking at the
16   code and from the extension on the URL that it's
17   JavaScript.
18       Q  Okay. Is JavaScript an image?
19       A  I mean, this is an image of a page of a
20   web, but JavaScript by itself is not an image.
21       Q  Right. I understand this is a screenshot
22   here, but I'm just saying, is JavaScript itself an

# Exhibit C

IVC Weekly Newsletter – Girafa.com gets the picture                                    4/7/08 9:06 AM

      

Sponsored by:

Israel Venture Capital
Research Center

IVC Weekly Newsletter

Highlights of the Israeli High-Tech, Private Equity & Venture Capital Industry            Apr 7, 2008

## IVC-Online Database

**IVC's Online database is a comprehensive resource on Israel's high-tech industry**
The IVC-Online database includes over 5,000 Israeli high-tech companies, private equity & venture capital funds, investment companies, professional service providers, foreign investors and technological incubators.

To receive a **FREE TRIAL** membership to our online database, subscribe now.


Subscribe

Search database

Go!

For further IVC inquiries please contact Ayala@ivc-online.com

## Upcoming Events

- **April 7-9, 2008**
  BIO-Europe Spring 2008
- **April 7-9, 2008**
  Venture Summit East
- **April 7-11, 2008**
  Photonics Europe
- **April 8, 2008**
  A symposium on Environmental Technology Research

More Info

## Girafa.com gets the picture

Published by: Jerusalem Post
www.jpost.com
Nicky Blackburn
09/09/2004

Shirli Ran, co-founder of start-up Girafa.com, says the company's technology, which allows Internet search engines to display thumbnail pictures of the sites in its directory, fills such an obvious need that it's a wonder no-one developed it before.

"It just struck me all of a sudden that there were no images for search results, and once we started thinking about it, it seemed very strange," says Ran, an attractive 31-year-old with curly brown hair.

Luckily for Ran and co-founder and CEO Eldad Baimoon, they were two of the first to identify the gap in the market, and after a few years of working round the clock have now managed to attract two heavyweight customers, Microsoft's MSN and America On Line. Today, Girafa is already profitable, and has annual revenues of several million dollars, a sum that is expected to rise dramatically in the wake of the AOL deal, which was signed in July.

Girafa's visualization solution, the Thumbnail Service, enables search engines and web directories to display not only links to sites that are called up in a search, but also a miniature image of the site itself. The technology enables users to identify sites visually, rather than just by the address, making the search process quicker and easier. Site images are updated regularly, enabling users to see if any changes have taken place.

"It's a much smarter way of navigating the Web," says Ran. "You can immediately get a feel for a site, and see whether it's serious, or whether it was created by a 10-year-old. You can also instantly identify whether it is a site you have visited before."

Ran says studies undertaken by the company show that the use of thumbnail pictures improves searches, increases repeat visits, and increases click-through rates by up to 300%. Users, it appears, are more likely to click on search results that display thumbnail images.

As a result, Girafa's solution enables search engines to increase their revenue from search pages, and at the same time improve the search experience for users.

The Girafa service, which costs search engines a monthly service fee



The most complete volume of Israel's private equity & venture capital industry. The yearbook includes data on Israeli PE & VCs funds, their portfolio companies.



A quarterly magazine covering trends and developments in Israel's high-tech industry, including IVC's Quarterly High-Tech Survey, statistical analysis, high-tech company financing and private equity & venture capital funds. IVCJ also alerts its readers to start-up companies seeking capital, the latest venture capital personnel appointments and lots more.



EXHIBIT
9

according to the volume of images required on a site, is hosted on the start-up's servers, and integrates seamlessly with each site. Search engines choose how many images they want to display per page – MSN for example displays the six top sites on each search page, while Netscape displays the first three or four sponsored clicks.

The search engines can also decide if there are some site images they want to block – pornography for example.

Girafa has also developed a free toolbar which can be downloaded from the company's site. This enables users to see thumbnail images of any site automatically, and to display a thumbnail of their favorites.

"This is more of a technical showcase than something we actively promote," says Ran. Industry feedback from the toolbar has been great, she asserts.

Ran, who wears a T-Shirt that reads "Juicy Heiress," came up with the idea behind Girafa when she was working as an attorney in a law firm that specializes in computer law. She and Barnoon, a friend from university who also worked as a lawyer, both liked the idea and realized it had great potential. Ran gave up her job and began looking for a developer who could push the idea forward. After a protracted search in a market then at its peak, they finally joined forces with Yuval Yarom, the CTO and former VP of research at Memco Software.

There was no funding at the start, and initially it was just the three of them working alone. The hi-tech bubble burst in 2000, and the company's hunt for investment suddenly became a great deal harder.

"It wasn't easy to get funds," admits Ran, who is now the company's COO. "The Internet was a dirty word, and most people didn't even realize why, which made it much harder to persuade them to invest." As a result, the company was unable to secure venture capital funds, and instead raised $1 million from angel investors. So far, this has been the only financial injection.

IN RETROSPECT, Ran believes the lack of VC money actually helped Girafa survive the past few difficult years.

"It allowed us to move fast and be very focused. We could make quick decisions and adapt rapidly. We didn't have a CEO in the US, or offices abroad, and that gave us breathing space," she says. "It was a great advantage. There were many companies that could not adapt as quickly, and they failed."

Girafa released its product toward the end of 2000, and began contacting potential customers. Like investment, sales were not easy. The Internet was still in disgrace, and Internet companies everywhere were closing.

"We would talk to a person at a company, and then a couple of days later find out he'd been fired," says Ran. "It was very hard to move forward with anything. Even now it takes a lot more persuasion than it did in the past. When we close a deal, however, it's solid."

Initially the company made a series of agreements with Israeli sites like Walla, YNet, Netvision, and Tapuz. In 2001, however, the

company had its first real breakthrough when it signed an agreement with the MSN network.

Under the pact, Girafa's technology was made available to millions of MSN search users in the US, using the Microsoft Internet Explorer search panel. The company also maintains the MSN service, ensuring that images are up to date. For sites like CNN, this means updating the image every two hours. Others need only be refreshed every 30 days.
Ran admits that the company was surprised by MSN's commitment to Girafa, which was then still a young, virtually untried company.

"We expected things to fall through even up to the last minute," Ran admits. "But MSN knew our situation and liked our technology." MSN also gave the company a helping hand by providing it with strict milestones at every stage of development. The MSN deal proved a significant step forward for Girafa, validating the technology and enabling the start-up to start attracting other new customers. "Things were much easier after that," Ran acknowledges with a laugh.

The next substantial agreement came in July this year, when the company signed with AOL after lengthy negotiations. AOL, which has tens of millions of customers, tested the Girafa technology on its ICQ site one year ago, and then went on to integrate it into all its sites offering search engines, including AOL's instant messaging service, AIM, and the portals Netscape and Compuserve. Ran declines to reveal financial details of the deal, which is expected to double company revenue, but does admit that it "increased our revenue, that's for sure".

THE COMPANY is now in negotiations with a range of other search engines, and is already running trials for a number of them. If all goes well, Ran says she expects that Girafa will announce a number of new deals in the coming six months.

In the meantime, competitors have inevitably emerged. In the past six months, says Ran, a number of new firms have moved into this field, and an increasing number of search engines are beginning to display thumbnail images.

"It's a good thing," she asserts. "It means the service is out there and that thumbnails are something that will become an integral part of search tools."

Despite the increasing competition, Ran says she is not concerned that Girafa may lose its position in the market.

"We are the only ones providing service to big customers and we've been doing it for several years," she says. "Our service goes out to millions of web users every hour, and we provide everything that our large customers need." Nor is Ran concerned that a large Internet provider might move in.
"Most of them prefer to use our services rather than create the technology themselves," she says. "It takes a great deal of attention, manpower and time to maintain this service, and at the end of the day it costs them less simply to use our technology."

In future, Girafa anticipates rapid growth. The search engine industry is

4/7/08 9:06 AM

set to increase by more than 100% per annum, and Ran believes Girafa has much to offer in terms of increased revenues and enhanced customer satisfaction.

At present, Girafa's main focus is on the US, which is quicker to adopt new technologies.

The company is also examining the European market, however, and is in talks with some players there. Though Girafa has staff in the US, it still doesn't have offices there, and has no immediate plans to open any. The plan, says Ran, is to stay relatively small.

At present the company employs just 14, and is not looking for more. "We don't believe we need too many people to do the right thing," says Ran.

In the near future, the company is planning to introduce a new visualization product that will be suitable for the mobile telephone market.
In response to customer requests, it is also examining a smaller, cheaper version for small Internet sites that want to use just a few thumbnail images.

The company's key objective right now is to increase its exposure in the US, and to boost sales. It is also working on additional undisclosed products based on its core technology.

For Ran the past few years have been a rollercoaster. "When I look back, I have no idea when I made the decision to switch jobs from law to high-tech. It just started rolling," she explains. "I'm enjoying my work though. We made the right decisions at the right time, and undoubtedly luck also played a part. I believe that thumbnails will become an integral part of any Internet search. We will be happy to be there, and to provide it."

Print

Close Window

Articles & Information compiled and edited by Avala Chiel

Contact | Tell a Friend | Privacy Policy | Feedback | FAQ
All right reserved IVC Online Research Center 1997 - 2008 (c) | Powered by ERG Solutions

# EXHIBIT D

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY