1                IN THE UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4

    GIRAFA.COM, INC.,              :   CIVIL ACTION
5                                  :
                  Plaintiff,       :
6                                  :
        vs.                        :
7                                  :
    AMAZON WEB SERVICES LLC,       :
8   AMAZON.COM, INC., ALEXA        :
    INTERNET, INC., IAC SEARCH     :
9   & MEDIA, INC. SNAP             :
    TECHNOLOGIES, INC., YAHOO!     :
10  INC., SMARTDEVIL INC.,         :
    EXALEAD, INC., and EXALEAD     :
11  S.A.,                          :
                                   :
12                Defendants.      :   NO. 07-787 (SLR)

13                            - - -

14                              Wilmington, Delaware
15                              Wednesday, August 27, 2008
                                10:02 o'clock, a.m.
16                            - - -

17  BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

18                            - - -

19

20

21

22

23

24                              Valerie J. Gunning
                                Official Court Reporter
25

1    APPEARANCES:

2

3                    ASHBY & GEDDES
                     BY:  TIFFANY GEYER LYDON, ESQ.

4
                             -and-
5

6                    SUGHRUE MION, PLLC
                     BY:  WILLIAM H. MANDIR, ESQ. and
7                         JOHN F. RABENA, ESQ.
                          (Washington, D.C.)
8

9
                          Counsel for Plaintiff
10

11

12
                     POTTER, ANDERSON & CORROON LLP
13                   BY:  RICHARD L. HORWITZ, ESQ.

14
                             -and-
15

16                   DLA PIPER US LLP
                     BY:  THOMAS G. PASTERNAK, ESQ. and
17                        R. DAVID DONOGHUE, ESQ.
                          (Chicago, Illinois)
18

19                        Counsel for Defendants
                          Amazon Web Services LLC, Amazon.com and
20                        Alexa Internet, Inc.

21

22

23

24

25

```
1    APPEARANCES (Continued):

2

3              CONNOLLY BOVE LODGE & HUTZ LLP
               BY:  ARTHUR G. CONNOLLY, III, ESQ.
4

5                     -and-

6
               CISLO & THOMAS LLP
7              BY:  DANIEL M. CISLO, ESQ.
                    MARK D. NIELSEN, ESQ.
8                   (Santa Monica, California)

9

10             Counsel for Defendant
               Snap Technologies, Inc.
11

12

13   ALSO PRESENT:

14
               SNAP TECHNOLOGIES
15             BY:  THOMAS McGOVERN, CEO

16
                      - - -
17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3               (Proceedings commenced in the courtroom,

4     beginning at 10:02 a.m.)

5

6               THE COURT:  Good  morning, counsel.

7               Let's start with introductions and then we can

8     move forward with the art.

9               MS. LYDON:  Good morning, your Honor.  Tiffany

10    Lydon, from Ashby & Geddes, on behalf of plaintiff,

11    Girafa.com.  With me are my co-counsel, Bill Mandir and John

12    Rabena, from Sughrue Mion.

13              THE COURT:  Thank you very much.

14              Mr. Horwitz?

15              MR. HORWITZ:  Good morning, your Honor.  Rich

16    Horwitz, from Potter Anderson, for the Amazon defendant.

17    With me Tom Pasternak and David Donoghue, from DLA Piper.

18              THE COURT:  How are you?

19              MR. CONNOLLY:  Good morning, your Honor.  Arthur

20    Connolly, on behalf of Snap Technologies.  With me this

21    morning are Dan Cislo and Mark Nielsen, of Cislo & Thomas,

22    and Tom McGovern, the CEO of Snap Technologies.

23              MR. CISLO:  Good morning, your Honor.

24              MR. NIELSEN:  Good morning.

25              MR. McGOVERN:  Good morning.

 1                    THE COURT:  All right.  Plaintiff's burden,

 2     plaintiffs go first.

 3                    MR. RABENA:  Your Honor, I have a copy of the

 4     slides to hand up to the Court, if I may.

 5                    THE COURT:  All right.

 6                    MR. RABENA:  And there is a preliminary matter

 7     I'd like to advise the Court of.  There's some subject

 8     matter in both presentation materials and in our

 9     presentations that have previously been marked confidential,

10     according to protective order.

11                    We realize we're in a hearing in a courtroom,

12     and there's just one issue that the parties have agreed that

13     when that's discussed, those that are not under the

14     protective order would step out, and it's a very narrow,

15     narrow point.

16                    And the other aspect is that the materials there

17     are being submitted to the Court for your Honor's reference,

18     and if there's any, although they're marked confidential,

19     we'll work out afterwards whether any of that needs to be

20     submitted officially under seal.

21                    THE COURT:  All right.

22                    MR. CISLO:  Your Honor, may I be heard on that

23     point?

24                    THE COURT:  Yes.

25                    MR. CISLO:  Shall I address the podium?

1            THE COURT:  No.  You can stand there.

2            MR. CISLO:  My client, Tom McGovern, the CEO of

3    Snap, has come up from Los Angeles to be participating in

4    this, to hear what's going on, to hear what evidence is

5    against the company, and we did not participate in any

6    agreement that he would not be able to hear that.  I would

7    just ask that perhaps that part of the presentation be put

8    to the end, and if the Court believes that he has to be

9    excused, so be it, but he would like to hear what evidence

10   is against the company in this.

11           THE COURT:  All right.  Well, given the fact I

12   don't know what evidence we're talking about half the time

13   this happens and it's one question and it takes half an hour

14   to clear the courtroom, the question is asked and it takes

15   another half an hour to get everyone back in again.

16           So I guess when we come to the point where at

17   least some of the counsel believe that we're treading on

18   confidential information, then we'll have a discussion about

19   it.

20           MR. RABENA:  Thank you.

21           THE COURT:  So apparently there is no general

22   agreement.

23           MR. RABENA:  I thought there was, your Honor.  I

24   apologize.

25           THE COURT:  All right.

```
1              MR. RABENA:  If, after looking through the
2   papers of the parties, it appeared pretty clear that
3   infringement, the issue of infringement in this preliminary
4   injunction motion, is nearly all conceded.  Snap's lawyers
5   might not agree, but their expert witness did.
6              The challenge that Snap and Amazon defendants
7   have put forth on invalidity and unenforceability grounds
8   is substantial only in the number of prior art references
9   they submitted, and only in the effort, but not under the
10  merits, it's not substantial.
11             Some of the references that they've submitted
12  and rely on are not even qualified as prior art.  They're
13  not published in time.  Some of the positions they've taken,
14  most of the positions they've taken, require a claim
15  construction that's contrary to the -- directly contrary to
16  the file history, and their witnesses, their experts,
17  entirely ignore the secondary considerations of
18  nonobviousness.  So there has not been a substantial
19  challenge to the question of the validity of the '904 patent
20  at issue here.
21             Irreparable harm will be addressed by my
22  partner, Bill Mandir, and as he'll explain, that is near
23  critical stage, and the fact that the harm alleged is
24  irreparable and cannot be repaired if injunction is not
25  issued, that fact has not been contested.
```

1          And Mr. Mandir will also talk about the balance

2     of hardships and the public interest in that Girafa got

3     this patent filed in '99, founded an entire industry of

4     third-party thumbnail providers.  They founded the industry.

5     When the other -- when the defendants in this room learned

6     of what Girafa was doing, they piggy-backed on top of

7     Girafa's technology and are now pushing Girafa out of the

8     market.

9          By way of background, I have on the screen a

10    screen shot I took off Girafa's website, and what this

11    screen shows is a search that I conducted on Girafa's

12    website.  I typed in "cars" and did an Internet search

13    for the word "cars."  That came up with a number of results.

14    This is just the first few results.

15         And as you can see on the screen, as is typical

16    in a search engine, there's a hyperlink, and this hyperlink

17    is a URL, it's called a URL.  It tells the address of the

18    search result web page, and if I were to click on that

19    hyperlink, it's linked to that URL, so it would take me to

20    that website.

21         The Girafa technology adds a thumbnail image of

22    the website, and in this case, it's of the website that you

23    would go to under this -- under this hyperlink.  And what

24    that does is, it gives the user some visual image of where

25    he or she would be going if he clicked on the link so that

1   there may be familiarity that he or she would recognize,

2   that's the place I want to go, or that's definitely not the

3   place I want to go.

4            The patent talks about a couple of embodiments,

5   and the one I'm showing on the screen from Figure 2 shows

6   that search engine or the search results screen on the

7   right with hyperlinked text and titles of the websites

8   that were search results and thumbnail images on the left,

9   and it shows the infrastructure that Girafa came up with to

10  handle this.

11           And this infrastructure, unlike what the prior

12  art was doing, takes the thumbnail images and generates

13  them in advance, stores them in a separate web server.

14  And then so how do you control that and how do you get

15  a search engine to use that?  Well, you add this

16  visualization functionality, which is basically Software

17  Code No. 206, to the web server code.  That tells the

18  web browser, the user's web browser, that when you do a

19  search, you're going to get the search results, the

20  hyperlinks, from the web server, and you're going to

21  get the corresponding thumbnail images from the image

22  server.

23           So what happens is when a user goes to a certain

24  website that has this functionality, the website server

25  adds to the user's web browser code immediately, and this

1    little patch of code then enables the user to get the images

2    from the server.  And we'll get into more detail, but here

3    the server, the web server and image server, are clearly

4    separated.

5              And what that does, by separating the server,

6    the two server functions, it allows -- it allowed Girafa

7    to spawn the industry of a third-party thumbnail provider

8    to any website.  The websites that use this technology don't

9    have to worry about building the infrastructure or managing

10   any of it or updating the thumbnails.  That's all done by

11   the third-party provider.  But by separating out the image

12   server capabilities away from the website, Girafa was able

13   to start that industry in 2000.

14             The defendants' expert, there are two of them.

15   One is Professor Robbins and one is Professor Hardin.

16   Professor Hardin gave a nice summary of the '904 patent in

17   his declaration and I think it's worth going through a

18   little bit.

19             He says the '904 patent is generally directed to

20   making Internet search engine result web pages more

21   user-friendly.  It is directed towards associating a

22   thumbnail visual image of a home page of a linked to

23   website, or the linked page it in certain claims, with a

24   hyperlink on the page.  And it teaches displaying the

25   thumbnails in various ways, either next to the hyperlink

1    or hovering over the hyperlink.

2            And this part is interesting, because he

3    recognizes from the file history what the focus of the file

4    history was.  And he says, According to the inventors during

5    prosecution of the patent, the two novel or inventive

6    elements of the patent were:  One, using thumbnail visual

7    images of a home page of a linked to website instead of a

8    thumbnail of the linked to page.

9            And, two, providing the thumbnails to the web

10   browser or web server using an image server separate from a

11   web server.

12           Claim one is an example of the home page claims.

13   There are two sets of claims at issue in this preliminary

14   injunction motion.  Generally, the lower number claims,

15   claims 1 through 34, are what we refer to as home page

16   claims, and claims 35 on deal with the separate image server

17   issues, and there's some overlap.

18           But for our purposes, the home page claims,

19   claim 1 is represented.  And it requires providing two

20   things, generally.  And of note is that it's focused on

21   presenting Internet information to a user and providing that

22   user two things.  The first element is providing a user

23   web page that has a hyperlink and at least partially

24   concurrently providing a thumbnail visual image of the

25   home page that's associated with that hyperlink.

1    Now, the patent, I won't go into this in a lot

2    of detail, I can't even read it.  But I put it up here to

3    show some aspect of the level of detail that the '904 patent

4    goes into in talking about this home page feature.  In fact,

5    Figure 5 in column 7 describes a very detailed way that you

6    can identify the home page of a search result link.

7    If your Honor has ever done a search on Google,

8    for example, you often get a link that could be three lines

9    long.  It could be a very long link.  That's the hyperlink

10   to the result page, and that's usually a page of a website

11   that's well within a website, a sub-page.

12   And so this part of the '904 patent talks about,

13   how do you identify where is the home page?  Sometimes

14   that's a little bit easy, because you can look for the

15   dot.com and truncate everything after that, but it's not

16   always that easy.

17   For example, if the website ends in a country

18   designator, like .U.K. or .J.P.  Anyway, there's a lot of

19   effort in the patent to describe an algorithm to identify

20   the home page that is associated with that hyperlink and

21   truncate that URL so that you can retrieve the thumbnail

22   of the home page.  And the practical advantage of this is

23   twofold.

24   Number one, it allows the third-party thumbnail

25   image provider, like Girafa, to save a couple orders of

1    magnitude less, or fewer thumbnails.

2              So, for example, if your typical website has one

3    home page, but maybe a hundred or 200 sub-pages within it,

4    the Girafa approach dealing with the home page aspect, you

5    could just save one home page.  You don't have to crawl the

6    Internet and get every single individual page.  And whenever

7    anybody searches and has a search result that is one of

8    those 200 sub-pages, you just display the home page.

9              And then the other part of the advantage of

10   that is, you can -- the provider can still give the user

11   some relevant feedback.  It gives the user an image of the

12   home page so that the user can say, oh, that's right.

13   That's where I want to go.  That's the page.  I've been

14   there before.  Some level of familiarity.

15             If you try to crawl the web and save every

16   single page that's out there, it's too burdensome for the

17   provider, and you end you having to give the user a number

18   of error messages, like a thumbnail that says, sorry, we

19   couldn't get that one, but we'll get it soon.

20             And so that's what this part of the home page

21   embodiment is trying to accomplish.

22             This issue came up in the file history, and

23   that's exactly what the applicants describe to the examiner

24   and then the examiner allowed the claims.

25             The examiner asserted two primary references

1    towards the end of the prosecution history.  One is the

2    Brown reference and the other is the Miller reference.

3            The examiner -- I'm showing here a quote from

4    the examiner, in his office action.  He says, Recognizes

5    that Brown did not disclose home pages, but Miller did.  And

6    essentially, the examiner says, Miller discloses a method of

7    displaying thumbnails of documents utilizing the function,

8    and it's clear that the web page is referring to the main

9    page or home page.

10           So the examiner said, Miller shows home pages,

11   and thumbnails.  And the applicant wrote back and quoted

12   that exact quote from the examiner and agreed that Miller

13   discloses home pages if the link is to a home page.  But

14   Miller never says, take that link, if it's not to a home

15   page, and display a thumbnail of the home page.

16           And here's where he says that.  Miller displays

17   thumbnails of linked pages.  So, of course, if the linked

18   page is to a home page, Miller is going to display the home

19   page.  But Miller does not show or suggest displaying

20   thumbnails of the home pages of the linked pages.

21           So the applicant is drawing a distinction

22   between rotely displaying exactly what's linked and using

23   the home page as a replacement for whatever is linked.  It's

24   that distinction over Miller that resulted in allowance of

25   the home page claims.

1              The other set of claims that are at issue here

2    begin with claim 35, and we refer to those as the separate

3    image server claims.  And I won't go into this claim in

4    detail, but, in general, it still has the two providing

5    steps, where you provide a web page to the user, a visual

6    image of the web page, and at least partially concurrently

7    you provide another web page.  These don't require the home

8    page requirement.

9              And in the last element, the claim says that

10   the web server is separated from the image server.  This

11   issue also came up in a file history.  In particular, the

12   examiner said that the Brown reference taught that feature.

13   And the applicant explained why that wasn't true.  The

14   applicant said, Brown talks about a proxy server, and a

15   proxy server is simply a ghost server or a mirror server

16   of the main server.  It does the same thing as the main

17   server.

18             And in Brown, the image server and web server

19   functions were combined, and that was problematic, for a

20   number of reasons.  The applicant explained that, according

21   to the prior art method, wherein the image server and web

22   server are combined, the web server and image server are

23   each limited by the limitations of the other.

24             But the invention, which separates that

25   functionality, allows a singer image server to capture and

1    serve images of web pages from multiple web servers.  And

2    that's what spawned the industry, is separating that

3    functionality out so you could provide the service to many

4    different web users.

5              If you do what the prior art was doing and

6    put the image serving functionality within the web server,

7    then a third-party provider has to go out to every customer

8    and install and maintain that functionality.  So that's what

9    the applicant was trying to get at.  And that result in

10   allowance of those claims.

11             So now I will go into the infringement issues

12   with that background.

13             Those issues that we just talked about from the

14   file history are not contested with respect to infringement.

15   So the defendants, the P.I. defendants, don't say that their

16   imagine servers are combined and they don't contest the home

17   page aspects.

18             Alexa and the Amazon defendants -- this is

19   a screen shot of their website -- they don't contest

20   the substance of the infringement allegations at all.  Their

21   only challenge to infringement is that we didn't allege

22   direct infringement, which is not true, and we pointed that

23   out in your reply papers, and that they don't contributorily

24   infringe, because they only provide a service, not a

25   product.  That's not accurate either.  They provide

1    thumbnails, and that's a product.  They also provide the

2    servers to manage and provide, and supply those.  That's a

3    product as well.  So that was the only allegation.

4              As you can see from this screen shot, the Alexa

5    website shows the home page, and this is detailed more in

6    our reply papers and in Professor Myers' declaration.  But

7    you have a very long URL, for example, of the Delaware

8    Chinese restaurants result.

9              And that's a URL to the, or hyperlink to the

10   exact inner page of Delaware on the web that deals with

11   Chinese or Japanese restaurants.  But the thumbnail, you

12   can't see it very well here, but it's in our papers,

13   that's a thumbnail of the home page, not of the inner

14   page.

15             The absent P.I. defendant is SmartDevil,

16   and their website operates pretty much exactly like Alexa,

17   so there's no contest to that.

18             Snap initially raised a few noninfringement

19   arguments in their papers, and they have a couple of

20   products.  One is the Snap Enhanced Mode, which I'm showing

21   on the screen now.  And Snap Enhanced is the system that,

22   if you do a search, it puts the results on the left and

23   the thumbnails on the right, and these are bigger thumbnails

24   than their other thumbnails for their other products.

25             And so their one noninfringement argument

1   with respect to the Snap Enhanced is that these are too

2   big, these previews are too big to be thumbnails.  But

3   their expert conceded that point in the deposition.  I will

4   show you that.

5            First, this is, in slide 16, an excerpt from the

6   deposition, where he agreed that that was the only issue

7   that they were contesting on infringement for claim 35.

8            And I said, "You identified one argument, and

9   that's the previous are not thumbnails; right?

10           "Answer:  Correct.

11           "Question:  So do you agree that Snap Enhanced

12  meets the other aspects of claim 35?

13           "Answer:  Yes."

14           That's from Professor Robbins' deposition.

15           In Professor Robbins' declaration, he adopted

16  the claim construction for thumbnail visual image from Dr.

17  Myers, Girafa's expert.  And that claim construction of

18  thumbnail visual image that he agreed to in his declaration

19  is, quote, An image that is a smaller version of a larger

20  image.  For the purpose of this declaration, I will use this

21  construction of thumbnail visual image as proposed by Dr.

22  Myers.

23           In his deposition, he backtracked a little

24  bit and said, I don't agree with that definition.

25           So I asked him, At that point, under this

1    definition, under the declaration as agreed to, this

2    definition of thumbnail visual image, you agree that Snap

3    Classic has situations where it will meet that limitation;

4    right?

5              And he agrees to that.

6              "And the same goes for Snap Enhanced?

7              "Answer:  Yes.

8              "Question:  And the same goes for the Snap

9    browser add-on?

10             "Answer:  Yes.

11             "Question:  And the same goes for the Snap

12   publisher and blogger code?

13             "Answer:  Again, assuming that we used the

14   construction of Dr. Myers, which we adopted for strategic

15   reasons, yes, that would be the case."

16             We don't know what those strategic reasons are,

17   but the point is, in their opposition they adopted that

18   claim construction.  In their deposition, the witness agreed

19   that definition covers all of their embodiments, so

20   infringement cannot be an issue on this claim.

21             And it's no surprise that they agreed, because

22   the contemporaneous documents from 2004 and 2006 show

23   Girafa -- I'm sorry -- show Snap personnel and their

24   predecessor personnel requesting information from Girafa

25   because they want to develop thumbnails using that same

1    term.

2              This is a 2004 e-mail from Aaron Boyer, who is

3    at IdeaLab.  IdeaLab is the incubator company that formed

4    Snap and still runs Snap, asking for information.  We are

5    interested in integrating thumbnails, and that's exactly

6    what they did.

7              Then in 2006, Justin Wheeler from Perfect Market

8    Technologies, which is the predecessor name of Snap, tries

9    to get more information from Girafa, and says, We are

10   looking to capture thumbnails, and they want to buy them

11   from Girafa and put them on their servers to be served up

12   with their search results.

13             And Mr. Wheeler even gave the size.  Lest

14   there be any doubt, he gave the various sizes of thumbnails

15   in his words that they wanted to use, and that large size

16   is the size of the large thumbnails that Snap Enhanced

17   use.

18             So that's entirely consistent with their expert

19   admission, and it's kind of surprising that Snap raised that

20   argument at all.

21             The other product, main product that Snap

22   provides, is referred to as Snap Classic.  And Snap Classic

23   displays the thumbnails not initially.  They pop up when the

24   user points the cursor to the hyperlink.  So if the user is

25   moving the cursor around the screen, whenever the user

1    points to a given hyperlink, a thumbnail of that, of that

2    website would pop up.

3              The argument of noninfringement that Snap

4    raised here deals with this phrase in claim 1, which is

5    in all of the claims:  And at least partially concurrently.

6    The two providing steps, providing to a user a visual image

7    of a web page, has to occur at least partially concurrently

8    with the providing of the thumbnail visual image, so that

9    when you back up, you can see from the snapshot that the

10   image of the web page is provided to the user and the

11   thumbnail is provided to a user.

12             Incidentally, Snap does not contest that the

13   classic thumbnail is, in fact, a thumbnail.  They didn't

14   raise that issue.  But so clearly from this picture, they're

15   being provided to the user at the same time.

16             The noninfringement argument that Snap has

17   raised is based on their interpretation of providing.  And

18   initially, in their opposition papers, they said, Providing

19   means transmitting and displaying.  Transmitting and

20   displaying.

21             Then, in the deposition of their expert, I

22   asked them to draw a timeline.  It's in our reply brief.

23   And I asked them to draw a timeline of when the web page

24   is provided, when it's transmitted and displayed, and when

25   is this thumbnail transmitted and displayed.  And he drew

1   that timeline.  And, in fact, they overlap in time.

2            So then -- and we point that out in our reply

3   brief.  Snap's motion for a surreply, they said, oh, wait.

4   The transmission doesn't overlap, and the transmission of

5   the data that's used to make these images, that doesn't

6   overlap in time, and therefore they're not partially

7   concurrently overlapping in time.

8            Well, there are a number of problems with

9   that position.  Number one, there isn't a single thing in

10  the '904 patent or file history that talks about the

11  transmission of the data.  There's no intrinsic evidence

12  to support that claim construction.  And these claims are

13  written to the perspective of the user, providing a visual

14  image to the user.  The user does not know or care about

15  the time that the data was transmitted.  The user wants to

16  know the thumbnail is visible when the web page is visible

17  so he does not have to click to the result web page to get

18  to it.

19           That's it on infringement, your Honor.  There

20  are other sub-issues, but in the interests of time, I don't

21  have anything on infringement prepared.  I would be happy to

22  answer any questions on infringement at the appropriate

23  time, if there are dependent claim issues.

24           As I said before, for the validity attack, it

25  is sort of a shotgun approach, through every reference

1    that has anything to do with anything close to the patent

2    and cobble them together, and that's a situation we have

3    here.

4              The first two references that the defendants

5    rely on it turns out are not prior art.  The Liptay

6    reference was relied on by the defendants as invalidating

7    prior art and has no date on it, and, in fact, cites to a

8    document that was published in 2000, which is a year after

9    the filing date of the '904 patent application.  So that's

10   not prior art.

11             The Schmid reference is also not prior art.  The

12   Schmid reference that was submitted has no date on it.  And

13   as their support or to support their argument, the

14   defendants submitted some U.S. patents that mentioned a

15   Schmid paper as having -- with the same title as having a

16   1998 date on it, and they say, aha, it must have been

17   published in 1998.

18             Well, the Patent Office accepts documents at

19   face value.  They don't investigate whether something was

20   publicly available.  But we don't even have to go that far

21   because those Schmid papers are not in evidence and they

22   have different page lengths.  They are 17 and 28 or 26

23   pages long.  They're different papers.  We don't know what

24   they are.

25             The page that the defendants decided to submit

1    as a Schmid paper is a four-page paper.  Okay.  So the

2    U.S. patents that cite some Schmid paper, that's irrelevant.

3              Then, in the surreply, the motion for surreply,

4    the defendants submitted another U.S. patent that had a

5    Schmid paper listed that didn't have page numbers on it.

6    So that one we thought, well, maybe that's a four-page

7    paper, so we looked that one up.  And lo and behold, we

8    find out that the Patent Office got that Schmid paper

9    from Stephen Lim, the CEO of SmartDevil, who is not here,

10   and who has not participated in this case, and the Patent

11   Office got that Schmid paper in 2003.

12             And Mr. Lim's representation to the Patent

13   Office was threefold:  That it was published at IEEE Yuforc

14   in 1998 and it's available for download at two library

15   websites.

16             There's no reference to IEEE Yuforc.  I could

17   not find any reference this was connected to IEEE Yuforc.

18   The defendants who have that burden certainly haven't

19   submitted it.  But I could look up those URLs WayBack

20   Machine, which is Alexa's Internet archive.  And your Honor

21   may recall in their opposition brief, they made a big deal

22   how big that was.

23             THE COURT:  I had another discussion about the

24   WayBack Machine, so I know all about the WayBack Machine.

25             MR. RABENA:  Okay.  Great, because I would have

1   thought if the defendants had a prior art reference they

2   needed to establish was publicly available on a website,

3   they would have looked in their own Internet archive.  And

4   when I looked at it, I was shocked to find out that there

5   was a record for these websites, these libraries, and that

6   this Schmid reference didn't show up at those libraries

7   until 2003 and 2002.  And I was also kind of surprised to

8   notice that the defendants did look to the WayBack Machine

9   for some of the other prior art that they submitted, and

10  in their exhibits is at least one WayBack Machine printout

11  that shows that some other reference was published.  But

12  they didn't submit these pages which show that it wasn't

13  available until much later.

14          So Schmid is not prior art.  Not that we have to

15  get there, but Dr. Myers, our expert, has looked at Schmid

16  and said, even if it was prior art, it only has one server.

17  It's not separate servers, as alleged.

18          The rest of the prior art, the references that

19  ostensibly qualify, the positions that the defendants have

20  taken, ignore the file history and are directly

21  contradictory to the file history as described by Professor

22  Hardin.

23          These two novel -- when he says the prosecution

24  history says are novel aspects of the invention, the

25  defendants' positions require the Court to ignore these two

1    novel aspects and require the Court to ignore the file

2    history in that regard.

3            So I'm going to go through, first, the home page

4    claims and the primary references that the defendants have

5    relied on there.

6            Professor Hardin said that Miller, the Miller

7    reference was the only one of the prior art references that

8    showed a home page thumbnail when the link was to something

9    other -- an inner page.  Okay.  That's on slide 32 in

10   the transcript.  He said, I can't think of any others that

11   teach that.

12           So then we talked about Miller, but Miller is

13   the one, if your Honor recalls, that was before the

14   examiner, and that this distinction came up and the Patent

15   Office addressed it and allowed the claims properly over

16   Miller because the Patent Office understood the invention

17   and the claims to mean that the link is not to a home page.

18   It would make this argument redundant.

19           Miller will display a home page if the link is

20   to a home page, and so will probably every other piece of

21   prior art that has hinges and thumbnails.  If the link is to

22   a home page, it will display a home page.

23           The applicant said right here, That's not what

24   this invention is.  It's home page of the linked pages, and

25   drew a distinction between the two.  They cannot be the

1    same.

2              For the other set of claims, claims 35 and on,

3    the primary dispute is over use of separate image servers.

4    And according to Dr. Myers, Girafa's expert, back in the

5    90s, the companies, and you'll see from this prior art,

6    that were looking at thumbnails, it was very well-known

7    that thumbnails were neat and good things to have.  They

8    were helpful.  That part was known.  And, in fact, that

9    establishes a long-felt need.  Everybody knew that

10   thumbnails were great.  Looking for a good solution to

11   make it commercially practical.

12             All of those focuses, every one, was adding

13   the functionality to the web server for a reason.  The

14   advantage of that is that you -- the Internet is dynamically

15   changing.  It changes all the time.  You don't want to store

16   a static version of thumbnails, because the thinking was

17   that gets old.

18             So you generate thumbnail images on the fly.

19   In order to do that, you need to do it within the web server

20   architecture so you have control over it.  And that's why

21   the art, all of the art submitted that deals with

22   thumbnails, is dealing with on-the-fly generation and

23   controlling of the thumbnail updating within the web server

24   itself.

25             Let's go through a couple of them.  That exact

1    issue, I mentioned this before, came up in the file history,

2    where Brown was doing everything in one server.  He was

3    doing the image control and the web server in one server.

4           So one of the main references that the

5    defendants rely on for showing allegedly the separate image

6    server is the Kraft reference, and the Kraft reference is

7    essentially the exact same thing as Brown that was of

8    record.

9           I'm showing a figure here from the Kraft

10   reference, where it shows a single server, the big block on

11   the right, and all the functionality within it, within that

12   one server.

13          And Kraft goes a little bit further than

14   that and says, The server side components interact closely

15   together.  Well, that's the same problem that the applicant

16   told the Patent Office Brown had.  I will go back to it.

17          Right here, where the applicant, on slide 35,

18   the applicant was talking about Brown.  He said, When the

19   image server and web server are combined, the web server and

20   image server are each limited by the limitations of the

21   other.

22          So Brown and Kraft have the same problem,

23   because the components within the server interact closely

24   together.

25          So this is no more relevant than the art of

1    record, and this is one example of where the defendants

2    are ignoring that file history.  Defendants' expert tried to

3    carve out pieces of this and say, some of these are the

4    image server and some of these are the web server.  Well,

5    it's all combined in one box and in one server.

6              In fact, what Professor Hardin said was, these

7    yellow boxes within the server would do the image serving

8    functions and the purple or blue boxes would handle the

9    web server functionality.

10             Well, number one, they're all in the same

11   server.  That's the opposite of what the applicant said

12   in the file history.  And to make matters worse, when

13   Professor Hardin was asked about the session manager and

14   the URL loader, he wasn't sure.  That's why they have

15   both colors.  So at least two of the functions are functions

16   that the expert was not sure which server it belonged to.

17             I will move on to Finseth.  That's another one

18   of the references that is primarily relied on by the

19   defendants to show separate image serving.  And there's no

20   image server here at all, because as their witness admit,

21   and as Professor Myers explains, Finseth teaches, consistent

22   with the other prior art, generate these thumbnails on the

23   fly.  The yellow highlighted sections in the slide are

24   what's called the rendering process or the rendering.

25   That's where the thumbnails are made.  You take a regular

1    image of a website and you turn it into a static image and

2    shrink it down.

3              Well, I won't go into this in too much detail,

4    but, for example, the picture on the left, the user submits

5    a request to his browser.  That request is submitted to the

6    search engine and only then is the thumbnail rendered.  This

7    is another on-the-fly generation of thumbnails.  There's

8    nothing in here that talks about pre-storing thumbnails in a

9    separate image server, and the same goes for the other

10   figure on the slide, that the rendering is done only after

11   the user does the request.

12             I tried to group some of the other pieces of

13   prior art based on their common deficiency.  Leighton,

14   Kriegsman, Kopetsky and probably some others, they deal

15   with proxy or ghost servers.  That's a mirror imagine of

16   the main server, and so there's no discussion of separating

17   out only the image functionality.  These are like Brown,

18   where the proxy server has all the functionality, the

19   image functionality as well as the web serving

20   functionality.

21             Hanson and Blumberg -- at least Hanson has

22   a box that says it's an image server, but it does not store

23   the images.  It's a real time generation of images.  Serving

24   does not necessarily mean you're storing them.  You could

25   generate and use a server architecture to serve them, but

1    you don't have to store them, and Hanson does not store the

2    thumbnail images anywhere.

3                    And, finally, Miller stores the thumbnails

4    on the user's computer.  That's not a separate image

5    server.

6                    So in light of all these deficiencies in the

7    prior art, the applicants, the defendants tried to combine

8    things.  They ignored those deficiencies, but they also

9    ignored the secondary considerations.  They made attorney

10   argument in their briefs that those secondary considerations

11   are irrelevant, but they didn't submit any evidence,

12   no expert opined on the secondary considerations, and they

13   are not irrelevant.

14                   The attorney arguments missed the point.  They

15   missed the point that the features in the claims of the

16   '904 patent are features that are touted by themselves in

17   their websites and that are mentioned in the Girafa

18   publications, publications where Girafa was mentioned as

19   having a great new tool.

20                   So they're relevant, and I will go through them

21   a little bit.  There are three main categories.  One is the

22   long-felt need.  The other is commercial success by both

23   Girafa and the P.I. defendants.  And, finally, copying.

24                   Long-felt need.  As we've seen from the art

25   submitted, there was a large recognition for the need

1   for thumbnails in a practical solution, and people were

2   doing things in other ways, and every single piece of prior

3   art that deals with thumbnail images of websites, every

4   one of those deals with on-the-fly generation of the

5   thumbnail, and if you store it, you store it right there

6   in your web server.  So they are all focused at that time

7   at a certain business model, certain approach for handling

8   thumbnails.

9          The commercial success is shown in two ways.

10  One, when Girafa launched, it was written up left and right

11  in every Internet publication imaginable.  This one is

12  from ZDNet, I believe, but they were written up in CNet

13  and PC Magazine, and there's a long list, long list in

14  our papers.

15         This one I'm showing here is from ZDNet, and

16  it's in 2001.  It says three downloads that maximize your

17  web browser's power.  Girafa is number two.  And

18  interestingly, Alexa is number three, but not for

19  thumbnails.  That's for another feature that they were

20  working on at the time, because Alexa didn't start looking

21  for thumbnails until after -- probably until after they

22  noticed Girafa.  Maybe even in this publication.

23         So Girafa was written up time and time again

24  from 2001 to 2005 and they did very well.  They started --

25  the customer base started building.  They were doing

1    extremely well.  Their profits went up significantly.  It's

2    in our papers.

3              Then, in 2005 and '06, the defendants started

4    merging in the market.  And this slide 42 is a screen shot

5    from the SmartDevil website that talks about the advantages

6    of them having the server separate from the customers.  And

7    they say, "We provide an end to end turnkey solution.  You

8    don't have to provide any hardware, software or bandwidth

9    resources.  We take care of everything for you.  You

10   shouldn't need to cache or store the thumbshots."

11             And then, at the very end, thumbshots are pulled

12   from our servers directly by the end users.

13             So they're touting the advantage of having their

14   own -- their server bank that you customers don't have to

15   worry about.  That's commercial success evidence for the

16   claimed feature of separate image servers.

17             Alexa touts the home page aspect as well as the

18   separate servers.  They talk on their website about their

19   thumbnails for the home pages and gives you access to

20   Alexa's large and growing collection of images.

21             And at the bottom, they mentioned how easy it is

22   to use.  All you have to do is add a single line of code to

23   your web page, and then the people that come to your website

24   will get thumbnails from our servers.

25             So they are touting the same things that are in

1    the claims as well.

2                  Finally, Snap does the same thing.  But the code

3    on their website and Snap takes care of the rest

4    automatically.  They call their technology award-winning.

5    Massive library of web pages.

6                  So this is the server and the ease of use, where

7    you just use a little piece of code into your browser or

8    your website and then you have access to our separate

9    server.  You don't have to worry about it.  That's evidence

10   of commercial success that's not rebutted.

11                 There's also copying evidence, which is an

12   element of secondary considerations of nonobviousness, and

13   in 2004 and 2006, Snap and its incubator company were

14   looking at Girafa.  They were getting information from

15   Girafa.  They were clearly aware of what Girafa was doing

16   and the thumbnail system that Girafa had.  And then they

17   went out and did it themselves.

18                 Thumbshots, in addition to using the technology,

19   is brazen enough to use Girafa's name in their home page so

20   that people searching for Girafa would accidentally stumble

21   upon Thumbshots.  So that's evidence that Thumbshots was

22   aware of us and that Thumbshots is targeting us to take

23   customers away, and based on our technology.  That's also

24   evidence of copying and awareness Girafa's technology.

25                 I'm going to let -- Mr. Mandir is going to

1    handle the rest of the part, unless your Honor has questions

2    of me.

3                    THE COURT:  I do not at the moment.

4                    MR. RABENA:  Okay.

5                    MR. MANDIR:  Good morning, your Honor.

6                    THE COURT:  Good morning.

7                    MR. MANDIR:  I took note of your comment about

8    clearing the courtroom and taking 30 minutes for one

9    question and, unfortunately, I think that would be the

10   situation here, so I have kind of a solution, which would

11   not require that.

12                   On slide 48 of our package, Bullet Point 3, that

13   is the sensitive information that we're referring to.  And I

14   think what I can do is not put that up on the screen,

15   reference it in a more generic way that it's in our papers,

16   and that the Court will realize and we won't have to clear

17   the courtroom.

18                   THE COURT:  All right.

19                   MR. MANDIR:  Okay.  So as Mr. Rabena said, we

20   talk about the other factors in connection with the P.I.

21   motion, irreparable harm, balancing of hardships, and the

22   public interest.

23                   Now, Girafa is a very small company.  It has a

24   handful of employees, and their main business is selling

25   these thumbnail images and they're in direct competition

1    with the defendants in this case:  Snap, Amazon and

2    SmartDevil.

3              They've never licensed their patent, meaning

4    that they should be the exclusive supplier of this patented

5    technology.  And as I indicate in this third bullet point,

6    there's real harm being done because they are not able to

7    acquire new customers, and this harm is irreparable.

8              Now, this P.I. motion is somewhat surgical in

9    that it's limited only to those defendants in competition

10   with Girafa.  There are a lot of defendants in this case.

11   The P.I. motion is only directed to those in direct

12   competition.  The others are users and they're infringing,

13   but they're not the subject of this motion.

14             If I can move this.  There we go.  Okay.

15             Let's talk first about Snap and SmartDevil.

16   Their business model is such that they are able to give away

17   the thumbnails for free.  They don't charge anything.  As

18   you can imagine, it's difficult to compete with someone who

19   is giving it away for free when you are trying to sell it

20   for a reasonable price.  As a result, there's erosion of the

21   market price and Girafa is losing market share to both Snap

22   and SmartDevil.

23             Amazon is a little different.  They don't give

24   away the technology for free.  They charge and their pricing

25   is either the same or similar to what Girafa does, but

1    they're properly in direct competition with our patented

2    technology, so they are also causing market share loss.

3            Okay.  So there's real irreparable harm here,

4    one of the other factors of the P.I. motion.

5            The other factor is balancing of hardships,

6    and when we balance the hardships, we submit it tips to

7    Girafa.

8            Snap was aware Girafa's patent application

9    back in 2004, so they went into this with their eyes wide

10   open.  They provide 11 different types of snapshots, only

11   one of which is implicated in this case, so if they're

12   enjoined, it's not like they're going out of business.

13   They have ten other snapshots they'll continue to be able to

14   supply.

15           Although the motion papers seem to suggest that

16   Snap is a little company, in fact, they, as Mr. Rabena

17   mentioned, they have strong financial backing by their

18   incubator parent company, IdeaLab.  So they're a small

19   company but they're backed by a very large company.

20           One other point that is not in our papers,

21   we're looking just recently, it appears that Snap has taken

22   out of their website the home page feature that Mr. Rabena

23   was referring to.  So at least with respect to the home page

24   claims, there's certainly no harm.  It appears that Snap has

25   just removed that from their website.

1               Now, Amazon has kind of a different story.

2       Amazon is a multi-billion dollar company.  The sales of

3       thumbnail services last year was $43,000, a drop in the

4       bucket for a company like Amazon, but for a company like

5       Girafa, it's a significant amount.  So when we balance those

6       hardships, it certainly goes to Girafa.

7               Now, when I read their papers, the main

8       opposition or defense I came away with was the defendants

9       are saying Girafa delayed.  They delayed in seeking this

10      P.I. motion.  And when you look at the facts, in actuality,

11      and this is supported by the declaration of Shirli Ran, the

12      CEO of Girafa, the irreparable harm occurred in 2007,

13      towards the end of 2007, and the reason it occurred is that

14      Girafa lost two main contracts.  And as a result of losing

15      the contracts, they are not necessarily related to the

16      defendants, they lost these contracts and they tried to

17      replace them with other customers and they couldn't because

18      of the infringement.  So really the irreparable harm

19      occurred towards the end of 2007.

20              Now, both defendants who filed briefs in this

21      case, in this motion, cite a case by the Federal Circuit of

22      High Tech Medical, and they say that case, you know, should

23      control here, and that indicates, because Girafa delayed,

24      that this motion should be denied.  But when we look at that

25      case, we think it actually helps Girafa, because in that

1    case, the District Court had granted a preliminary

2    injunction motion and the Federal Circuit overturned it.

3    But when it came to the issue of delay, and in that case, it

4    was a 17-month delay, it came to the issue of delay, the

5    Federal Circuit said, 17 months, this delay standing alone

6    is not going to make us overturn this decision of the

7    preliminary injunction motion.  Rather, the Federal Circuit

8    went to several other factors.

9           And these factors, the first one they went to,

10   was the fact that the patentee in that case, High Tech

11   Medical, they weren't even a player.  They didn't practice

12   their patented technology.  They weren't a competitor.  They

13   didn't even practice their patent.

14          So that was something that the Federal Circuit

15   looked at and said, hey, that's something that would suggest

16   you don't need a preliminary injunction.  Well, that's not

17   the case here, your Honor.  Girafa is in direct competition

18   with these defendants.  So that's very different.

19          The second factor that was looked at was the

20   fact that the patentee had actually offered the defendant

21   in that case a license, which kind of suggests money damages

22   alone would suffice.  You don't need an injunction.  That's

23   not the case here.  As I indicated before, Girafa has never

24   offered a license to the defendants or to anybody.  They

25   want to be the exclusive supplier of this technology.  It's

1    their technology.

2            So when you look at these factors, the Court

3    said that delay alone wasn't going to do it, but when we

4    looked at these other factors, the fact that the patentee

5    was not in the market, the fact that they had offered a

6    license, damages alone would suffice, you didn't need any

7    interim injunctive relief, and that's why that Court, that's

8    why the Federal Circuit overturned the P.I. motion.  That is

9    not the case here, your Honor.  So we think that case

10   actually helps us.

11           The final thing is the public interest, which

12   we also believe favors Girafa.  As Mr. Rabena said, this

13   industry was founded by Girafa in the 2000/2001 time frame.

14   We saw some literature that indicated that this had received

15   a lot of industry acclaim.  It was a big deal.

16           And Snap, as we saw from the e-mail from Mr.

17   Boyle, they contacted Girafa under the guise of saying, hey,

18   we want to buy your services.  It was actually not Snap,

19   but, again, their incubator company, IdeaLab, had contact

20   Girafa.  Hey, we want to understand more about your

21   technology, we want to buy it.  But then they did not buy

22   it.  They formed Snap to compete directly with Girafa, and

23   they compete in a way where they are able to give away the

24   thumbnail images for free.

25           Amazon also went into this with their eyes wide

1   open.   In 2004 -- I'm sorry -- in the spring of 2006, Amazon

2   was aware of the patent.   As Mr. Rabena said, they have not

3   offered here in 2008 any substantive noninfringement

4   argument.   They certainly didn't have one back in 2006, when

5   they were aware of the patent.

6          So under these factors, your Honor, we think

7   that the public interest certainly favors Girafa and

8   entering this preliminary injunction.   So that is all I have

9   on the irreparable harm issue.

10          THE COURT:   All right.   I think I will save my

11   questions until I hear from defendants.

12          Why don't we take just 15 minutes before we

13   begin that presentation.

14          (Short recess taken.)

15                  -  -  -

16          (Proceedings resumed after the short recess.)

17          THE COURT:   Please be seated.

18          Yes, sir?

19          MR. PASTERNAK:   May it please the Court, your

20   Honor, my name is Tom Pasternak.   I'm from DLA Piper, and

21   representing the Amazon defendants in this case.

22          THE COURT:   All right.

23          MR. PASTERNAK:   My colleague, Dave Donoghue,

24   will also be presenting on a portion of our technology or

25   a portion of our presentation.

1          I've got some boards I'd like to use and with

2   your permission, I'd like to walk over there and point some

3   things out much.

4          THE COURT:  Surely.

5          MR. PASTERNAK:  And, finally, your Honor, I

6   have, like Mr. Rabena, a couple binders for use by you and

7   your clerk.

8          May I approach?

9          THE COURT:  Yes.

10          MR. PASTERNAK:  And there is stuff in these

11   binders that has been designated under the protective

12   orders, and we will deal with the lodging issues later.

13   (handing binders to the Court).

14          THE COURT:  All right.

15          MR. PASTERNAK:  If that's all right?

16          THE COURT:  That's fine.

17          MR. PASTERNAK:  Your Honor, I want to start

18   with something Mr. Mandir said.  I think he has basically

19   admitted that the irreparable harm in this case was not

20   caused by and is not being caused by the defendants in

21   this case.  I'm going to come back to that.  But if you

22   really look at what happened here, this company got killed

23   when it lost Microsoft and when it lost AOL.  I'm going to

24   put that on a timeline and explain that to you, but that is

25   the harm.

1          Now, what they're saying the harm is by these

2     companies is not the real harm in this case.  I'd like you

3     to keep that in mind.

4          THE COURT:  All right.

5          MR. PASTERNAK:  I was reading a lot of cases

6     last night, getting ready for the hearing probably as

7     other people were, and it's startling to me and I guess

8     not surprising that no mention has been made by Mr. Rabena

9     or Mr. Mandir of the standards that are in play today, and

10    really a sharp contrast, the standards that are applying to

11    both sides of this room.  I've read some of your cases.  You

12    know, I've read some of the other Delaware Court cases.  I

13    read some Federal Circuit cases.  And I'd like to start out

14    by putting the standards that have to be applied into

15    context.

16         A preliminary injunction is a drastic and

17    extraordinary remedy, rarely granted in patent cases.

18    That's the Cordis Corporation case, Federal Circuit case.

19    Another case by Judge Latchum, the standard for granting a

20    preliminary injunction against infringement in a patent suit

21    is an unusually high one.  The parties seeking preliminarily

22    to enjoin infringement must demonstrate beyond question that

23    the patent is valid.  That's the Jenner Corporation versus

24    Modern Made Company.  I have cites, but that's Judge

25    Latchum.  And he also said in that same case, the Court has

1    recently, as the Court has recently observed, the standard

2    for granting a preliminary injunction against infringement

3    is unusually stringent.  Stringent means severe, strict,

4    rigorous, harsh, tough, and flexible, rigid.

5              So that's the standard that Girafa is facing

6    today.  Sharp contrast to the standard we're facing today as

7    a defendant is down here.  All we have to show on the

8    question of validity is a substantial question or that the

9    patent is vulnerable.

10             I think we can stop right now.  I think there's

11   enough that you've seen in the papers, and you'll certainly

12   see more of it when Mr. Donoghue gets up and makes our

13   positions known, and Mr. Nielsen.  We have shown that this

14   patent is vulnerable.  That is enough and enough of a

15   grounds for you to stop and not grant the motion.

16             There's one more point of law that I would

17   like to get out there in the beginning that's going to kind

18   of be a context with the case and then I will get into the

19   argument, and that is this issue of loss of market share.

20             Girafa claims loss of market share because of

21   our activities.  We don't agree with that at all.  But even

22   if it were true, loss of market share is not enough for

23   the moving party to allege as a proxy for irreparable

24   harm.  That's the law.  So even if there were market share,

25   that's not enough.  There are two problems with that,

1   and that standard, and that law needs to be kept in mind

2   today.

3          The Court in that case says -- it's the

4   Siemens Medical Solution versus Saint-Gobain Ceramics,

5   application of that concept that every patentee is always

6   irreparably harmed by an alleged infringement of pretrial

7   sales with equally -- would equally disserve the patent

8   system.

9          So that's a context.  And I think it has been

10  ignored by plaintiffs and I think it can't be and I think it

11  has got to be kept in mind.  Given that burden, I'd like to

12  point to my first board.

13         We think there are at least seven, maybe eight,

14  maybe nine, maybe six -- I'm not arguing about how many -- a

15  lot of different reasons, and each of them standing by

16  itself, that you could deny this motion.  The delay, which

17  we'll talk about, the fact that Alexa, and just to make

18  clear, I have two clients, two Amazon entities and an

19  Alexa entity.  Alexa is the only company that has a product

20  accused of infringement, so I'm probably going to be

21  referring to Alexa, but I may blur over into the Amazon

22  defendants.  It's essentially the same thing.

23         The claim construction situation that we

24  will get into, the lack of participation by all of our

25  other defendants, the invalidity issues, noninfringement

1    issues, the inequitable conduct issue, any one of them is

2    enough.  If you pile them all up, it's just overwhelming

3    and the standard that they have to meet, extraordinary,

4    given all of that, I think the answer is pretty clear, that

5    this motion shouldn't be granted.

6              What I would first like to do as I get into it,

7    your Honor, is teach you a little more about Alexa.  Alexa

8    is essentially -- it's an information company.  You go to

9    Alexa to learn about what sites are being hit a lot, what

10   popular searches are, things like that.  It does have a

11   search capability, where you'll see thumbnails.  But it's

12   not in the thumbnail business.  It's a subsidiary, a small

13   subsidiary of Amazon, located in San Francisco, that we

14   acquired a few years back.

15             What I'm going to show you is a screen capture

16   of an actual search I did on Alexa, just so you get sort of

17   a real life context.  You could go back and do this on your

18   own.  I didn't really have the capability to do it in the

19   courtroom.

20             And what I'd like to do, if it's appropriate,

21   your Honor, is walk over and point some things out while

22   it's going.

23             THE COURT:  Okay.

24             MR. PASTERNAK:  So we're signing out.  We are

25   signing into the Alexa's home page.  This is what will

1    come up.  As you can see, there are graphs.  There are

2    lists of top searches.  There's all sorts of information

3    about various cites.  Top sites and games came up in this

4    search on Friday.  You can see thumbnails.  And if you

5    went on there today, you would probably see other

6    information.

7              This is a place where someone who is involved

8    in the Internet community can go and find things out that

9    they want to find out.  It does have a search like Google

10   has.  Everyone is familiar with that.  Alexa has a search,

11   and that is the only product that's accused of infringement,

12   the Alexa search.

13             So you'll see what I do next, I do a search

14   for coffee, not Chinese food.  I like coffee better than

15   Chinese food, and we get a search, a search result.  You

16   are going to see ten hits come up along the left of various

17   home pages or sites that have to do with coffee.  Starbucks

18   you see.  Whatever else comes up on this particular day

19   having to do with coffee, and we get like ten on the first

20   page.

21             And now I'm going to enlarge it and pause it a

22   little bit and explain to you what some of these issues

23   arise due to the home page and the non-home page issues that

24   come up in claim construction.

25             All right.  So if you look at the first hit, you

1  see it's Starbucks.com.  Everybody knows Starbucks.  This

2  URL is a Starbucks.com home page.  This is the home page, a

3  thumbnail of the home page of Starbucks.  Okay?

4             Now, under Girafa's new construction, this

5  will not infringe.  Under their original construction,

6  as we understand it, it would.  So that construction dispute

7  puts infringement into doubt it also puts invalidity into

8  doubt.  It's a moving target.  That's one of the issues in

9  the case.

10             This hit is not -- is a non-home page hit.  If

11  it had stopped at com, it would be a home page URL, but it

12  doesn't.  It has backslash coffee, which means it goes

13  through a non-home page.  It goes through another site that

14  is sort of underneath the home page.  This is the home page

15  thumbnail.  This is the non-home page URL.  By their new

16  construction, this would infringe, assuming all the other

17  elements are there.

18             So I wanted to show you this so you can

19  understand what the talking is about between a home page

20  URL and a non-home page URL.  That's what it's about.

21  And as you go through this search and look at it, you will

22  see some of them are home page URLs and some of them are

23  not home page URLs.

24             As a potential infringer, we don't know which

25  ones infringe.  In our initial papers, we thought, I

1    think we thought all of them did, if everything else was

2    being equal and there wasn't a direct infringement problem,

3    but now we think only these do, only the non-home page

4    URLs.  It's a big issue in the case.  And it also impacts

5    invalidity, as you'll see.

6            The other point, your Honor, I wanted to make

7    about, while I had Alexa up, is this issue of infringement

8    and whether it's contested.  It is contested, and here's

9    why.

10           Both of the claims that are asserted against

11   Alexa require providing to the user something, providing to

12   the user a search.  Without a user, there's no infringement.

13   They have made no effort to show how a user is involved in

14   what Alexa is doing.

15           I'm a user, so if they sue me as a user and say

16   that Amazon is causing contributory infringement or inducing

17   my infringement as a user, they may have a viable theory

18   if they do it right.  The problem is they have not said

19   anything about that.  They just gloss it all over, point

20   to this website and say, you're infringing, Alexa.  To

21   me, that's another problem.  That's another reason to

22   deny the motion.  The lack of a good infringement theory

23   against the service that Alexa is being accused of

24   infringement.

25           The only other point about this, your Honor,

 1    is this is the only product they're accusing of

 2    infringement.  The $43,000 they are talking about, we

 3    also sell thumbnails to others, people who want to buy

 4    them.  That is the money that they are saying they would

 5    get if we're enjoined, but they have not accused that

 6    portion of our business of infringement.  They've accused

 7    this portion of our business of infringement.  If this were

 8    enjoined, they have not even accused the other thing where

 9    the money is of infringement.  This is just an internal use.

10    So there is a major problem with that theory as well.

11              Mr. Rabena noted that the claims are written

12    through the perspective of the user.  He realizes that.

13    It's the user.  There has to be an indirect infringement

14    theory.  They have not even articulated one.

15              The next thing I would like to talk about,

16    your Honor, with your permission, is put up another board

17    that lays out the chronology.

18              THE COURT:  All right.

19              MR. PASTERNAK:  And it is in the Judge's

20    notebook.

21              What I'm going to show you on this slide,

22    your Honor, is the delay, which I will concede is not by

23    itself enough, by the case law, but it certainly is a major

24    factor, and it's a big factor here combined with everything

25    else.

1           So here are kind of the salient facts of the

2    case.  Around the early part of 2000, Ms. Ran, who you

3    will see shortly, testified, started her company, Girafa.

4    They got lucky.  They signed with Microsoft right out of the

5    box.  That is what got the company going.

6           Alexa began to claim thumbnails in 2002.  They

7    get lucky again in 2004, when they sign with AOL.  So right

8    in the beginning of the history of the company, they have

9    these two big clients.

10          March 8, 2005, their patent issues.  Here's

11   when the delay starts.  We're out there.  They know about

12   it.  They have not disputed they know about it.  They wait

13   three years.  Sue, file a preliminary injunction.  This is a

14   delay factor.  It's big.  You can't question the case law

15   says the delay is a big deal in denying a preliminary

16   injunction.

17          Now, here's the real harm, as Mr. Mandir pretty

18   much admitted.  2001, they sign with Microsoft.  Right

19   before they sue, they lose Microsoft.  They also lose AOL.

20   That's what killed this company.  Nothing the defendants

21   are doing killed this company.  It's only after that

22   happened and that they are harmed that they decide, what

23   are we going to do now?  We're going to go after these

24   little guys with -- to try to do something.

25          One of the things they try to do, and you will

```
 1    see Ms. Ran testified about this as well, is they tried to

 2    evolve.  Companies have to evolve as things change.  In the

 3    middle of losing these big companies, they change their

 4    business plan, and you'll hear her testify that they are

 5    going after smaller companies now.  They are not going great

 6    guns, but they're slowly but surely becoming a different

 7    company.

 8              Mr. Nielsen will show you that they are out

 9    there on the Internet, trying to hire people.  We are

10    hearing they're about to die.  I don't know that that is

11    right.

12              So the big delay and the real harm.  That is the

13    point of this slide.  And I think, as you look at this laid

14    out and look at when the lawsuit is filed, inescapable

15    conclusion that, yes, there's some harm to this company.

16    It's not just by the people in this room.

17              I'm going to take that one down so you can see

18    the screen.

19              The next part of my presentation, your Honor,

20    really drills in on why Girafa is not harmed, particularly

21    by Alexa.  And those points are proved pretty well by Ms.

22    Ran's own testimony.

23              (Videotape played as follows.)

24              "Question:  Did Girafa.com have some sort of

25    arrangement with Microsoft/MSN?
```

```
 1                    "Answer:  That's a question?

 2                    "Question:  Yes.

 3                    "Answer:  We had an agreement with them.

 4                    "Question:  What was the agreement?

 5                    "Answer:  We were providing them with a Girafa

 6      (inaudible) service.

 7                    "Question:  And when was that?

 8                    "Answer:  The agreement was signed in 2001.

 9                    "Question:  At some point, did the relationship

10      end?

11                    "Answer:  Yes.

12                    "Question:  When was that?

13                    "Answer:  At the end of 2007.

14                    "Question:  Why did it end?

15                    "Answer:  Because the feature that included

16      Girafa's thumbnail was taken out of Internet Explorer and

17      no longer available in Explorer 7, so as a result, the

18      service discontinued.

19                    "Question:  So Microsoft did not go to a

20      competitor; correct?

21                    "Answer:  No, they didn't, not that I know of.

22                    "Question:  What happened in 2006 that you

23      believe may have caused this drop in Girafa sales?

24                    "Answer:  Girafa has been working in that area

25      mainly with large scale customers, and we have lost one of
```

1   those accounts.  And that was the reason for the drop.

2                   "Question:  Who was that?

3                   "Answer:  AOL.

4                   "Question:  Do you have any specific examples?

5                   (Videotape stopped.)

6                   MR. PASTERNAK:  Your Honor, as I was listening

7   today and thinking about this, this was not even in

8   their opening brief.  This came out in her deposition.

9   No mention of it in their opening brief that this was the

10  cause of any damage to the company.

11                  (Videotape played as follows.)

12                  "Question:  Do you have any examples of

13  customers that you are not able to acquire because they

14  are going to competitors?

15                  "Answer:  Obviously, customers, also

16  competitors, would qualify under, as falling under your

17  question.  In most cases, we do not actually receive an

18  explanation or a response as to why someone is not using or

19  is not continuing with Girafa.

20                  "So the only thing I would say, the obvious

21  example are customers off the competitors.

22                  "Question:  You use 'obvious' again.  What do

23  you mean?

24                  "Answer:  The clear examples of this would be

25  customers of the competitors.

1                    "Question:  What customers are you referring to?

2     I'm trying to get names of companies that you think you've

3     lost to competitors.

4                    "Answer:  I'm giving an example of names of

5     companies that we have lost as potential customers.

6                    "Question:  Okay.  I haven't heard any.

7                    "Answer:  We can look at the list of customers

8     for any of the competitors and name these.  That would

9     be --

10                    "Question:  So what you are saying is, if I

11     understand you, that Snap or Alexa's customer list are

12     competitors you lost; is that right?

13                    "Answer:  No.

14                    "Question:  All right.

15                    "Answer:  You asked me, or at least if I

16     understood it correctly, potential customers that we have

17     lost, and I'm saying that customers of our competitors are

18     potential customers that Girafa has lost.

19                    "Question:  Okay.  So for me to get specific

20     companies that you think you've lost due to the competitive

21     action, I would go and say, Alexa, who are your customers?

22     You would then say, those are my lost customers.

23                    "Is that what you are saying?

24                    "Answer:  Would say these are, these were

25     potential customers for Girafa and that they are currently a

1    customer of their competitor, so, yeah.  I've lost them as a

2    potential customer.

3              "Question:  Do you think that that is a logical

4    explanation, just because they went to a competitor, they

5    should have been yours?

6              "Answer:  I'm not saying they should have been

7    mine, but they could have been mine.

8              "Question:  All right.  So if I understand this

9    right" --

10             (Videotape stopped.)

11             MR. PASTERNAK:  So, your Honor, it's pure

12   speculation.  There's no evidence they lost any customers to

13   Alexa.  She can't name one.

14             And the next clip, your Honor, has to do with a

15   change in the model and that they are reinventing the

16   company and they're doing something as they go forward.  You

17   can hear Ms. Ran describe it.

18             (Videotape played as follows.)

19             "Question:  Ms. Ran, you at some point, 2006,

20   have you changed your focus to try to -- let me finish the

21   question -- concentrate on the smaller sort of customer as

22   opposed to the larger?

23             "Answer:  We've increased our focus to include

24   small and medium size.  We believe that we did not want

25   to be dependent on a few number of large customers, and

1    that's why we decided to offer such a solution through our

2    website that is available and suitable for the small and

3    to medium sites as well.

4                "Question:  With respect to the small and medium

5    sites, is Girafa.com losing significant market share or is

6    it gaining market share?

7                "Answer:  It's not gaining market share.

8                "Question:  Is it losing market share?

9                "Answer:  Can you --

10               "Question:  Sure.  What I'm trying to get clear

11   is, as I understand it, this loss of significant market

12   share you referred to in your declaration has to do with

13   sort of a larger potential client or a larger client.  At

14   some point, you decide to change your focus a little bit and

15   maybe try to get a smaller or medium client.  I want to know

16   what's going on with respect to market share for that group

17   of people, group of companies.

18               "Answer:  Okay.  What I'm trying to say, that we

19   are not seeing an increase in the market share attributable

20   to Girafa in the form of being supplier of thumbnail

21   services to those sites.

22               "Question:  But Girafa is gaining new customers

23   in that segment every day; right?

24               "Answer:  New customers we're getting every day

25   are mostly, if not -- these are mostly free -- these are

 1   mostly customers of the free service.

 2             "Question:  Is Girafa getting new paid customers

 3   every day?

 4             "Answer:  No.

 5             "Question:  Is it losing paid customers every

 6   day?

 7             "Answer:  No."

 8             (Videotape stopped.)

 9             MR. PASTERNAK:  The point on the next bullet,

10   your Honor, is without any testimony, it's illogical to

11   speculate that Alexa is stealing market share from Girafa

12   when our prices are higher.  It just doesn't make any sense.

13   And even further, it's illogical to assume we're damaging

14   them when we have prices that are higher than them when

15   there are people out there who are giving away thumbnails

16   for free, as Ms. Ran admits.

17             (Videotape played as follows.)

18             "Question:  I'm confused by your answer, so let

19   me ask it again.  Are you being harmed -- is the harm worse

20   from a defendant that's offering its services for free or

21   from a defendant that is selling its services?

22             "Answer:  I'm not sure how you define 'harm'

23   in this, but it's competing with a service that is provided

24   for free is much more difficult, yes."

25             MR. PASTERNAK:  And the last point on this

1   theme, that Girafa has not been harmed by Alexa is monetary

2   damages can be quantified if this ever goes through and can

3   help them.  The fact that they presumably are going to go

4   under before that happens begs the question of what these

5   monetary damages are.

6          If it's $43,000, which, by the way, isn't even

7   coming from the product that's accused here, assuming they

8   can somehow get that $43,000 that Alexa makes a year on the

9   thumbnails they provide to other people, is that really

10  going to keep the company afloat?  It can be quantified, but

11  it's not going to help the problem caused by the loss of the

12  big accounts.

13         The last point I would like to address,

14  your Honor, before I turn it over to Mr. Donoghue is what

15  I'm calling the claim construction mess, and this has sort

16  of two parts to it.

17         One is the fact that there are not countless,

18  but a lot of terms here that are in dispute, proposed

19  constructions have changed throughout the series of

20  briefings, so that that by itself, as the case law shows,

21  is enough to deny the preliminary injunction, and maybe

22  more importantly, none of these people in the room who are

23  going to be affected by the outcome of claim construction,

24  all the other defendants who aren't in the preliminary

25  injunction, they have not even had the chance to

1   participate.

2           So you can deny this now on that basis because

3   it's such a mess and/or, more importantly, because none of

4   the defendants have had a say, and I know that they have

5   different views on these constructions and I know they're

6   going to want to have their day, as they should.  It doesn't

7   make any sense to any of us that you should do this now in

8   this context and then have to do it again either in the

9   context of summary judgment/claim construction later on in

10  the case.

11          But what I'm going to do here is just show you

12  how we got to where we are in this case.  In Girafa's

13  opening brief, they propose six terms that they thought

14  needed construction and that they proposed terms for.

15  Amazon accepted all six.  Snap accepted five, but did not

16  accept image server, which is shown in red.

17          So Snap, in its opposition, opposed image server

18  and opposed four more terms that they thought needed

19  construction.  So we're up to like ten terms and one is in

20  dispute at this point.

21          In Girafa's reply, all of a sudden, terms that

22  weren't even in dispute in the opening brief, the ones that

23  they had proposed, based on our oppositions, they took issue

24  with some of the constructions we had come up with,

25  presumably because they affect invalidity, so now, all of a

1    sudden, we have this home page link or non-home page dispute

2    you're going to hear more about.  We have this separate

3    image server dispute and we have an annotated web page

4    dispute.  In our proposed surreply, we took issue with the

5    same.  And then Snap, in its surreply, took issue with three

6    others.

7             So here's my list.  I bet everyone has a

8    different list, some longer or some shorter, of the terms

9    that are in dispute.  I think we can all admit there are a

10   lot and we can all admit not everyone in this room has had

11   time to participate, two reasons to deny the motion today.

12            Unless you have any questions from me, your

13   Honor, I'm going to turn it over to Mr. Donoghue to address

14   some specific claim construction issues and the invalidity

15   part of the case.

16            THE COURT:  All right.  Thank you.

17            MR. DONOGHUE:  Good morning, your Honor.

18            THE COURT:  Good morning.

19            MR. DONOGHUE:  Mr. Pasternak has laid out the

20   number of claims in dispute.  I want to talk to you about

21   invalidity, and as a first step in that, really focus in on

22   two of the constructions that are particularly significant;

23   not surprisingly, the same two that Mr. Rabena spoke about

24   at length.

25            They really, at least for the Amazon defendants,

1    are the heart of the invalidity issues, the disputes over

2    the invalidity issues.

3              So, first is separate server.  That's the issue

4    of whether the image server and the web server are, in fact,

5    separate.

6              In his opening brief, Girafa, through their

7    expert, Dr. Myers, said that separate meant a functional or

8    logical separation.  And what that means is that the

9    separation does not have to be in separate boxes, as

10   Girafa now suggests, but it can be within a single box

11   or a single computer, a single entity, as long as it can be

12   understood to be separate by someone of ordinary skill in

13   the art.

14             And we'll hear Mr. Myers explain that, Dr. Myers

15   explain that.

16             (Videotape played as follows.)

17             "Question:  How did the scenario where you have

18   a multi-processor, one chip, multi-processor chip; right?

19   Are you with me?

20             "Answer:  Yes.

21             "Question:  And that same multi-processor is

22   running a web server and is running an image server.  Is

23   that separate?  Are the web server and the image server

24   separate if that were the case?

25             "Answer:  I think if you can distinguish, if

1   somebody, you know, an engineer or user looking at the

2   system can distinguish one from the other, then they're

3   separate.  So I think, you know, if they are running in a

4   way that they are separate, that's sufficient."

5                   (Videotape stopped.)

6                   MR. DONOGHUE:  So here, Dr. Myers says they've

7   taken multi-processors, the chip that's in any computer,

8   you can run a web server, an image server off of that single

9   processor as long as it's a multi-processor, meaning it can

10  do more than one thing at once.

11                  And in Girafa's opposition to Amazon's motion

12  for a surreply, they suggest that Dr. Myers was answering

13  hypothetical questions here.  He wasn't talking about

14  the patent.  But in the next clip, Dr. Myers explains

15  that he's talking about the definition of separate right

16  in the patent.  And he also talks about the idea of one

17  box and how you can really fit anything in the one box.

18  He uses the example of a microwave and a conventional

19  oven.

20                  (Videotape played as follows.)

21                  "Question:  What are the parameters or methods

22  that one uses to distinguish whether they're separate

23  for purposes of this definition?  As a potential infringer,

24  how do I know what's separate or what isn't?

25                  "Answer:  Well, they serve different functions.

1              "Question:  So it's truly functionality?

2              "Answer:  I think the -- the patent is clear,

3     that it's using the same kind of software, using Apache,

4     whatever version it was.  Serve both functions, and it's

5     clear that they invented it for -- two separate functions.

6              "So, clearly, the distinguishing feature is what

7     function they're serving.

8              "Question:  And it doesn't matter if the

9     hardware, if the software it's running is in the same metal

10    box?  They're still going to be separate?

11             "Answer:  Today you can get more and more stuff

12    into the same box, so, you know, you could put, you know, a

13    microwave in a regular oven in the same box, but it doesn't

14    mean that they are the same functions.  So I don't think the

15    physical box is an appropriate metric.

16             "Question:  All right.  So that's what I'm

17    trying to get at, and I think what you are telling me is the

18    appropriate metric is if one can distinguish separate

19    functions between the two servers?

20             "Answer:  Yes."

21             (Videotape stopped.)

22             MR. DONOGHUE:  So Dr. Myers was clear in that

23    initial deposition.

24             Based on that, the Amazon defendants accepted

25    Girafa's construction and showed that the '904 patent was

1   invalid based on several references.

2           On reply, Girafa comes out with a new

3   construction.  You can see this portion of the sentence

4   from Dr. Myers' rebuttal declaration:  A single server

5   that does all of the functions is not what these claims

6   require.

7           And during Mr. Rabena's argument, you heard him

8   talking about, got to be in separate boxes.  So we have a

9   major shift in the claim construction, making it very

10  difficult for the Amazon defendants to know what they are

11  trying to do.  However, as I will talk about, the claims

12  of the '904 patent, the single server claims, remain

13  invalid.

14          The next element, the last element I want to

15  talk to you about, is the link to element, as we've been

16  calling it.  This one is very surprising to us.

17          Girafa, in their opening brief, made no mention

18  that the requirement, and you see it in claim 1, in the

19  last element there, providing a thumbnail visual image of

20  the home page of at least one website, which is represented

21  by said at least one hyperlink.  Then it goes on and talks

22  about the image server a little bit.  But just as by a

23  hyperlink, there is no language at all suggesting it has to

24  be limited to a deeper link or non-home page link.

25          Girafa says we've ignored the prosecution

1    history, and you will hear more from Snap about the

2    prosecution history.  But we've not.  What we have

3    done is looked at the clear language of the claims, and

4    there is no doubt what the claim says.  It says, just a

5    hyperlink.

6           Again, the Amazon defendants accept Girafa's

7    initial construction for purposes of this motion in their

8    responsive papers and Amazon replied, makes their change.

9           So that leads us to invalidity.  And Mr. Rabena

10   directed you to two claims, claim 1 and claim 35.

11          The '904 patent, Girafa's patent, has in excess

12   50 claims, and Girafa has charged infringement with more --

13   for the Amazon defendants, more than 30 of those claims.

14   But the parties have really looked at claim 1, which has

15   the link to element and claim 35, which has a single server

16   element.

17          Girafa is not arguing, at least in reply or

18   today, about any of the other elements.  There's no question

19   that the prior art shows, has a method for presenting

20   Internet information, or that there's a visual image of a

21   web page with a hyperlink, or that a thumbnail visual image

22   is provided.  It is just about these two elements.

23          And let's turn back to separate server element

24   in claim 35, and we'll look at -- it's five prior art

25   references, or five of the six that we cited.  There's also

1    the Robertson reference.  In the interests of time, I'm not

2    discussing that.  We'll stand on the papers there.

3              Mr. Rabena called our invalidity effort a

4    shotgun attempt.  It's really not.  We've cited six

5    references because there's a lot of art out there.  He

6    says that we cited 30 prior art references.  Professor

7    Hardin, in his declaration, provided a background section,

8    explaining what some of the prior art was that was in

9    existence at the time, citing a bunch of things, but we're

10   not relying on that for invalidity purposes.

11             And so we look back to claim 35 in a separate

12   server.  What I want to do is show you an image from each of

13   the five patents.

14             First, we have the Schmid reference.  I will

15   talk about the Schmid date briefly a little bit later.

16             Can I approach?

17             THE COURT:  Yes.

18             MR. DONOGHUE:  Thank you, your Honor.

19             Are you able to see with that board there?

20             THE COURT:  Yes.

21             MR. DONOGHUE:  In the Schmid reference, this

22   is Figure 2 of Schmid, we see a thumbnail server host.

23   That's your image server and a web server host.  These

24   are actually two web server hosts.  So you have the web

25   server.

1          Now, the thumbnail server hosts also creates

2    some of the thumbnails, and so Dr. Myers disputes that, but

3    you have separate servers there.  They're even in the

4    separate boxes that Girafa and Dr. Myers prefer, but they're

5    no question functionally separate.

6          This, your Honor, is Figure 4 of the Kraft

7    patent, and Girafa talked at some length about this.  There

8    are two elements that are important here.

9          First, they direct you to the server side box

10   and say, one box can't be separate servers.  There certainly

11   can be functionally separate servers.  And there are several

12   indications of that.  That's the second important point.

13          First, we see a cache database.  This cache

14   database is where the images are stored.

15          Additionally, it does not show it in the figure,

16   but the Kraft patent is generally teaching a system that's

17   interacting with another search engine.  So, for example,

18   Google would be out here in space somewhere, providing the

19   web page that the thumbnails would be added to.  So even

20   though there's one box, there are multiple servers.  At

21   least functionally, and also physically.

22          This is the Finseth patent, the '840 patent,

23   and, again, here, you have a search engine in the upper

24   right corner.  This is Figure 4.  This search engine is

25   your web browser.  And then you have a renderer plug-in

1    in a browser interface right here, which is your image

2    server.

3              Now, Girafa questions exactly what that is

4    doing and if it's storing, but it's certainly capable of

5    storing, and it's even physically separate as well, of

6    course, as functionally separate.  As something that's

7    physically separate, it almost has to be functionally

8    separate.

9              Here, we have the Miller reference, and Girafa

10   makes a point that Miller and Brown were considered by the

11   examiner, but that does not prevent us from using them to

12   show invalidity, of course.

13             And in Miller, we have the document source, the

14   web server, and the storage device that's holding our

15   images.  There's a central processor, but we still have

16   functional separation of the two pieces, because they're on

17   opposite sides, separated.

18             So you can tell that they're doing different

19   things.

20             And the final reference on separate servers is

21   the Brown reference.  Brown, you can see in the bottom

22   left-hand corner, 206, you have a cylinder, which is a

23   standard representation for database.  You're holding your

24   images there and you have a server, 204, where your web

25   browser comes from.

1          So you have a web server and an image server.

2   This network would be Internet and then these are the user

3   computers that are necessary to complete the system.

4          So for each of these references, each of these

5   references invalidates the '904 patent.

6          Now, going back to claim 1 and the link to

7   requirement, you've got to look at both constructions.

8   And under those constructions, under the first construction,

9   which would allow for a home page thumbnail associated with

10  a home page hyperlink, there are two references that we

11  would like to direct you to.  The first is the Kraft

12  reference.

13         Now, Kraft here is not showing in Figure 1 a

14  home page hyperlink, or a non-home page hyperlink with a

15  home page thumbnail, but what we have here is in the second

16  entry, and this was a sample search result page,

17  www.infoseek.com, a home page hyperlink.  And Kraft teaches

18  providing a thumbnail of the hyperlink site, so this will be

19  a thumbnail of the home page.

20         So under the original link to construction, we

21  have invalidity based on Kraft.  Even using Girafa's new

22  construction, it would be obvious in light of Kraft to make

23  this minor change.

24         Similarly, in the Miller reference, the Hunter

25  patent, Dr. Myers, and this is at Page 304 of his deposition

1    testimony, agreed that Miller would display a home page

2    thumbnail associated with a home page hyperlink.

3            And, finally, and I will leave this for Snap,

4    we discussed and cited the Site-Seer website in our papers,

5    in Professor Hardin's declaration, and this is a page from

6    that.

7            You can see, maybe you can't, but you can see

8    it in the bench book, that it's dated March 2, 1998.  And

9    right here (indicating), we have a thumbnail image of the

10   Microsoft.com website.  You can see it says Microsoft.com

11   across the top.  And Snap will show this in more detail, but

12   there are two links here.  One is blue Microsoft, the blue

13   lettering that universally tells you you've got a hyperlink,

14   and Microsoft.com, the home page.

15           But here we have documents presented in the

16   corporate information area in blue that's another hyperlink

17   to a deeper page within the Microsoft.com website.

18           So this reference, as Snap will talk about in

19   more detail, in combination with any of the other references

20   we've cited for invalidity purposes, makes obvious the '904

21   patent or the claim 1 and its progeny.

22           Finally, I'd like to speak briefly about Schmid.

23   We presented a four page Schmid paper.  The title of that

24   paper was web representation of dynamic thumbnails.  It does

25   not have a date on it.  And we cited to you four patents,

1   the '607 patent that shows, as you can see in that blurb,

2   that's the highlighted language, a paper by the same name

3   that was published in March 1998.

4          The '330 patent has another paper by Schmid of

5   the same title, June 1998.

6          The '502 patent, another paper by Schmid, same

7   title.  This is a July 1998 date.

8          And then, finally, the '165 patent, with a

9   March 1998 date, and the same title.

10          Now, Girafa suggested to you that because the

11   information is on the WayBack Machine, and it was put there

12   in 2002, that it's not prior art.  I would submit that if I

13   put the Gettysburg address up on a website today, it would

14   go on to the Internet archive, the WayBack Machine, but its

15   publication date would not be 2008.

16          I don't know who put it up there and why, but I

17   think the more important evidence is that Schmid put out

18   apparently several versions of this paper.  We happen to

19   have the shortest one.  I didn't receive the paper from Mr.

20   Lim.  This wasn't some sort of back channel effort with

21   co-defendants.  And the fact is, on the WayBack Machine,

22   it's just not necessarily relevant evidence.

23          Additionally, as Mr. Pasternak pointed out,

24   for the preliminary injunction defendants here, for the

25   Amazon defendants, our burden is to show a substantial

1   question, or to show, as to the validity of the patent or

2   to show the patent is vulnerable.  I think that Schmid does

3   that.

4          Your Honor, unless you have questions for me, I

5   will turn it back to Mr. Pasternak.

6          THE COURT:  I have none at the moment.  Thank

7   you.

8          MR. PASTERNAK:  Your Honor, I will finish up in

9   about a minute, and it's essentially to counter a couple of

10  Mr. Rabena's points.

11         He said infringement certainly is not contested.

12  Well, it is.  I told you about the direct/indirect

13  infringement issue.

14         As far as secondary considerations, and we have

15  not contested them, if you read the papers, you'll see that

16  their expert for secondary considerations is their technical

17  expert, and he basically admitted that he shouldn't have

18  been an expert on that issue.  I'm not going to read the

19  cross-exam questions.  They're in the brief.

20         All they're really relying on for secondary

21  considerations is advertising and Internet articles.  It

22  would be almost as if I started a business and someone

23  thinks it's a great idea, writes it about me.  All of a

24  sudden, I'm commercially successful.  That is not -- it is

25  not supported by expert testimony at all.  It's lawyer

1    argument that an advertisement establishes commercial

2    success.  And, certainly, irreparable harm is contested.  It

3    is just a question of who caused the harm.

4              The last board I'd like to use, your Honor,

5    is an article by -- an article where the inventor, Ms. Ran,

6    talked to the Jerusalem Post.  This stands unrebutted.  They

7    did not cross-examine her on it.  They did not talk about it

8    in their briefs, two or three briefs.  They did not file a

9    declaration.  She admitted she said these things, and I

10   frankly expect them to say, well, she didn't really mean

11   what she said, but they didn't.

12             So let's see what she said.  And this kind of

13   encapsulates, I think, what is going on here.

14             Ms. Ran said that her invention fills such an

15   obvious need, that it's a wonder no one developed it before.

16   The inventor equating it to being obvious.  And I've heard

17   nothing from anyone saying, oh, you're misinterpreting the

18   statement.  That's not what she meant.  She meant obvious

19   means something in Hebrew.  Nothing.  She also said, as you

20   can read here, she thinks competitors in the thumbnail

21   market are good.

22             So I submit that we -- all we've got is

23   speculation from her saying that, Alexa, Snap, being in the

24   market, are bad.  I can speculate the other way and I can

25   say, we're good.  We're getting thumbnails out there.  We're

1    driving traffic to their cheaper thumbnails.  How does she

2    know if we're -- they're not going to be hurt even worse?  I

3    can counter-speculate to their speculation.

4              That's all I have, you.  We thank you for the

5    time.

6              THE COURT:  All right.  Thank you very much.

7              MR. CISLO:  Good morning, your Honor.  Dan

8    Cislo, of Cislo & Thomas, on behalf of Snap.  And with me is

9    Mark Nielsen, who will address some of the infringement and

10   invalidity, after I address the irreparable harm.

11             As Snap clearly does not admit that the patent

12   is valid and it does not admit that there's infringement.

13   Quite the contrary, we believe it's highly contested.

14             But addressing the irreparable harm, the

15   standard is important to consider, because independent of

16   likelihood of success, it's Girafa's burden to show that

17   money damages are inadequate, and they must clearly show

18   that money damages are inadequate.  Girafa has completely

19   failed in that burden.  They completely failed in that

20   burden because they cannot even identify a single customer

21   it lost to Snap.  They cannot identify even a single

22   customer they would acquire if Snap were enjoined.

23             Girafa offers multiple static thumbnails

24   contemporaneously delivered with the web page.  I think

25   that has been clearly shown today.  Snap, on the other

1    hand, provides dynamic web page previews that are

2    sequentially delivered.  In other words, when you call

3    up the page, you don't have all of these small thumbnails

4    being populated.  You put your cursor primarily over

5    the link and it presents a page, and that page may be

6    rendered in a very different way.  They're clearly not

7    thumbnails.

8              And I'm not sure if the Court uses a Blackberry,

9    but it is kind of like trying to read a PDF on one's

10   Blackberry.  The image is too small.  It's not usable.

11   You can't click on things in there, and although it might

12   have some value, clearly, Microsoft and AOL decided it

13   didn't.

14             Snap, on the other hand, has something of value.

15   It spent some $15 million developing this system that seems

16   to be growing.  And the system that is developed, most, or

17   the majority of it, up to possibly 90 percent, would be

18   enjoined.

19             So it is a -- it would be a terrible fate and a

20   loss of $15 million of development work if an injunction

21   were to enter.

22             The other thing I want to point to is Girafa

23   completely failed to provide any market study or survey to

24   show any irreparable injury.  They failed to identify any

25   non-speculative damages in the event that Snap is not

1    enjoined.

2            Money damages is clearly a satisfactory remedy

3    in the event that it could prevail in this case, even though

4    that's cast in doubt.

5            Even if this were a setting for a preliminary

6    injunction under eBay versus American Exchange, this Court

7    would have the ability to determine that maybe there

8    shouldn't be an injunction.  Maybe there should be some sort

9    of ongoing royalty as opposed to an injunction, applying the

10   different factors that this Court has the discretion to

11   address.

12           Here, we're at a preliminary stage where there

13   has not been a construction of the highly disputed claim

14   language.

15           I have on my right here, and it's in your book,

16   kind of a chart.  It shows Girafa's delay in filing suit.

17   Girafa waited almost two years before filing suit and

18   bringing its motion.  And the timeline, as can be seen,

19   is back in 2006, Snap Enhanced search engine with large

20   previews was launched.  Thereafter, Girafa, in this

21   discovery, has admitted awareness of Snap's allegedly

22   infringing activities.  That's Request For Admission 92.

23           So here we go, April 2006.  And, of course,

24   and then Snap developed some of its other products, spending

25   its $15 million in development.  And you have the Snap

1    Shot's preview service launched.  And then you see in

2    January of 2007, Girafa Investing contacted Snap Investing,

3    and this is all in the papers, to discuss potential

4    collaboration between Girafa and Snap.  At no time did

5    Girafa ever say, hey, you're infringing my patent or, hey,

6    have you looked at my patent, they cover what you're doing,

7    or, hey, do you want to license us because you're

8    infringing.

9              And, in fact, Girafa representative and Snap

10   representative meant in Israel, where Girafa is primarily

11   located with their employees there, to discuss potential

12   collaboration.  At no time did it occur that there was an

13   allegation of infringement, that the Snap system in any way

14   violated any patent.  Until we get to some 18 months after

15   learning about Snap activities, without a cease and desist

16   letter or any notice or phone call or anything, we have a

17   lawsuit that's filed in this action, and then, of course,

18   several months later, Girafa filed a motion for preliminary

19   injunction.

20             So you can see it's almost two years since they

21   were aware of what Girafa was doing, and I argue, and I

22   submit, there are one of three reasons this occurred.

23             One was Girafa knew that their patent was

24   invalid and subject to attack and not strong enough to bring

25   especially against what Snap was doing.

1              Two, that they didn't believe that Snap's

2    previews, which are not contemporaneously, that they do

3    not use separate image servers and they do not have all

4    these thumbnails, they have something very different,

5    infringed.

6              Thirdly, and maybe this is a little bit more

7    nefarious, but perhaps they decided to just wait and we'll

8    build damages.  In fact, Girafa would be in a position that

9    when we do sue them, they will be over a barrel and we can

10   ask billions of dollars from them.

11             Now, I hope that's not the case, but if that

12   is the case, that's not equitable, and if they are coming

13   here to ask for an equitable remedy, that would not be

14   equitable.

15             So we see that there's nothing to show that

16   Snap has had any effect on Girafa's sales, has no effect

17   on any activity with regard to Girafa.  There's no evidence

18   to suggest that Girafa lost Microsoft and AOL because of

19   Snap.  There's no evidence to show that Snap received any --

20   either of those customers or any other customers.  And

21   Girafa has offered no rational proof or viable theory that

22   suggests money damages would not be adequate here.

23             There's simply no irreparable harm here, your

24   Honor, and money damages would be clearly an adequate remedy

25   here.

1          Furthermore, Girafa has failed to even quantify

2     this alleged irreparable harm, as required that they do so,

3     so that the Court can balance what the harm might be to

4     Snap.

5          In this particular case, the harm to Girafa is

6     extreme, as recited in the declaration of Thomas McGovern,

7     the CEO, who is here and spent many sleepless nights over

8     this.

9          Snap would be severely damaged and irreparably

10    harmed.  There's some $15 million of development work that

11    went into this, in their system, in promoting the business.

12    Investors would lose their investment.  Some 30 employees

13    would have to be laid off.  Snap would lose its customers

14    that were never Girafa's customers.  And there's no evidence

15    to show that these customers would go to Girafa.

16          As I said earlier, Snap's other services are

17    insufficient.  There's such a minority portion to carry the

18    business, the business would have to close.

19          Snap would lose its advertising relationships

20    and those third parties would be in the lurch.  Because of

21    the serious life-and-death situation of this, any bond that

22    would be required here would have to approximate the

23    development costs to Snap, which would entirely be

24    appropriate.

25          With regard to some of the arguments that

1    they made about not being able to close the bond, I have

2    never heard any of those cases applicable to a patent

3    case and clearly are not applicable in this situation at

4    hand.

5            The balance of hardship clearly favors Snap

6    as it would have to close its doors, whereas Girafa is

7    seeking a money remedy in this case and they have waited

8    so long that a monetary remedy would be sufficient.

9            Then the final issue to address is about the

10   public interest not being served by granting an injunction

11   here.  And I can't, for the life of me, see what is in the

12   public interest to grant an injunction here.  The public

13   interest is not served where a party waits two years and

14   watches someone else build their business and then strikes.

15   It's not equitable.  It's not justice.

16           The public would not be served by Snap laying

17   off its 30 employees during this time of economic downturn

18   and distress.  The public would not be served by Snap's

19   advertising being terminated.  The public would not be

20   served by the many Snap users to find out their system

21   no longer works.

22           For all of these reasons, your Honor, even

23   without considering the extensive claim construction

24   required, the invalidity issues, the lack of any

25   infringement, the motion should be denied by this Court.

1    The schedule that this Court has set for motions for summary

2    judgment and claim construction is an appropriate way to

3    work through these issues.  As the Court knows, claim

4    construction is a question of law that has to be refined so

5    that there's a proper determination made later on in the

6    event that this goes up on appeal.

7              And so we would ask that, on this basis alone,

8    that there be no injunction granted.  But Mr. Nielsen

9    has some arguments that he would like to make specific to

10   Snap and they have to do as to why there's no infringement,

11   because Snap does not have a separate dedicated image

12   server, because Snap doesn't have a concurrent display of

13   both the web page and the image, that it's sequential

14   viewing instead, that its previews clearly are not

15   thumbnails.

16             And with that, I'd like to ask Mr. Nielsen to

17   approach and address those arguments, your Honor.

18             THE COURT:  All right.  Thank you, Mr. Cislo.

19             MS. NIELSEN:  Thank you, your Honor.

20             I just want to show you briefly what Snap

21   services look like.  These are all screen shots that were

22   in the declaration of Mike Agostino.  One of Snap's services

23   is called Snap Enhanced and it's a search engine, much like

24   a Google or something else.

25             In the upper left, where it says Snap, you type

1    in your search query.  The column on the left are search

2    results and this large image on the right is a preview of

3    one of the results.  It's the one that's highlighted in

4    blue, so it's the third result.  And a user would just

5    toggle their mouse up and down on the left side and it would

6    change the preview.

7              And that is not a thumbnail.  Thumbnails are

8    small images, and that is not a small image.  It's half

9    the size of your web browser and it's much larger than the

10   images that Girafa, in their own system, refers to as

11   thumbnails, which is on the left.  Those are Girafa's

12   thumbnails on the left, those little boxes, and this is

13   Snap's preview on the right.  I mean, in terms of area, it's

14   problem he 15 or 20 times larger, Snap's preview, than

15   Girafa's thumbnails.

16             The next service that Snap offers is Snap

17   Classic, and this is, again, a search engine, where a user

18   would type in the search query in the upper left and get a

19   list of search results, much like you would on Google.  And

20   this is a screen shot where a preview has been triggered,

21   but what actually comes up when you first do the result does

22   not have that preview box in the middle.  It's just the

23   search results.  And just to the right of the hyperlink,

24   it's difficult to see.  There's a little icon right there

25   and the user would hover the mouse over the hyperlink or

1   that icon and then the preview would be transmitted to the

2   use's computer and displayed on the on the screen.  And

3   that's what Mr. Cislo was referring to, is there's a lack of

4   sequential providing of that preview in the Snap Classic

5   version of Snap service.

6            And for expediency, Snap has two other services:

7   The Snapshots browser add-on, and basically you're

8   installing a feature that's essentially the same as Snap

9   Classic, where you would trigger the preview, but it's

10   actually just put into your own computer.

11           So you would do a Google search in your

12   computer, and the Google search would have the link icons

13   next to the hyperlinks, and a user could hover over the

14   hyperlink or the icon and then trigger the transmission and

15   display of that preview.  So that's sort of, for an end

16   user, could just enable this on their own computer.

17           And the last service Snap offers is snapshots

18   for publishers and bloggers, and very similar again to

19   Snap Classic, where people who create websites can enable

20   Snap's Snapshot technology on their website to embellish the

21   content, allow users of various websites to preview links,

22   and the user can hover over a link and it will bring up, it

23   will transmit and bring up the preview.

24           So I just wanted to make that clear, that in

25   Snap Classic and then the snapshots browser add-on and

1    Snapshots for publishers, bloggers, that is kind of -- we

2    group them together.  They are slightly different, but in

3    terms of the case, they're essentially the same, and they

4    are different than Snap Enhancement.  There are really two

5    classes of Snap Service:  the Snap Enhanced, which is the

6    big preview window with searchers all on the left, and then

7    the Snapshots functionality, which is the user actually

8    having to affirmatively trigger the appearance of the

9    preview.  It does not come up on its own.

10            And as I pointed out earlier, Snap Enhanced, the

11   primary noninfringement argument that we made for that

12   service was that what is shown is not a thumbnail, and there

13   has been talk in the papers that we admitted their initial

14   construction of a thumbnail being a smaller version of a

15   larger image.

16            Our expert struggled with that tremendously

17   because it just was not something that he -- he understands

18   a thumbnail to have a specific meaning, a definable meaning

19   that's not simply a smaller version of a larger image.

20            Under that definition, you could reduce an image

21   .0001 percent and it would be a thumbnail regardless of how

22   big it started out.  So it's not that a smaller version of a

23   larger image is wrong; it's just not specific enough.

24            And our expert had issues with that and he

25   differentiated Snap Enhanced from the patent by indicating

1      that he did not believe that the preview shown in Snap

2      Enhanced is a thumbnail.

3              This is another issue.  Regarding Snap Classic

4      and the browser add-on and the publisher blogger feature,

5      a primary noninfringement argument that Snap made was that

6      the preview window that comes up with the smaller image in

7      it is not provided, at least partially concurrently.  In our

8      opposition papers, we were very clear as to what we proposed

9      for a construction of providing, and that was transmitting

10     and displaying.

11             These images, these web pages, come from remote

12     servers, and to wind up on a use's computer, there has

13     to be a transmission.  They are not on this to begin with,

14     and certainly, there is an aspect of display to the

15     invention.

16             And if I may, I'm going to walk up to the

17     overhead here and just point out what I'm talking about.

18             In the Snap Classic group of services that

19     Snap offers, what happens is, a user will perhaps do a

20     web search or go to a web page, and that web page will be

21     requested by the user's computer and transmitted to the

22     user's computer and then it will be displayed on the user's

23     computer.

24             And with the Snapshot's functionality present,

25     the user has to then go in and trigger the preview by

1    hovering over the hyperlink, or that little icon, and then

2    the preview is transmitted.  It's not sent with the web

3    page.  It's transmitted later in time and then it would be

4    displayed.

5            And Girafa has severely misconstrued Mr.

6    Robbins' sketch in his deposition by arguing that there's at

7    least partial -- that providing at least partially

8    concurrently being met, because they've only focused on the

9    display part of it.  They have never contested the

10   construction that we proposed that providing meant

11   transmitting and displaying, and clearly, from the way

12   Snap's technology works, in terms of the classic, the

13   browser add-on and the publisher blogger, there is not

14   partially concurrent transmission of the web page and the

15   preview.  And that's a huge distinction that affects every

16   single one of the asserted claims in the '904 patent and

17   easily shows why Girafa cannot show a likelihood of success

18   on the merits as to the Snap Classic group of products.

19           And with Snap Enhanced, again, the thumbnail

20   requirement is in all the asserted claims, and we don't

21   believe that's a thumbnail, so, again, a likelihood of

22   success on the merits is going to be very difficult to

23   show.

24           Now I want to touch briefly on invalidity, and

25   Mr. Donoghue talked about this.  This is the CNN SightSeer

1    website.  This is in the record.  Professor Hardin, in his

2    expert declaration, mentioned it, and Girafa even commented

3    on it in their reply briefs.

4             Again, I'm going to walk over and I believe

5    these materials, the actual web page, the four-page web

6    page that's being shown here, was printed out in your

7    materials to show that this overhead has not been tampered

8    with or it has just been embellished to highlight certain

9    features.

10             This is the web page, the CNN SightSeer web

11   page, and this portion at the lower part has been blown

12   up.

13             An important aspect of the evidence is that

14   this is dated March 2, 1998, 21 months before Girafa filed

15   their provisional patent application.  And what's shown,

16   again, on this site, when you see this in real size, this is

17   a very small -- just a thumbnail of Microsoft.com,

18   Microsoft's home page, and you have two links on this page,

19   a link to the -- this is a Microsoft link.  It's to the home

20   page.  You have a second link, documents presented in the

21   corporate information area, and the URL for this link is not

22   Microsoft's home page, but a deeper page.

23             So what we're --

24             MR. RABENA:  Your Honor, I'm sorry to interrupt,

25   counsel, but this is a new argument.  It has never been

1    briefed or raised by any expert.  The exhibit was in their

2    papers, but the experts never raised this and was asked

3    about this specific exhibit and other exhibits and never

4    said that the second link is an internal link.  So we would

5    object to this coming out now.

6              THE COURT:  Well, you certainly will have the

7    opportunity to respond.  I appreciate your not interrupting

8    argument again.

9              MR. RABENA:  Thank you your Honor.

10             MS. NIELSEN:  At any rate, the second link is to

11    an internal web page and the thumbnail shown is to the home

12    page.

13             So even under Girafa's new construction in the

14    reply papers, this evidence would satisfy the requirements

15    of Claim 1 in their patent, and it's an example that there

16    is a substantial question as to the validity, at least some

17    of the claims of Girafa's patent, just from this one piece

18    of evidence.

19             And I just want to comment briefly.  There's

20    another piece of prior art, Leighton, that was a U.S. patent

21    filed about seven months before Girafa's provisional patent

22    application, and what this reference shows is, and you can

23    read along the top of there.  There's a user in this middle

24    box, Will request a web page from a content provider site,

25    and the content provider site will return the web page.  At

1   the same time, there may be embedded objects in this page,

2   and the patent refers to them as GIF files, which are image

3   files that belong in a web paining.  HTML documents are web

4   pages.  And these embedded objects are images and they're

5   retrieved from a separate server.  They're served from a

6   hosting server, not the content provider site.

7           And this itself, I would admit, is not an

8   anticipatory reference, but GIF files, image files that

9   would be embedded objects that would be served from a

10  separate image server in this scenario, there's no

11  limitation in this patent on what size those would be.

12  It does not say GIF files as long as they're not

13  thumbnails.

14          So, at any rate, this just shows that the

15  technology that Girafa claims to have come up with was

16  already in use, already known, prior to their filing their

17  provisional patent application, and the way Girafa has

18  implemented it is they've taken known technology,

19  implemented it in predictable ways to get predictable

20  results.

21          And this is in your materials.  I'm not going

22  to go through it.  This is just comparing Leighton and

23  Figure 2 from Girafa's patent showing the similarity of the

24  request of the web page and then the request for the images

25  in different servers being provided to a user.

1           Now, one thing that -- Girafa claims, to be on

2    the verge of closing its doors.  And Mr. Pasternak talked

3    about Girafa reinventing themselves, going after a different

4    customer base.  And the other night, as a lark, I was just

5    goofing around on the Internet and I decided to go to

6    Girafa's website and just look around.  And when I clicked

7    on this company tab, a little pull-down comes down, and one

8    with of them says "Jobs."  And I clicked on it for the heck

9    of it, and what I found is that Girafa is seeking two

10   high-level employees:  A developer for their software

11   development team and a senior software engineer, with a lot

12   of experience required for these jobs.

13           It sounds a little odd that a company that's

14   about to close its doors is seeking to hire high-level

15   employees, who would probably command significant salaries.

16   So I just wanted to point that out.  It's on Girafa's web

17   page.  They have to know about it.

18           So with that, with the overall showing of the

19   absence of irreparable harm and the substantial questions of

20   validity that have been brought up, our noninfringement

21   arguments, the massive issues with claim construction, some

22   of the defendants have not even been heard on that yet,

23   there are a number of reasons to deny this motion.

24           And before I close, I would just simply say

25   that, to the extent that Girafa might argue that Snap

1    presented its own invalidity arguments because it disagreed

2    with Professor Hardin, that's false.  He was a joint expert

3    for both of us.  We agree with him.  There are certain

4    things that came up at the last minute that we need to get

5    in our brief that Professor Hardin couldn't get in his

6    report, and we put them in there and so be it.  But we

7    affirm what we did.

8            So with that, I don't think there's anything

9    else.  So thank you very much.

10           THE COURT:  All right:  Thank you.

11           MR. RABENA:  Your Honor, with the Court's

12    permission, could I address a few points?

13           THE COURT:  Well, I have two points I want you

14    to address and you may address a few of your own.

15           One, the issue about whether the irreparable

16    harm to which Girafa points, if, in fact, that was actually

17    caused by the defendants conduct.

18           And, second, the whole procedural problem of

19    going forward with claim construction, which I generally

20    only do once at the end of the case, without the full

21    participation of all the defendants, who would be bound by

22    that claim construction.

23           So those are the two issues I want you to

24    address and then you can address whatever you want to.

25           MR. RABENA:  Yes, your Honor.

 1          Let me address the claim construction issue

 2    first.

 3          First of all, claim construction is a rolling

 4    basis.  Courts very often have issued claim constructions,

 5    whether it be by summary judgment and then at trial --

 6          THE COURT:  It's not a rolling basis in my

 7    court.  This is a problem.  I've got too many cases.  I

 8    jump into a case once, generally, unless there are

 9    compelling reasons to do so.  I'm just saying that if

10    you're asking me to jump into claim construction now, I do

11    not believe that it is appropriate to do so without having

12    the best views of all the parties who would be bound by

13    that, because I am not going to change my mind after this.

14    That's a problem with doing claim construction early on.

15          MR. RABENA:  First, one point is that the

16    defendants, the other defendants in this case, have, in

17    fact, participated.  They've attended every deposition and

18    they have asked questions of every witness in this case.

19          The issues that the Court needs to resolve

20    for the issue of infringement and invalidity are very

21    narrow.  There are two claim construction issues that

22    need to be -- that are in dispute that need to be resolved.

23    And they're very narrow and very simple, and I submit

24    that they don't -- it's not a significant impact to the

25    other defendant.  We have never heard any issues raised

1  by that.

2           The harm by defendants, the harm that you asked

3  the question about, the harm --

4           THE COURT:  Yes.  What evidence is there of

5  record that you have argued or presented otherwise that

6  the harm that you allege your clients is suffering was

7  actually caused by the conduct of these defendants?

8           MR. RABENA:  Well, that's a very good question.

9  In fact, Mr. Cislo misspoke.  He said that there's no

10  evidence that any actual customer went to Snap instead

11  Girafa.  And I will put one example up.

12           Ran Exhibit 6 in Girafa's opening paper is an

13  e-mail from a gentleman at Compete.com, where responding to

14  an inquiry from Girafa, it says, "Hi, Shirli.  Thanks for

15  reaching out.  We already have a relationship in place with

16  Snap.  If that changes, I'll contact you."

17           There's one company.

18           THE COURT:  But that was before you filed

19  suit, before there was any issue about whether -- I mean, I

20  guess -- all right.  That is before you filed suit; is that

21  correct?

22           MR. RABENA:  That is.  That's August 2007.

23           THE COURT:  All right.

24           MR. RABENA:  We don't have discovery yet at

25  this stage of the customer base that the defendants have,

1   so we cannot tell if any of them were previous customers

2   of ours.  But the point is, Girafa's view, Girafa should

3   be the exclusive third-party provider.  So any customer

4   that the defendants are supplying to, if the patent was

5   enforced, that customer would have no choice but to come to

6   us.

7              THE COURT:  Well, that's an argument that every

8   patentee can make.

9              MR. RABENA:  Not necessarily, your Honor.

10             THE COURT:  Well, if they're in the market --

11             MR. RABENA:  Right.

12             THE COURT:   -- they can make it.

13             MR. RABENA:  Right.

14             THE COURT:  So that's not necessarily a

15  compelling reason for me to want to grant Girafa this

16  extraordinary relief.  It would be more compelling if, and

17  certainly, I would think, you might not know who prospective

18  customers might be, but you would certainly know what

19  customers you lost.  That's entirely within your realm of

20  information.

21             And my question is, aside from these large

22  customers who I assume, I believe I understand, you did not

23  lose them to your competitors, they simply didn't provide

24  the service any longer, I guess the question is, is there

25  any information of record that indicates that Girafa has

```
 1    lost customers to your competitors?  To these competitors,

 2    to these defendants?

 3              MR. RABENA:  The Compete.com is the one that we

 4    have evidence of at this stage.  We don't have the discovery

 5    of who the other customers of the defendants are, so we

 6    can't tell at this stage whether the ones that we've lost

 7    have gone to the other defendants.

 8              THE COURT:  And where do I find this

 9    information?

10              MR. RABENA:  Compete.com?  That's in Ran

11    Exhibit 6 to Girafa's opening brief.

12              THE COURT:  Okay.  All right.

13              MR. RABENA:  A couple of minor points.

14              One, Mr. Pasternak said that we never accused

15    their business of providing thumbnails to others of

16    infringement and that's not right.

17              On Page 19 of our opening brief, we said that

18    Amazon uses its Alexa.com website to showcase its thumbnail

19    technology for search results.  The Amazon defendants also

20    sell access to thumbnail images to other website owners as

21    well as the source code so that the customer can use the

22    thumbnails in a manner that infringes these claims.

23              Once a customer installs the Amazon defendant's

24    source code, the customer's website will dismay thumbnails,

25    as does the Alexa website.
```

1            So the infringement proof, we used Alexa.com to

2    go through the claim charts and show that there's

3    infringement, and then Dr. Myers says, when Amazon and Alexa

4    provide thumbnails to third-party companies, they do it in

5    the same way, so that's the direct infringement proof.

6            Mr. Pasternak also argued that it takes a user

7    to infringe and there can't be a direct infringement because

8    we have not accused any user of infringement, and that's not

9    true either, because the claims say providing to a user.

10   It's the provider that does the direct infringement and

11   that's the defendant we have here.

12           Girafa was accused a number of times of changing

13   the claim construction, and that's not true either.  There

14   is nothing that the defendants pointed to, and they can't

15   point to, that shows a different claim construction taken

16   during the course of these proceedings.  We have been

17   consistent throughout and the allegations are unsupported.

18           One final point on the quote from the newspaper,

19   that Shirli Ran was quoted of saying there was an obvious

20   need.  That's exactly right.  There was a long-felt need

21   that people knew about.  And the inventor's view of

22   something, whether it's obvious, first of all, is

23   irrelevant.  What's obvious to an inventor is not the

24   standard of obvious to one of ordinary skill, because an

25   inventor is at a higher level.

1                   She didn't say the invention was obvious.  She

2       said it was an obvious need, and that's what we've been

3       saying all along:  There was a long-felt need for this

4       problem, and it was Shirli Ran and her co-inventors that

5       solved it.

6                   Finally, back to irreparable harm.  We heard

7       some case law from Mr. Pasternak, but what he didn't mention

8       was the case law that we have cited in our brief, where the

9       Federal Circuit -- this is on Page 33 of our brief -- the

10      Federal Circuit has consistently held that a district court

11      should presume that a patent owner will be irreparably

12      harmed when it establishes a strong likelihood of a valid

13      and enforceable patent.  That's from the Pfizer case.  And

14      the eBay case says, irreparable harm is more likely when the

15      patentee also sells a product.  And that's the situation we

16      have here.

17                  Unless you have further questions, your Honor, I

18      have nothing else.

19                  THE COURT:  I do not.

20                  Our resources on stretched.  I will try to get

21      something out.  I suspect I don't need two copies, because I

22      suspect that I will be doing this, not a law clerk, because

23      my law clerks are involved in other matters.  So rather than

24      make me feel guilty about wasting paper, I'm going to make

25      you feel guilty about wasting paper, and I'm going to give

1    you back your second copies of all of this.  I will try to

2    get something out as soon as I can.

3              So let me get out of my computer.  You all go

4    home.  Thank you very much, and let me give you back some

5    paper.  I will just leave it here for you to gather.  And I

6    appreciate your time and patience today.

7              (Counsel respond, "Thank you, your Honor.")

8              (Court recessed at 12:41 p.m.)

9                          -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25