# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GIRAFA.COM, INC., | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 07-787-SLR |
| SMARTDEVIL INC., | ) |
| Defendant. | ) |

## MOTION TO SET ASIDE DEFAULT ORDER AND RELIEVE JUDGMENT

## I. INTRODUCTION

Defendant Smartdevil Inc. ("Smartdevil") respectfully submits this request to the Court to set aside its Default Order and relieve Judgment against Smartdevil, under Fed. R. Civ. P. 60(b), on the grounds of:

    a. the judgment has been satisfied;

    b. plaintiff's complaint was improperly served to defendant;

    c. misrepresentation by plaintiff Girafa.com Inc. ("Girafa").

## II. FACTUAL BACKGROUND

On April 14, 2008, Girafa moved for entry of Default Judgment against Smartdevil. On April 15, 2008, in a letter to the Court, Smartdevil requested that the Court set aside the default judgment because it could not afford attorney representation to defend itself. (D.I. 68). On April

21, 2008, the Court granted Girafa's motion for a default of appearance against Smartdevil, but reserved the entry of a default judgement against a foreign entity until the resolution of the case is resolved with the other defendants. (D.I. 67). On January 27, 2010, Smartdevil submitted additional financial evidence in a letter to the Court demonstrating defendant's inability to afford attorney representation even until today. (D.I. 459). Your Honour, I apologize if this motion does not conform to the convention of the Court.

As the defendant recently learned, Rule 55(c) of the Federal Rules of Civil Procedure provides that "[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Rule 60(b) in turn permits the court to relieve a party from a final judgment for "any ... reason that justifies relief."

## A. Judgment has been satisfied

On September 25, 2009, having heard arguments and new evidence from counsel of the other defendants on the issue of claim construction, this Court has already concluded that claims 1 and 18 of the U.S. Patent No. 6,864,904 (the '904 patent) are invalid for indefiniteness. Furthermore, this Court has ruled that "infringement by these products necessite requires multiple parties's participation. That is, defendants perform at least one step of the claimed methods, while the users must facilitate at least the "providing" step by their own actions. The law of divided infringement, in these instances, does prohibit infringement by defendants". Smartdevil does not infringe on the '904 patent because it has no control over how users perform one of the steps of

the claimed methods.

## B. Plaintiff's summon and complaint was improperly served to defendant.

Defendant moves to set aside that entry of default and default judgment, arguing that the complaint was improperly served on December 10, 2007 at 7:45 a.m in accordance to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters under Fed. R. Civ. P. 4(h)(2) and 4(f)(1).

1. The <u>Return of Service Under Oath of Office, Affidavit of Service</u> shows the original complaint was served to a non-existent individual named "STEPHANE LIM". (D.I. 14). There is no individual named "STEPHANE LIM" who resides at the address or represents the company. The mistaken name is evidence that the plaintiff and Bailiff were disregardful and injudicious in the serving process.

2. Under Fed. R. Civ. P. 4(h)(2) and 4(f)(1) requires that service of a summons on a party residing outside of the country complies with the Hague Convention. The Quebec law for service abroad explicitly requires all "[r]equests for the service in Québec of judicial or extrajudicial documents under the Hague Convention must be sent to the Central Authority for Québec." (APPENDIX A.1).

Smartdevil has obtained verbal confirmation from Central Authority for Quebec that Girafa did not employ the Central Authority for Quebec in serving the summons and complaint to Smartdevil. (APPENDIX A.4). A key purpose of the Central Authority is to validate and reject

identity errors like "STEPHANE LIM" instead of "Stephen Lim" in the service of process. Furthermore, "[u]nder a reservation made by Québec pursuant to the third paragraph of article 5 of the Hague Convention, a French translation of documents which commence actions is required." (APPENDIX A.3). Smartdevil, without its consent, never received any judicial document in French from Girafa.

3. The 2156 Rousseau, Montreal, Quebec, Canada destination is the business address and address of a multi-family residential building. The Bailiff incorrectly served the complaint to a random household tenant, who is neither an employee nor owner nor a "person in charge" nor a representative of the company; and collected the wrong signature from that individual who is neither "STEPHANE LIM" nor "Stephen Lim".

Under Article 5(1)(2) of the Hague Convention for Quebec, Canada requires "[d]ocuments ... be served on a <u>legal person</u> at its head office, at one of its establishments in Quebec or at the establishment of its agent in the district where the cause of action arose, speaking to one of its <u>senior officers</u> or to a <u>person in charge</u> of the said establishment." (APPENDIX A.5). The Bailiff improperly served to neither senior officers of the company nor person in charge of the establishment.

Smartdevil hereby provides a Witness Affidavit that shows "Stephen Lim" was present at a different city location on the day and time of serving. (APPENDIX B). Furthermore, to help the Court validate the signature collected by the Bailiff, the defendant hereby submits the Signature Affidavit of "Stephen Lim" (APPENDIX C). If the Court should require Girafa to release the

original and unaltered receipt of the signature returned by the Bailiff, it would become evidently clear that the collected signature will not match the signature provided in the Signature Affidavit.

In Thompson v. Mattleman, Greenberg, Shmerelson, Weinroth & Miller, No. Civ. A. 93-2290, 1995 WL 321898, at *4-5 (E.D. Pa. May 26, 1995) the Court ruled that because the record was "[l]acking any evidence that the person served had either a direct connection to defendant . . . or made any representation of authority to receive service to plaintiff's servers, I must conclude that plaintiff failed to properly serve these two defendants," even where defendants had actual knowledge.

Smartdevil has provided evidence that the complaint was improperly served, and as a result, defendant lost precious defense time and is urging the Court to set aside the entry of default and default judgment.

## C. Misrepresentation by plaintiff Girafa

Girafa has, along the way, misrepresented claims to purposely mislead the Court to show that Smartdevil has been acting in bad faith.

On January 22, 2010, Girafa's Motion for Final Default Judgment against Smartdevil raised several accusations using text quotes that are undated or taken out of its context from Smartdevil's Web site to mislead the Court. (D.I. 451). On January 27, 2010, Smartdevil responded in a letter to the Court counter arguing each of the accusations point by point with

factual events and evidence that are available in public archive shamefully revealing Girafa's dishonesty. (D.I. 459 under points 5, 6, 7 and 8).

On February 8, 2010, Girafa's "Reply In Support of Its Motion For Entry of Default Judgment Against Smartdevil Inc" continues to make unwarranted claims that Smartdevil is acting in bad faith to purposely harm Girafa. (D.I. 461).

Girafa states "because Smartdevil has no intention of stopping its infringement until the Court orders it to stop...as it purportedly loses money or at best breaks even on its Thumbshot sales". Yet, Girafa contradicts itself by stating that Smartdevil "ha[s] been intentionally designed to take business away from Girafa". It's difficult to imagine any company can purposefully lose or break even for so many straight years. The motive does not match the accused action that Smartdevil "ha[s] been intentionally designed to take business away from Girafa". A more likely explanation is Smartdevil's product and business model are different and unique from Girafa's, and hence, so are the sales figures.

Girafa asserts that it "is being harmed by Smartdevil's continued infringement, regardless of whether Smartdevil makes a profit on every infringement or gives some of its Thumbnails away for free at a loss leader for other sales". This statement contradicts what Miss Ran said in her interview: "In the meantime, competitors have inevitably emerged. In the past six months, says Ran, a number of new firms have moved into this field, and an increasing number of search engines are beginning to display thumbnail images. "It's a good thing," she asserts. "It means the service is out there and that thumbnails are something that will become an integral part of search

tools. ... We are the only ones providing service to big customers and we've been doing it for several years," ... Despite the increasing competition, Ran says she is not concerned that Girafa may lose its position in the market." (APPENDIX D). Once again Girafa's accusation contradicts its own COO's statements, with its goal to discredit Smartdevil.

Your Honour, regarding the provision of free service on the Internet, we would like to submit an article that clearly describes the "Freemium" business model for most Internet companies such as Google, Youtube and Facebook. (http://www.wired.com/techbiz/it/magazine/16-03/ff_free?currentPage=1)

The only reason Smartdevil continues to do what we do, your Honour, is because both the owners of Smartdevil have put in so much of their time, effort and money, without any big venture or private investors. We are passionate about our business and product. We are passionate about serving our clients.

## III. CONCLUSION

For the reasons stated above, Smartdevil respectfully requests the Court to set aside this entry of Default and Default Judgment.

DEFENDANT(S)

[signature]

STEPHEN LIM

Dated: March 3, 2010

## CERTIFICATE OF SERVICE

In support of a **MOTION TO SET ASIDE DEFAULT ORDER AND RELIEVE JUDGEMENT** dated March 3, 2010, Defendant(s) hereby certify that a copy of the attached Motion and Exhibits have been sent to the following counsel of record at the address indicated below and in the manner indicated:

| | |
|---|---|
| Steven J. Balick (sbalick@ashby-geddes.com) | VIA ELECTRONIC MAIL |
| John G. Day (jday@ashby-geddes.com) | VIA ELECTRONIC MAIL |
| Tiffany G. Lydon (tlydon@ashby-geddes.com) | VIA ELECTRONIC MAIL |
| William H. Mandir (wmandir@sughrue.com) | VIA ELECTRONIC MAIL |
| John F. Rabena (jrabena@sughrue.com) | VIA ELECTRONIC MAIL |
| Chandran B. Iyer (cbiyer@sughrue.com) | VIA ELECTRONIC MAIL |
| Shahrzad Poormosleh (spoormosleh@sughrue.com) | VIA ELECTRONIC MAIL |
| Ryan M. Corbett (rcorbett@sughrue.com) | VIA ELECTRONIC MAIL |

DEFENDANT(S)

*[signature]*

STEPHEN LIM

# APPENDIX A

1. "Requests for the service in Québec of judicial or extrajudicial documents under the Hague Convention must be sent to the Central Authority for Québec" (second paragraph of article 3 of the Hague Convention. See #2 below)

   http://www.justice.gouv.qc.ca/english/programmes/sneaje/quebec1-a.htm

2. Hague Convention

   http://www.hcch.net/index_en.php?act=conventions.text&cid=17

3. "Under a reservation made by Québec pursuant to the third paragraph of article 5 of the Hague Convention (#2 above), a French translation of documents **which commence actions** is required."

   http://www.justice.gouv.qc.ca/english/programmes/sneaje/traduction-a.htm

4. Central Authority for Québec

   The role of the Central Authorities in each contracting State is to receive and act on requests for service or notification originating from other contracting States.

   http://www.justice.gouv.qc.ca/english/programmes/sneaje/autorite-a.htm

5. "Documents may be served on a legal person at its head office, at one of its establishments in Quebec or at the establishment of its agent in the district where the cause of action arose, speaking to one of its senior officers or to a person in charge of the said establishment."

   http://www.hcch.net/index_en.php?act=authorities.details&aid=248

# APPENDIX B

6615 Corelli  
Brossard, Quebec  
J4Z 0C9 Canada

## AFFIDAVIT

Yue Ying Ma, the Undersigned Affiant, hereinafter "Affiant", on March 2, 2010 does hereby solemnly swear, declare, and state as follows:

1. Affiant is competent to state the matters set forth herewith.

2. Affiant has personal knowledge of the facts stated herein.

3. All the facts stated herein are true, correct, and complete to the best of Affiant's knowledge and understanding, and if called upon to testify as a witness Affiant shall so state.

### Plain Statement of Facts

4. Affiant is an inhabitant of Quebec, Canada.

5. On or about the hours of 7:00 A.M., Monday, December 10, 2007 to 8:30 A.M., Monday, December 10, 2007 Affiant witnessed Stephen Lim's at 1467 rue Palerme, Brossard, Quebec, Canada.

### Verification

6. The Undersigned Affiant, Yue Ying Ma, does herewith swear, declare, and affirm that Affiant issues this AFFIDAVIT with sincere intent, that Affiant is competent to state the matters set forth herein, that the contents are true, correct, and complete, admissible as evidence, and reasonable and just to the best of Affiant's knowledge.

YUE YING MA

Date: March 2, 2010

[Seal: Commissaire à l'assermentation — HARMELLE GAUTHIER — # 164 394 — Tous les — du Québec]

# APPENDIX C

6615 Corelli
Brossard, Quebec
J4Z 0C9 Canada

## AFFIDAVIT

Stephen Lim, the Undersigned Affiant, hereinafter "Affiant", on March 2, 2010 does hereby solemnly swear, declare, and state as follows:

1. Affiant is competent to state the matters set forth herewith.

2. Affiant has personal knowledge of the facts stated herein.

3. All the facts stated herein are true, correct, and complete to the best of Affiant's knowledge and understanding, and if called upon to testify as a witness Affiant shall so state.

### Plain Statement of Facts

4. Affiant is an inhabitant of Quebec, Canada.

5. The following signature is the legal signature in use of Stephen Lim:

    [signature]
    STEPHEN LIM

### Verification

6. The Undersigned Affiant, Stephen Lim, does herewith swear, declare, and affirm that Affiant issues this AFFIDAVIT with sincere intent, that Affiant is competent to state the matters set forth herein, that the contents are true, correct, and complete, admissible as evidence, and reasonable and just to the best of Affiant's knowledge.

[signature]
STEPHEN LIM
Date: March 2, 2010

[Seal: Commissaire à l'assermentation — HARMELLE GAUTHIER #164 394 — Tous les districts judiciaires du Québec]

[signature: Harmelle Gauthier]

# APPENDIX D

**IVC**

Print

**09/09/2004**
**Girafa.com gets the picture**

Shirli Ran, co-founder of start-up Girafa.com, says the company's technology, which allows Internet search engines to display thumbnail pictures of the sites in its directory, fills such an obvious need that it's a wonder no-one developed it before.
"It just struck me all of a sudden that there were no images for search results, and once we started thinking about it, it seemed very strange," says Ran, an attractive 31-year-old with curly brown hair.

Luckily for Ran and co-founder and CEO Eldad Barnoon, they were two of the first to identify the gap in the market, and after a few years of working round the clock have now managed to attract two heavyweight customers, Microsoft's MSN and America On Line. Today, Girafa is already profitable, and has annual revenues of several million dollars, a sum that is expected to rise dramatically in the wake of the AOL deal, which was signed in July.

Girafa's visualization solution, the Thumbnail Service, enables search engines and web directories to display not only links to sites that are called up in a search, but also a miniature image of the site itself. The technology enables users to identify sites visually, rather than just by the address, making the search process quicker and easier. Site images are updated regularly, enabling users to see if any changes have taken place.

"It's a much smarter way of navigating the Web," says Ran. "You can immediately get a feel for a site, and see whether it's serious, or whether it was created by a 10-year-old. You can also instantly identify whether it is a site you have visited before."

Ran says studies undertaken by the company show that the use of thumbnail pictures improves searches, increases repeat visits, and increases click-through rates by up to 300%. Users, it appears, are more likely to click on search results that display thumbnail images.

As a result, Girafa's solution enables search engines to increase their revenue from search pages, and at the same time improve the search experience for users.

The Girafa service, which costs search engines a monthly service fee according to the volume of images required on a site, is hosted on the start-up's servers, and integrates seamlessly with each site. Search engines choose how many images they want to display per page – MSN for example displays the six top sites on each search page, while Netscape displays the first three or four sponsored clicks.

The search engines can also decide if there are some site images they want to block – pornography for example.

Girafa has also developed a free toolbar which can be downloaded from the company's site. This enables users to see thumbnail images of any site automatically, and to display a thumbnail of their favorites.

"This is more of a technical showcase than something we actively promote," says Ran. Industry feedback from the toolbar has been great, she asserts.

Ran, who wears a T-Shirt that reads "Juicy Heiress," came up with the idea behind Girafa when she was working as an attorney in a law firm that specializes in computer law. She and Barnoon, a friend from university who also worked as a lawyer, both liked the idea and realized it had great potential. Ran gave up her job and began looking for a developer who could push the idea forward. After a protracted search in a market then at its peak, they finally joined forces with Yuval Yarom, the CTO and former VP of research at Memco Software.

There was no funding at the start, and initially it was just the three of them working alone. The hi-tech bubble burst in 2000, and the company's hunt for investment

suddenly became a great deal harder.

"It wasn't easy to get funds," admits Ran, who is now the company's COO. "The Internet was a dirty word, and most people didn't even realize why, which made it much harder to persuade them to invest." As a result, the company was unable to secure venture capital funds, and instead raised $1 million from angel investors. So far, this has been the only financial injection.

IN RETROSPECT, Ran believes the lack of VC money actually helped Girafa survive the past few difficult years.

"It allowed us to move fast and be very focused. We could make quick decisions and adapt rapidly. We didn't have a CEO in the US, or offices abroad, and that gave us breathing space," she says. "It was a great advantage. There were many companies that could not adapt as quickly, and they failed."

Girafa released its product toward the end of 2000, and began contacting potential customers. Like investment, sales were not easy. The Internet was still in disgrace, and Internet companies everywhere were closing.

"We would talk to a person at a company, and then a couple of days later find out he'd been fired," says Ran. "It was very hard to move forward with anything. Even now it takes a lot more persuasion than it did in the past. When we close a deal, however, it's solid."

Initially the company made a series of agreements with Israeli sites like Walla, YNet, Netvision, and Tapuz. In 2001, however, the company had its first real breakthrough when it signed an agreement with the MSN network.

Under the pact, Girafa's technology was made available to millions of MSN search users in the US, using the Microsoft Internet Explorer search panel. The company also maintains the MSN service, ensuring that images are up to date. For sites like CNN, this means updating the image every two hours. Others need only be refreshed every 30 days.
Ran admits that the company was surprised by MSN's commitment to Girafa, which was then still a young, virtually untried company.

"We expected things to fall through even up to the last minute," Ran admits. "But MSN knew our situation and liked our technology." MSN also gave the company a helping hand by providing it with strict milestones at every stage of development. The MSN deal proved a significant step forward for Girafa, validating the technology and enabling the start-up to start attracting other new customers. "Things were much easier after that," Ran acknowledges with a laugh.

The next substantial agreement came in July this year, when the company signed with AOL after lengthy negotiations. AOL, which has tens of millions of customers, tested the Girafa technology on its ICQ site one year ago, and then went on to integrate it into all its sites offering search engines, including AOL's instant messaging service, AIM; and the portals Netscape and Compuserve. Ran declines to reveal financial details of the deal, which is expected to double company revenue, but does admit that it "increased our revenue, that's for sure".

THE COMPANY is now in negotiations with a range of other search engines, and is already running trials for a number of them. If all goes well, Ran says she expects that Girafa will announce a number of new deals in the coming six months.

In the meantime, competitors have inevitably emerged. In the past six months, says Ran, a number of new firms have moved into this field, and an increasing number of search engines are beginning to display thumbnail images.

"It's a good thing," she asserts. "It means the service is out there and that thumbnails are something that will become an integral part of search tools."

Despite the increasing competition, Ran says she is not concerned that Girafa may lose its position in the market.

"We are the only ones providing service to big customers and we've been doing it for several years," she says. "Our service goes out to millions of web users every hour, and we provide everything that our large customers need." Nor is Ran concerned that a large Internet provider might move in.

"Most of them prefer to use our services rather than create the technology themselves," she says. "It takes a great deal of attention, manpower and time to maintain this service, and at the end of the day it costs them less simply to use our technology."

In future, Girafa anticipates rapid growth. The search engine industry is set to increase by more than 100% per annum, and Ran believes Girafa has much to offer in terms of increased revenues and enhanced customer satisfaction.

At present, Girafa's main focus is on the US, which is quicker to adopt new technologies.

The company is also examining the European market, however, and is in talks with some players there. Though Girafa has staff in the US, it still doesn't have offices there, and has no immediate plans to open any. The plan, says Ran, is to stay relatively small.

At present the company employs just 14, and is not looking for more. "We don't believe we need too many people to do the right thing," says Ran.

In the near future, the company is planning to introduce a new visualization product that will be suitable for the mobile telephone market.
In response to customer requests, it is also examining a smaller, cheaper version for small Internet sites that want to use just a few thumbnail images.

The company's key objective right now is to increase its exposure in the US, and to boost sales. It is also working on additional undisclosed products based on its core technology.

For Ran the past few years have been a rollercoaster. "When I look back, I have no idea when I made the decision to switch jobs from law to high-tech. It just started rolling," she explains. "I'm enjoying my work though. We made the right decisions at the right time, and undoubtedly luck also played a part. I believe that thumbnails will become an integral part of any Internet search. We will be happy to be there, and to provide it."

Source: Jerusalem Post, Nicky Blackburn

Privacy Policy